**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK-**
-----------------------------------------------------------------------------------------------X

**BUILDING AND REALTY INSTITUTE OF WESTCHESTER**
**AND PUTNAM COUNTIES, INC., APARTMENT OWNERS**
**ADVISORY COUNCIL, COOPERATIVE AND CONDOMINIUM**
**COUNCIL, STEPPING STONES ASSOCIATES, L.P., LISA DEROSA**
**AS PRINCIPAL OF STEPPING STONES ASSOCIATES, L.P.,**
**JEFFERSON HOUSE ASSOCIATES, LP; SHUB KARMAN, INC.,**
**DiLaRe, INC., PROPERTY MANAGEMENT ASSOCIATES**
**and NILSEN MANAGEMENT CO., INC.,**

                                                            **Plaintiffs,**

                        **v.**

**STATE OF NEW YORK, RUTHANNE VISNAUSKAS, IN HER OFFICIAL**
**CAPACITY AS COMMISSIONER OF NEW YORK STATE HOMES**
**AND COMMUNITY RENEWAL, DIVISION OF HOMES AND**
**COMMUNITY RENEWAL,**

                                                            **Defendants.**
-----------------------------------------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiffs Building And Realty Institute of Westchester And Putnam Counties, Inc., Apartment

Owners Advisory Council, Cooperative And Condominium Council, Stepping Stones Associates,

L.P., Lisa DeRosa, As Principal of  Stepping Stones Associates, L.P., Shub Karman, Inc.,

Jefferson House Associates, LP;  DiLaRe, Inc., Property Management Associates and Nilsen

Management Co., Inc.   (collectively referred to herein as the "Plaintiffs"), by their undersigned

attorneys, Finger & Finger, A Professional Corporation, for their Verified Complaint allege as

follows:

**NATURE OF THE ACTION**

    1.      This action challenges the constitutionality of the 2019 New York Housing

Stability and Tenant Protection Law (sometimes referred to herein as the HSTPA) as the successor

and amendment to the predecessor Emergency Tenant Protection Act (ETPA) that covers

1

approximately 25,000 rental apartments in Westchester County as well as approximately 500,000 other residences in the County whether apartment dwellings, cooperative apartments, single family condominium units or even single family dwellings in Westchester.

2.      The 2019 Housing Stability and Tenant Protection Act (HSTPA) violates the United States Constitution and the New York State Constitution. It is an arbitrary exercise of governmental power and is arbitrary and irrational and in violation of the Fourteenth Amendment's Due Process Clause as well as the Constitutional right prohibiting governmental interference with private contracts;; it effects a physical as well as regulatory taking of property in violation of the Constitution's Takings Clause; The HSTPA is therefore unconstitutional.

3.      The rent laws, as codified in several places, including Section 4 of chapter 576 of the laws of 1974 (constituting the ETPA), and are found in N.Y. UNCONSOL. LAW TIT. 23 §§ 8621 et seq. (McKinney).  The HSTPA was passed on June 14, 2019 and signed by the Governor and effective on or about June 14 and after some corrections, on June 25, 2019. The majority of the provisions of the law were effective immediately, but some are effective at various time until October, 2019. The ETPA was first effective in 1974 and built upon (and provided an alternative to) the rent control laws then in existence. The ETPA has been amended on multiple occasions, culminating in these most recent amendments, the HSTPA, which was enacted in June 2019. The HSTPA violates multiple provisions of the federal and state Constitutions. There can be no doubt that the HSTPA's irrationality and arbitrariness, and its web of restrictions overrides fundamental rights of property owners and impose unconstitutional burdens on property owners of pre-1974 buildings with six or more units (the "ETPA" threshold).

4.      The HSTPA's harmful effects are not limited to the group of multi-family rent regulated  property owners that are subject to its requirements. To the contrary, the law affects all property owners, including cooperatives, condominiums and single family residences.

.

**PARTIES**

5.      Plaintiff Building and Realty Institute of Westchester and Putnam Counties, Inc. ("BRI") is a not-for-profit trade association composed of over 1500 members, consisting of managing agents and property owners of both rent stabilized and non-rent stabilized properties in New York, over 300 cooperatives and condominium associations; builders, developers and remodelers. Among its basic functions, BRI advocates on behalf of its members before the Westchester County legislature; local city, town and village councils, the New York State Legislature, and State agencies, and is also affiliated with the New York State Builders Association.   It advocates on behalf of its members before the Westchester County Rent Guidelines Board and defendant State Division of Housing and Community Renewal, now known as Homes and Community Renewal, on an array of housing policy issues, including the issue of rent regulation. BRI also fills an informational and educational role, providing updates in the form of a monthly newsletter, Impact, 2 radio shows, seminars, and e-mails to its members relating to the requirements of State, County and local laws and regulations which impact upon the ownership and management of apartment buildings and housing in the County. In addition to a staff, BRI provides other services to its members—and sometimes to non-members—to assist in their efforts to comply with statutory and regulatory requirements, including, but not limited to, annual rent registrations with the State Division of Homes and Community Renewal.

advocating on such diverse issues as lead paint, property taxes, water rates, and rent regulation. AOAC provides its members with a variety of services, including advice relating to regulatory compliance and assistance to members who are facing legal challenges. AOAC advocates on behalf of its members at the local, City, County and State levels and provides regular updates on issues of importance to property owners.

7.      Plaintiff Cooperative and Condominium Council ('CCAC") is a component entity of the BRI, representing more than 150 cooperatives and condominiums in Westchester County. The BRI, and therefore, the CCAC, founded in 1946 has been a key participant in local,  County and State housing policy for over 50 years, educating, advising and advocating on such diverse issues as lead paint, property taxes, water rates, and rent regulation. CCAC provides its members with a variety of services, including advice relating to regulatory compliance and assistance to members who are facing legal challenges. CCAC advocates on behalf of its members at the local, City, County and State levels and provides regular updates on issues of importance to property owners.

8.      The following, some of whom are   Plaintiffs herein, are all residents of Westchester County and have been deprived of their constitutional rights and have been subject to a governmental taking as set forth below:

a.      Stepping Stones Associates, LP ('SS") is a resident of White Plains, County of Westchester, New York. SS owns a 248 unit residential apartment building located in White Plains, New York. Many of the unit are subject to ETPA and now also to the HSTPA. The property was built by and has been in the owner's family since 1974, and has owned it since. Lisa DeRosa, another plaintiff is a principal of Stepping Stones.

Plains, New York. Many of the unit are subject to ETPA and now also to the HSTPA. The property was built by and has been in the owner's family since 1974, and has owned it since. Lisa DeRosa, another plaintiff is a principal of Stepping Stones.

        b.     Jefferson House Associates is a family owned real estate business also, founded by David Bogdanoff who was one of the first and premier developers of affordable housing in Westchester County.  This Ossining building has approximately 240 apartments and virtually all are subject to HSTPA unless the landlord agrees to considerable restrictions and opts out of ETPA.

        c.     Shub Karman, Inc. is a small building with only 7 ETPA units.

        d.     Jeffrey Park III Ltd. LLC is a large apartment complex with over 200 units in Yonkers, many of which are still subject to ETPA and HSTPA

        e.     Broadlake Co. LP is a large apartment building in White Plains with many units subject to ETPA and HSTPA.

        f.     DiLaRe, Inc. is a family owned apartment building in Yonkers with 22 apartments, all of which are subject to ETPA and the HSTPA.

        g.     Nilsen Management Co., Inc. is the managing agent for 8 buildings in Yonkers, all of which have ETPA and HSTPA restricted apartments, and which therefor have a total rent roll that is over 8% under the market rent roll.

        h.     Property Management Associates which is the managing agent for a number of multi family rent regulated buildings in Westchester.

    10.     Defendant State of New York Homes and Community Renewal is the government entity given the responsibility by the state of New York to determine the existence of a housing emergency and to establish and implement rent stabilization.

11.     The State of New York is a public corporation which through its legislature and governor voted on, approved and signed the HSTPA that is being challenged herein.

12.     The Defendant Ruthanne Visnauskas is the Commissioner of the New York State Division of Housing and Community Renewal ("DHCR") now known as Homes and Community Renewal ("HCR"). HCR (through its Office of Rent Administration-ORA) oversees the administration of the two rent regulatory systems—rent stabilization and rent control—in the State of New York.  That administration includes but is not limited to the system for the annual registration of all ETPA apartments, the processing of major capital improvement rent increase applications by owners, the processing of overcharge, service and other complaints by tenants, administrative hearings arising from challenges by owners and tenants to the determinations of such applications and complaints, and the promulgation of regulations, policy statements, fact sheets and operational bulletins, writing, promulgating, supplementing and interpreting the State rent regulation statutes.


**JURISDICTION**

13.     This Court has personal jurisdiction over each Defendant in New York and in this judicial district because they each regularly transact business in this judicial district.

14.     This Complaint alleges that Defendants have violated Plaintiffs' rights protected by the United States Constitution. Accordingly, this Court has subject-matter jurisdiction under the Supremacy Clause of the United States Constitution, Art. VI, Clause 2, and 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs seek declaratory and equitable relief under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, and the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

**VENUE**

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims alleged herein have occurred, and will continue to occur, in this district, and because the properties that are the subject of this action are located in this district in Westchester County.

**STANDING**

16.     AOAC, CCAC and the BRI each have organizational standing to bring this claim. They each (i) have suffered and continue to suffer an imminent injury in fact to their organizations which are distinct and palpable; (ii) those injuries are fairly traceable to the HSTPA ; and (iii) a favorable decision would redress their injuries. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Ba*y, 868 F.3d 104, 109 (2d Cir. 2017).

17.     As a result of the HSTPA, the AOAC, CCAC and BRI have been forced to devote substantial time and resources to counsel their members about how to administer their properties under the law, how to abide by the maze of new requirements governing the owners properties subject to the HSTPA and how to react to the HSTPA's requirements.

18.     The AOAC and the BRI have participated in the Rent Guidelines Board process.

19.     Both BRI and AOAC as well as the CCAC have counseled their members regarding advocacy related to the HSTPA and BRI Executive Director Albert A. Annunziata testified at an Assembly Housing Committee hearing concerning the proposed modifications to the ETPA. Multiple submissions to the legislature were made and many members of the BRI and AOAC participated. The confusion, engendered by the HSTPA is substantial and there still are

many questions about the new legislation which impinges and impacts on the constitutional rights of all landlords and cooperatives.

20.      The time and money AOAC and the BRI and CCAC have spent helping  their members address the HSTPA has prevented them from spending those same resources assisting their members with other matters. This includes time and money that could be spent working on state, county and local legislative and regulatory issues, providing seminars for their  members, and researching and advocating for housing policies that benefit both owners and tenants. This expenditure of time and resources constitutes an organizational injury. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (equal housing non-profit would have organizational standing to challenge discriminatory policies that forced it to expend time and resources investigating instances of discrimination and providing counseling to victims); *Nnebe v. Daus*, 644 F.3d 147, 156–57 (2d Cir. 2011) (counseling just a few suspended taxi drivers a year would grant association of taxi workers organizational standing to challenge New York City's taxi driver suspension policy). Here, the BRI, AOAC and CCAC have been forced to take action and spend resources advising their members on compliance  with  the  HSTPA and have even had their chief counsel appear for three radio sessions explaining the law and answering listeners call in questions. This  burden  has  been  particularly  great  given  the  significance of  those changes to the ETPA and novel  legal questions that arise from these changes and among other things, these organizations  have  held  numerous  seminars  attended  by  members  explaining  the  HSTPA, answering questions and attempting to navigate through the morass of intended and unintended consequences of this Act. These organizational injuries would be remedied by the relief sought in this action.

21.     These organizations each have standing to challenge the HSTPA because their members are directly regulated by, and suffer injury as a result of the HSTPA, as demonstrated by their members who have appeared as Plaintiffs in this action.  Those members, along with other AOAC, CCAC and BRI members own property subject to the ETPA have been and continue to be subjected to an invasion of a legally protected interest that is concrete and particularized, actual or imminent and not conjectural or hypothetical, and that will be redressed by the injunctive and declaratory relief sought in this suit without the need for participation of all the affected individual members as plaintiffs. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992); *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).

**Multi Family Rent Regulated Monetary Losses To Westchester Multi Family Rent Regulated Landlords  As A Result Of The HSTPA Takings and Lack of Due Process**

22.     Plaintiff Stepping Stones, either directly or through its managing agent or principal(s) is a member of BRI, and has been since the 1970s and its then principal, John DeRosa, Sr., since 1946.  John DeRosa, and now his daughter Lisa DeRosa, and Stepping Stones joined BRI in order to take advantage of the educational benefits, advocacy, and support that BRI offers to property owners in Westchester County. Like other BRI members, Stepping Stones Associates owns a residential apartment building with units subject to the HSTPA, and has been injured as a direct result of the HSTPA. Among other things, Stepping Stones Associates has been forced to offer renewal leases to stabilized tenants at rental rates far below the market. The value of Stepping Stones Associates' property has been substantially diminished by the HSTPA. Lisa DeRosa has standing to sue in her own right as a principal of Stepping Stones.  Examples of the inequities in rents that are being charged and now cannot be increased due to the elimination of the vacancy increase as well as the IAI limitations are set forth as follows:

SOLITAIRE SEVEN ASSOCIATES
7 Lake Street, White Plains, New York

| Existing Rent | | Market Rent | Existing Rent as a % of Market Rent |
|---|---|---|---|
| $1,376.09 | 1 | 2,025.00 | 67% |
| 955.19 | 1 | 1,625.00 | 58% |
| 1,467.85 | 1 | 1,875.00 | 74% |
| 864.77 | 1 | 1,625.00 | 53% |
| 1,163.00 | 1 | 1,625.00 | 71% |

NORTH LAKE ASSOCIATES
15 Lake Street, White Plains, New York

| Apt.# | Type of Apt. | Existing Rent | Market Rent | Existing Rent as a % of Market Rent |
|---|---|---|---|---|
| 1-A | Studio | 976.01 | 1,550.00 | 62.97% |
| 1-E | One BR + | 1,535.00 | 1,850.00 | 82.97% |
| 1-F | One BR + | 855.09 | 1,850.00 | 46.22% |
| 1-J | One BR + | 1,235.29 | 1,850.00 | 66.77% |
| 3-D | Large 11 BR | 1,099.42 | 1,950.00 | 56.38% |
| 5-F | One BR + | 1,139.55 | 1,850.00 | 61.60% |

| Stepping Stones Associates | | | | |
|---|---|---|---|---|
| 125 Lake Street, White Plains | | | | |
| 11-A N | 2 BR 1 BA | 1,111.06 | 2,100.00 | 52.91% |
| 11-C N | One BR | 893.82 | 1,725.00 | 51.82% |
| 11-K S | One BR | 772.30 | 1,725.00 | 44.77% |
| 11-L S | Studio | 994.72 | 1,525.00 | 65.23% |
| 11-M S | One BR | 939.70 | 1,725.00 | 54.48% |
| 11-N N | 2 BR 1 BA | 1,404.32 | 2,100.00 | 66.87% |
| 12-A S | 2 BR 1 BA | 1,448.59 | 2,100.00 | 68.98% |
| 12-C S | One BR | 1,020.21 | 1,725.00 | 59.14% |
| 12-G S | 2 BR 2 BA | 1,087.31 | 2,100.00 | 51.78% |
| 4-D N | One BR | 1,234.12 | 1,725.00 | 71.54% |
| 4-G N | 2 BR 2 BA | 1,134.37 | 2,100.00 | 54.02% |
| 4-K N | One BR | 1,390.00 | 1,725.00 | 80.58% |
| 4-K S | One BR | 1,062.46 | 1,725.00 | 61.59% |
| 5-A S | 2 BR 1 BA | 1,414.54 | 2,100.00 | 67.36% |
| 5-B S | 2 BR 2 BA | 1,694.84 | 2,400.00 | 70.62% |

| 5-C N | One BR | 1,272.35 | 1,725.00 | 73.76% |
| 5-C S | One BR | 1,247.27 | 1,725.00 | 72.31% |
| 5-G S | 2 BR 2 BA | 1,025.97 | 2,400.00 | 42.75% |
| 5-N N | 2 BR 1 BA | 1,310.41 | 2,100.00 | 62.40% |
| 6-G S | 2 BR 2 BA | 1,575.30 | 2,400.00 | 65.64% |
| 7-H S | 2 BR 1 BA | 1,292.49 | 2,100.00 | 61.55% |
| 7-N S | 2 BR 1 BA | 1,125.89 | 2,100.00 | 53.61% |
| 8-B S | 2 BR 2 BA | 1,837.92 | 2,400.00 | 76.58% |
| 9-F N | One BR | 1,208.63 | 1,725.00 | 70.07% |
| 9-K N | One BR | 879.99 | 1,725.00 | 51.01% |
| 9-L N | Studio | 1,072.36 | 1,525.00 | 70.32% |
| 9-N S | 2 BR 1 BA | 1,181.47 | 2,100.00 | 56.26% |

23.     Plaintiff Jefferson Houses LLC is a limited liability companies owned and controlled by the Bogdanoff family, now Suzanne Bogdanoff, who have been members of AOAC, and BRI for over 30 years and were the prime and virtually only developer of affordable housing when that was in its infancy. The Bogdanoff family joined AOAC, and BRI in order to take advantage of the educational benefits, advocacy and support that these trade associations offer to property owners in Westchester County. Bogdanoff owns residential apartment buildings with units subject to the HSTPA, and has been injured as a direct result of the HSTPA, and as a matter of fact has been compelled to "opt out" of Ossining ETPA to its detriment to avoid the disastrous effects of the HSTPA.[1]  Among other things, Bogdanoff has been forced to offer leases to tenants in stabilized units at levels far below market rates and has only limited ability to recover the costs of repair and improvements. For several units, limits on rent increases and recoverable repair costs make continued rental of those units prohibitive. Once the current tenants vacate, those units may not be re-rented and instead may be left vacant, exactly what the

[1] The Village of Ossining passed ETPA in 2018 and in 2019 provided a mechanism for opting out of ETPA provided it, among other things, agreed to permanently delineate 20% of its apartments as "affordable," and also to file an agreement that would be recorded and burden the property for eternity.

legislation was not intended to foster. The value of Bogdanff's property has been substantially diminished as a result of the HSTPA. Bogdanoff has standing to sue in her own right. Examples of the rental inequities in Jefferson House are as follows:

JEFFERSON HOUSE ASSOCIATES (240 Units)

Examples of:

| ETPA RENT | # UNITS | MARKET RENT RANGE |
|---|---|---|
| $  850.00 | 1 | $1204-$1625 |
| 875.00 | 1 | 1204- 1625 |
| 1,050.00 | 10 | 1204- 1625 |
| 1,075.00 | 5 | 1204-  1625 |
| 1.100.00 | 17 | 1204- 1625 |
| 1,110.00 | 1 | 1204- 1625 |
| 1,125.00 | 5 | 1204- 1625 |
| 1,150.00 | 6 | 1204- 1625 |
| 1,175.00 | 1 | 1204- 1625 |
| 1,300.00* | 1 | 1400- 1625 |

*$12,074.90 spent on renovations which are limited in terms of return.

24.     Plaintiff Nilsen Management Co., Inc. manages 8 buildings in Yonkers, all with ETPA tenants and ranging in size from 10 units to 79 units. Examples of the disparity between actual rent and market rent is as follows:

| HSTPA-2019-Differences Between Market and Regulated Monthly Rents in Regulated Apts. | | | | | | |
|---|---|---|---|---|---|---|
| Building | Apartment | Apartment Size | Current Rent | Market Rent* | Difference | Rent as % of Market Rent |
| 201 North Broadway | | | | | | |
| | 2N | 7 rooms | $1,057.00 | $2,390.00 | $1,333.00 | 44.23% |
| 190 Palisade Ave. | | | | | | |
| | 3F | 3 rooms | $715.00 | $1,350.00 | $635.00 | 52.96% |
| | 4A | 4 rooms | $1,014.21 | $1,750.00 | $735.79 | 57.95% |
| | 4F | 3 rooms | $1,037.38 | $1,350.00 | $312.62 | 76.84% |
| | 6C | 3 rooms | $707.55 | $1,350.00 | $642.45 | 52.41% |
| 383 Warburton Ave. | | | | | | |
| | 1A | 3 rooms | $993.99 | $1,350.00 | $356.01 | 73.63% |
| | 2F | 3 rooms | $960.00 | $1,350.00 | $390.00 | 71.11% |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | 4D | 3 rooms | $631.00 | $1,350.00 | $719.00 | 46.74% |
|  | 35G | 5 rooms | $1,289.00 | $2,200.00 | $911.00 | 58.59% |
| **110 Morris Purser** |  |  |  |  |  |  |
|  | 4B10 | 4 rooms | $1,188.02 | $1,750.00 | $561.98 | 67.89% |
|  | 3B 24 | 4 rooms | $877.59 | $1,750.00 | $872.41 | 50.15% |
|  | 5C 28 | 5 rooms | $1,485.52 | $1,880.00 | $394.48 |  |
| **227 Palisade Ave.** |  |  |  |  |  |  |
|  | 1E | 3 rooms | $1,024.00 | $1,450.00 | $426.00 | 70.62% |
|  | 2B | 3 rooms | $676.83 | $1,450.00 | $773.17 | 46.68% |
|  | 2J | 3 rooms | $646.00 | $1,450.00 | $804.00 | 44.55% |
| **7 Highland Place** |  |  |  |  |  |  |
|  | 2A | 5 rooms | $976.89 | $2,350.00 | $1,373.11 | 41.57% |
|  | 2D | 4 rooms | $1,283.14 | $2,000.00 | $716.86 | 64.16% |
|  | 2F | 5 rooms | $1,238.66 | $2,350.00 | $1,111.34 | 52.71% |
|  | 2G | 3 rooms | $1,275.00 | $1,450.00 | $175.00 | 87.93% |
|  | 2H | 4 rooms | $1,329.04 | $2,000.00 | $670.96 | 66.45% |
|  | 3A | 5 rooms | $1,074.41 | $2,350.00 | $1,275.59 | 45.72% |
|  | 3C | 3 rooms | $1,091.60 | $1,450.00 | $358.40 | 75.28% |
|  | 4H | 4 rooms | $1,418.41 | $2,000.00 | $581.59 | 70.92% |
|  | 5H | 4 rooms | $928.57 | $2,000.00 | $1,071.43 | 46.43% |
|  | 6H | 4 rooms | $1,230.26 | $2,000.00 | $769.74 | 61.51% |
|  |  |  |  |  |  |  |
| **265 North Broadway** |  |  |  |  |  |  |
|  | 1K | 5 rooms | $1,386.09 | $2,200.00 | $813.91 | 63.00% |
|  | 2B | 4 rooms | $1,650.00 | $2,000.00 | $350.00 | 82.50% |
|  | 2C | 5 rooms | $1,457.49 | $2,200.00 | $742.51 | 66.25% |
|  | 2D | 5 rooms | $734.92 | $2,200.00 | $1,465.08 | 33.41% |
|  | 2G | 5 rooms | $911.22 | $2,200.00 | $1,288.78 | 41.42% |
|  | 2H | 5 rooms | $1,803.16 | $2,200.00 | $396.84 | 81.96% |
|  | 2K | 5 rooms | $1,190.50 | $2,200.00 | $1,009.50 | 54.11% |
|  | 3G | 5 rooms | $1,280.47 | $2,200.00 | $919.53 | 58.20% |
|  | 4B | 3 rooms | 1055.67 | $1,500.00 | $444.33 | 70.38% |
|  | 5J | 3 rooms | $796.20 | $1,500.00 | $703.80 | 53.08% |
|  | 7E | 3 rooms | $753.11 | $1,500.00 | $746.89 | 50.21% |
|  | 7H | 5 rooms | $947.60 | $2,200.00 | $1,252.40 | 43.07% |
|  | 7K | 5 rooms | $1,455.88 | $2,200.00 | $744.12 | 66.18% |
|  |  |  |  |  |  |  |

| Building & Apt. # | ETPA RENT | MARKET RENT | DISPARITY | RENT AS A % OF MARKET RENT |
|---|---|---|---|---|
| 227 Palisade | | | | |
| 2A | 976. | 2,350. | 1,373. | 41.54% |
| 2D | 1,283. | 2,000. | 716. | 64.15% |
| 2F | 1,238. | 2,350. | 1,111. | 53.69% |
| 2H | 1,329. | 2.000. | 670. | 66.45% |
| 3A | 1,074. | 2,350. | 1,275. | 45.74% |
| 3C | 1,091. | 1,450. | 358. | 75.31% |
| 4H | 1,418. | 2,000. | 581. | 70.95% |
| 5H | 938. | 2,000. | 1,071. | 53.55% |
| 6H | 1,230. | 2,000. | 769. | 61.55% |

25.     Plaintiff Shub Karman has a building with ETPA units.  One 2 bedroom apartment was recently rented for $1,721 per month, however the mirror image of that unit is now renting for $1,227, approximately $500 less than market rent with no hope of an increase.  In addition, due to the court delays that are now increased, this landlord lost approximately $12,000, and a second large loss from a tenant who "played" the Order to Show Cause system, causing the landlord to lose $7000 last year.  These are practical consequences of the delays inherent with the HSTPA changes to the Real Property Law.

26.     Plaintiff DiLaRe, Inc. is the owner of a 22 unit building, all subject to ETPA and HSTPA, has rents that vary from $931.22 for an apartment with a market rent of $1,525 (with loss differential of $593.) to a maximum of $1,479. The total % loss between current rent and market rents is 12.6%, with it being now virtually impossible to raise the rent on vacancies due to HSTPA making the lost rent permanent and growing. Another Landlord (Emerick Gross Real Estate, LP) in White Plains, has provided examples of the disparity between the actual rents and market rents: The Market rents are $1750 to $1850 for studios; $1900 to $2100 for one bedroom apartments and $2250 to $2500 for 2 bedroom apartments.  Examples of substantially lower actual rents are: $818, 920, 1011, 1029, 1081 and 1570 for the studios; $1302, 1336, 1421, 1540 and 1631 for the one bedroom apartments and $1252 and 1365 for 2 bedroom apartments, all of which are substantially

under the market rent for each and now impossible to ever reach the market rate with no vacancy increases allowed.

27.      Sheridan Gardens LLC has 58 apartments in two buildings in which over a third have been renovated.  These renovations were done with the ability to raise the rents pursuant to IAIs and thereby benefit both the landlord and the incoming tenants, who came into a virtually "new" apartment.   In addition, the Landlord recently installed new windows throughout the building which was both an upgrade and maintenance of the whole building – to all residents benefits.  This expenditure of over $200,000 would have resulted in a 15% increase for all new windows- that everyone benefits from.  Now, although expecting that increase, the landlord is limited to 2% per year, which barely covers the financing costs of the windows, without even considering the basic cost.  This is an interference with the basic investment back expectations and moreover, hamstrings a landlord who wants to not only keep his building up to prime standards, but maintaining the building as a first class residence.  That will not happen in the future with a limited 2% a year increase that is ultimately reduced back to zero. Examples of the lower than reasonable rents in the building are rents at $662; $661; $732; $920; $930; $783. and $ 661 in one building and $766; $500; $616; $807; $664; 698; and $848. In the other building. That means that almost 25% of the apartments have abnormally low rents that will now  be set in stone, and be permanent with no real hope of raising them.

28.      Other examples of the disparity between actual rent and market rent abound.  In Jeffrey Park, a large apartment complex in Yonkers, 2 examples are (1) Studio – tenant vacated after moving in in 1971. The Apartment needed over $10,000 in renovations which would have allowed $166.66.  Now, not only is there a limitation, but with the lack of a vacancy increase or real IAI, the rent will remain very close to the $518.48 where it was at, not the market rate of

15

$1,200, an amount less than 50% of the market rent.  Another apartment in the same complex show the even greater disparity with a 2 bedroom apartment where the tenant vacated after living thee 20 years. That apartment needs substantial work totaling approximately $16,000 that would have resulted in this 2 bedroom with  full second bath being rented at approximately $1,500 with the renovation costs being reimbursed at the old rate and the market being at $2,400.  However, with another vacancy, this apartment could have anticipated a rental more in line with its value.  Finally, in a White Plains building owned by the same principals, a 2 bedroom and 2 bath apartment, occupied since 1974,  The renovation cost was approximately $22,000 resulting, with the vacancy increase, with a rent of approximately $1,600, still below the market of $2,400, but certainly better than the rent of approximately $1,200, about one half of the market rent.

29.    In another White Plains multi family building, the market calls for rents as follows:

| RENT | MARKET RENT |
|---|---|
| APT 1D- STUDIO- $1,570 | $1,750 - $1,850 |
| APT 1F- 1 BED- $1,336 | 1,900 -  2,100 |
| APT 1i- studio $1421.67   (just renovated for $15,000) | 1,750 -  1,850. |
| APT 1K -studio- $920.43 | 1,750 -  1,850 |
| APT 1M-studio- $1029.01 | 1,750 -  1,850 |
| APT 2D- 1 BED- $1631.24 | 1,900 -  2,100 |
| APT2F- 2 BED- $1,365.87  **** | 2,250-  2,500 |
| APT 2H- 1BED-$1302.25 | 1,900-  2,100 |
| APT 4C- 1 BED- $1,540.21 | 1.900-  2.100 |
| Apt 4G-studio-$1,011.05 | 1,750 -  1,850 |
| APT 4i- studio- $818.90 | 1,750 -  1,850 |
| APT 4M- STUDIO- $1081.79 | 1,750 -  1,850 |
| APT 5L- 2 BED-$1,252.51 | 2,250 -  2,500 |

30.    One example in Drake Manor in New Rochelle is a 2 bedroom; 2 bathroom apartment with water views and a terrace that just rented for approximately $1000 when prior to June 14th it would have rented for about double that amount.

16

31.     Another Owner-Landlord, with buildings operated by Property Management Associates, is a family owned multi-family regulated housing business, is the DeFeo family. Among other expenditures are the following, in approximate numbers for the cost:

Balcony Restoration:   $350,000.
New windows:               60,000.
New Elevator:               90,000.
New Sidewalks:              30,000. (second location)
New roof, windows and glass sliders:$110,000.
New roof at a second location:  $120,000.

This Landlord has made extensive building and apartment renovations with the reasonable expectation of receiving the MCIs that were formerly granted, i.e., the full IAI and the MCIs up to 15% year reimbursed. It has now advised that with the lack of appropriate reimbursement, there will not be any more apartment renovations and only "old" apartments will re-rented; and no more efficiency upgrades, such as new heat and water boilers, a blow to energy efficiency.

32.     With all these landlords, there are multiple losers:

a.     the Landlord owners of these rent regulated multi family buildings who are losing their reasonable monetary and investment expectations and return  as well as reasonable rents and reasonable reimbursement for the building expenditures;

b.     The new Tenants who will have lost the ability to rent newly renovated apartments;

c.     The existing tenants whose buildings will deteriorate and not receive the capital improvements that are necessary in the 21st Century, leading to a repeat of the situation as it existed in the Bronx in the 1970s and now exists with the New York City Housing Authority;

d.     The local municipalities which will lose tax revenues due to the lower assessed value of these deteriorating and aging buildings and will have to give larger refunds of taxes;

e.      The single family homeowners in a community and small business owners who will have to make up the lost tax revenues;

f.      The local contractors, many of whom are minorities, who will lose the work as to the IAIs and the MCIs;

g.      Society, which will lose the upgrades to the buildings that will benefit the environment.

33.      Many of the Plaintiffs above named have been members of AOAC, and BRI for over 30 years. All own residential apartment buildings with units subject to the HSTPA and have been injured as a direct result of the HSTPA. Among other things, each has been forced to rent units at levels far below market rates, often to strangers who claim "succession" rights to occupy stabilized units decades after the original tenant took occupancy. They have limited or no ability to oust these strangers from their property. The value of each of these properties have been substantially diminished as a result of the HSTPA. They each have standing to sue in their own right.

**BACKGROUND**

**HISTORY OF THE NEW YORK TENANT PROTECTION LAWS**

34.      There are two different systems that operate in Westchester County to regulate the relationship between property owners and tenants, regardless of the tenant's income or wealth: rent control and rent stabilization under the ETPA and as amended in 2019 by the HSTPA.  In 1974, New York State passed the Emergency Tenant Protection Act, referring to apartment housing of 6

or more units that were constructed prior to January 1, 1974.[2]   The Court of Appeals thus, in *Manocherian*, recognized the value of the vacancy and other rent increases. ETPA did not replace the old Rent Control laws, but actually supplemented them, leaving 2 sets of rent regulatory statutes applicable to apartment housing in Westchester County. The ETPA placed limits on the rents that property owners could charge individuals living in apartment buildings that contained six or more units. This law also created the Rent Guidelines Board ("RGB") to regulate whether and by how much the rents of ETPA units may be increased yearly for one and 2 year periods.  The RGB, however, is not the subject of the instant litigation.  In 1971, the state legislature enacted vacancy decontrol measures, pursuant to which apartments that were previously subject to rent stabilization and rent control became deregulated once they became vacant. This permitted property owners to charge new tenants market rate rents for their units and served the purpose of assuring mobility and availability in housing.  In January 1974, the Temporary State Commission on Living Costs and the Economy of the State of New York issued a Report on Housing and Rents. In the introduction to the report, the Chairman of the Commission explained that its recommendations were "based on an awareness of the effects of inflation and on the belief that no one sector should be asked to bear all the costs."  That is exactly what the HSTPA has not done – it has caused one segment of society to 'bear all the costs' and not be able to recoup them. Although that report recommended abrogation of vacancy decontrol, it recognized that any return to rent stabilization should not dis-incentivize the very increase in supply of quality housing needed to address vacancy and affordability issues. The report explained that its recommendations were

---

[2]     The New York State Court of Appeals, in *Manocherian v. Lenox Hill Hospital*, 84 NY2d 385 (1994) stated that "Unlike rent control, which places stricter price controls on owners and leaves many dwellings only marginally profitable, the State, in enacting rent stabilization, seeks to insure more balanced terms under which owners may apply for regulated rent increases and to protect primary occupants." at 389 (emphasis added).

intended to allow "the minimum impact required by today's inflation to be passed on to the tenant population without either endangering the proper delivery of services, or inhibiting long term growth and renovation of our valuable housing stock." The Report explained that "increased costs must be reflected in the rent, otherwise essential services will be curtailed," and that "[t]he importance of permitting increased rents for essential capital improvements cannot be overemphasized. This is exactly what the HSTPA has not done – in fact it reversed and/or ignored the intent as expressed in the statute and provided that increased costs are not reflected in the rent;[3] and in fact the rent increases over a 4 year period as shown in the footnote below have been ½ of the increase in expenses for a 3 year period.

35.     Under the Rent Regulation Reform Act of 1993, the state began vacancy deregulation for high-rent apartments (termed "Luxury Decontrol").   By 2018, a Westchester unit with a legal regulated monthly rent of $2,830.21 could be deregulated on vacancy.   The Rent Regulation Reform Act of 1993 adopted a high-income deregulation provision where units that were occupied with tenants whose household income exceeded $250,000 (later reduced to $200,000) for 2 years and whose rents exceeded the Luxury Decontrol threshold would also be subject to decontrol. There were very limited examples of both in Westchester, but they did give a landlord the incentive to modernize its apartments even if the actual rent did not meet the market rent or the legal regulated rent, particularly given the flexibility of preferential rents. Nevertheless, the HSTPA has eliminated these monetary benefits.

---

[3]     In the last three surveys submitted to the RGB by Westchester landlords, the expenses have risen 10% yet the last 4 RGB increases have been a combined 4.75% for one year leases and 7.75% for 2 years leases (bearing in mind that there is only one increase every 2 years, thereby halving the increase to under 4% for the 4 year period.

36.     ETPA establishes that a municipality may determine that there exists a "public emergency requiring the regulation of residential rents" if the vacancy rate in the municipality is 5% or less. N.Y. UNCONSOL. LAW § 8623.a (McKinney). The statute requires that "[a]ny such determination shall be made by the local legislative body of such city . . . on the basis of the supply of housing accommodations within such city . . . , the condition of such accommodations and the need for regulating and controlling residential rents within such city. . ." Id. The applicability of the HSTPA in Westchester County depends on the local municipalities making such an emergency determination. Id. § 8622.  Twenty one such communities made such a declaration, the most recent being in 2018 in Ossining, and the majority in the 1970s into 1980 (except for Ossining, the City of Rye and Croton on Hudson the latest being December 23, 1980).  However, upon information and belief none of these communities has ever repeated the initial emergency declaration or conducted a good faith, or in fact any study of vacancies and vacancy rates in the local community. The Ossining survey was fraught with defects and in fact eliminated many vacant apartments from the survey and since the initial adoption of ETPA, within six months, eliminated all buildings of 20 or less units and enabled larger buildings to "opt out" of ETPA if they provide 20% "affordable" units in the specific buildings.

37.     The Tenant Protection statutory scheme imposes a substantive obligation on the local community to go beyond merely declaring an emergency when vacancy rates are less than 5%, but rather to formulate a rational basis for determining whether that vacancy rate warrants the initial as well as the continued declaration of a public emergency; or whether the existence of such emergency triggers "the [continued] need for regulating and controlling residential rents," or whether there are specific classes of housing accommodations that should not be subject to the

emergency and can be eliminated from the survey and the count of units in the municipality, and finally whether the regulation of rents serves to abate the emergency.

38.     Defendants and the Westchester local communities that have adopted ETPA attempt to justify the HSTPA by reference to a claimed "housing emergency." But the nature of that asserted "emergency"—i.e., the aspect of the housing market that supposedly gives rise to a state of emergency—has shifted significantly over the 45 years the ETPA has been in effect.  When the ETPA was first enacted in New York in 1974—the initial declaration of a housing emergency in Westchester County carried the same rationale as rent control: to address the "emergency created by war, the effects of war and the aftermath of hostilities" and, language was set forth indicating that the ultimate goal as to get to a market rent situation.[4]    Thus, while the legislative intent is to go to a "market of free bargaining between landlord and tenant...," the HSTPA does exactly the opposite.  Moreover, the requirement that there be a continued "public emergency requiring the regulation of residential rents within any city, town or village by the local legislative body of such city, town or village" has been honored in its breach rather than its compliance.  In 1974 the legislature shifted the basis of the housing emergency to an "acute shortage of housing accommodations." N.Y. UNCONSOL. LAW § 8622 (McKinney). In the ETPA, the legislature permitted the declaration of a housing emergency only when the vacancy rate fell below a specific minimum. Section 8623(a) delegated to the local municipalities the authority to declare a housing emergency when "the vacancy rate for the housing accommodations within such municipality is not in excess of five percent." The legislature gave no basis for its decision to

---

[4]     As stated, the ETPA provides: "that the transition from regulation to a normal market of free bargaining between landlord and tenant, while the ultimate objective of state policy, must take place with due regard for such emergency; and that the policy herein expressed shall be subject to determination of the existence of a public emergency requiring the regulation of residential rents within any city, town or village by the local legislative body of such city, town or village."

select 5% as the vacancy rate that could trigger an emergency nor is there any rationale for 5% rather than 2% or 3.5%. Nor has it ever revisited whether that threshold is appropriate given the changes in the economy, job market, and housing market since 1974.

39.     The local municipalities must rationally apply existing facts and data to make each determination and have **not** done so either in a rational basis or in fact at all since 1980.  Since the various communities first adopted ETPA virtually none of them have voted to conduct a survey of vacancies so as to declare the continuation of a "public emergency" thereby permitting the system of ETPA housing to continue indefinitely and now permanently due to the 2019 Housing Stability and Tenant Protection Law.[5]


**FOR A FIRST  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**THE 2019 HSTPA VIOLATES DUE PROCESS. AND IS AN UNCONSTITUTIONAL TAKING IN THAT IN THAT IT DOES NOT MEET ITS STATUTORY GOALS.**

40.     The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

41.     The HSTPA violates Due Process because, among other things, it is an irrational, arbitrary and demonstrably irrelevant means to address its stated policy ends.  Under the Fifth and Fourteenth Amendments to the Constitution, individuals may not be deprived of their property

---

[5]     The exception is the Village of Ossining which had a survey conducted that was flawed in that it did not count vacant apartments that were being renovated for re-rental and other vacant apartments where the surveyers could not get access to the building, among other deficiencies of the study.   In Croton and Port Chester, which adopted ETPA at a later date than the other 18 communities that adopted ETPA in the late 1970s or early 1980s, they both used ETPA to punish one landlord in each community for raising rents a larger amount than the community deemed reasonable and therefore adopted ETPA for that one building in each community.

without due process of law. When, as here, Plaintiffs are being deprived of their property rights without any rational relationship between that deprivation and a legitimate government interest, the deprivation violates the Fifth and Fourteenth Amendments to the United States Constitution. Moreover, given the fundamental nature of the right to property—a right that is expressly articulated in the Constitution itself—Defendants must demonstrate that the 2019 Housing Stability and Tenant Protection Act is narrowly tailored to achieving a compelling governmental purpose. Defendants cannot satisfy that standard and thus, the legislation must be declared unconstitutional.

42.     Specifically, the HSTPA is not rationally related to achieve any of the ends that have been used to justify the extreme measures taken under this law.  The HSTPA has been justified as a means to provide affordable housing to low- income families.  But this law's operative provisions are wholly disconnected from that goal. There is no requirement that HSTPA units can be rented only to low-income families.  The only financial qualification for the application of the HSTPA —the provision permitting decontrol of a unit if the owner earns an income over $200,000 and the rent was above the Luxury Decontrol threshold—was removed from the HSTPA.  There are numerous reports of stabilized units leased by families least in need of assistance. The data confirms that the HSTPA has not been targeted at all—let alone effectively or narrowly targeted— to families with low income and in need of affordable housing.

43.     The HSTPA has also been justified by the alleged and stated need to increase the vacancy rate, and thereby remedy a purported "housing emergency." Even if there were evidence that any housing emergency still existed (but Defendants have failed to generate any record in support of the "emergency" finding, as discussed herein, nor has any survey been undertaken in the last 38 years for 18 of the 21 ETPA communities), the HSTPA not only fails to increase

the vacancy rate but in fact lowers it. Existing tenants have even greater incentive than before to remain in units that are no longer appropriate to their needs. For example, previously, a tenant with a preferential rent might have the incentive to move to a more appropriate residence rather than risk a higher rent back to the legal regulated rent on the lease renewal. Now there is no such incentive. The HSTPA is not rationally related to achieve the goal of providing more suitable housing for those who most need it. There will clearly be less vacancies as there is virtually no incentive for anyone to leave a life estate in an apartment with a rent that almost cannot be raised more than the minimal guideline increases that have not, since 2014, been over 2% for a one year renewal or 3% for a 2 year renewal (which is a one time increase for the 2 year period). Once again the purported goals of the ETPA and the HSTPA are not met and violate the constitutional protections to property owners.

> **There Are Alternatives Such As Subsidies And Tax Credits To The 2019 Housing Stability And Tenant Protection Act That Are Available To Meet The Goals Claimed To Underlie The HSTPA.**

44. There are other available alternatives that would help provide affordable housing to low-income families or help to increase the supply of housing generally. But those alternatives would require support from all New York taxpayers, and therefore lack the appeal of imposing the financial burden entirely on a small group of property owners, which underpins the HSTPA. As a result, the Defendants continue to use the landlords of multi family housing to justify the HSTPA which is not rationally related to, and fails to, achieve the ends that it is claimed to serve.

45. As stated, the HSTPA is not rationally related to the goal of ameliorating a lack of affordable housing for low-income individuals and families and in fact does the opposite. ETPA units are not awarded based on financial need. There is no part of the HSTPA that targets

relief to low-income populations. There is no means testing, no financial qualification, no affordable housing requirement and no other requirement that HSTPA apartments be rented to persons or families at particular levels of area median income (AMI). Indeed, given that the HSTPA requires owners to perpetually renew the lease of their tenants, it severely limits the ability to remove tenants, and now does not allow investigation into payment history / eviction proceedings of prospective tenants whether it be for a rental tenancy or a cooperative interview. Data and studies confirm that the ETPA, now strengthened by the HSTPA is not benefiting low-income households, but are randomly benefitting those who have the good fortune to inherit or live in a rent regulated apartment.

46.     A study as to New York City rent stabilized housing found that in 2010, there were an estimated 22,642 ETPA households in New York City that had incomes of more than $199,000, and 2,300 ETPA households with incomes of more than $500,000. According to 2017 HVS data, there were 37,177 ETPA units occupied by households with incomes of at least $200,000 and 6,034 with incomes of at least $500,000. It has also been reported that ETPA households that earn more than $200,000 and live in below market-rate units pay a total of $271 million less annually than the average cost of an unregulated unit of the same size in a similarly priced neighborhood, an average savings of $13,764 per household per year. The situation in Westchester, while less in numbers of apartments and households is proportionately the same in substance.

47.     Requiring a relatively small group of private property owners of pre 1974 multi family apartment houses, (it is noted that in some of the communities subject to ETPA and the HSTPA there are only 1 or 2 buildings subject to ETPA, an obvious effort single out individual landlords and property owners) to subsidize housing costs for individuals with no demonstrated

need for rental assistance is not only grossly inequitable, but also diverts valuable local community and State resources away from programs that could actually help address the vacancy rates and provide low-income individuals with housing assistance and also violates applicable constitutional protections. Viable measures currently in place in New York and also employed elsewhere, such as housing vouchers or tax abatements, are rationally related to the challenges that the HSTPA purports to ameliorate but does not address. These alternatives not only come closer to furthering the stated goals of the HSTPA but also distribute the costs and benefits in an equitable manner. Unlike the HSTPA, they do not impose the burden of a costly "public assistance benefit" on the property rights of individual owners, but rather equally distribute the costs for these programs among society as a whole. And also, unlike the HSTPA, they actually target and help individuals who demonstrate a need for rental assistance.

        a.     One alternative to the HSTPA is the use of direct housing subsidies. These are already provided in the form of housing vouchers under the federal Section 8 program, which targets low-income individuals for housing assistance. Section 8 provides subsidies for individuals to use toward housing based on income and family size. There are thousands of households in Westchester, Rockland and Nassau Counties that benefit from this program. These vouchers can be general, enabling the tenant to select any apartment, or "project-based," in which the voucher must be used for a certain property. Under the Section 8 program, the agency issuing the voucher ensures that the rent for the rental unit selected is reasonable for the area, and recipients of housing vouchers are expected to pay 30% of their income toward rent and utilities, or a minimum rent payment of up to $50, whichever is greater. Allowing individuals to choose where they use their housing vouchers enables lower-income families to move out of high-poverty neighborhoods and would increase diversity in the various ETPA communities.

b.      Other examples of subsidy programs that might be expanded to address housing costs are the SCRIE and DRIE programs offered by the local communities that have opted to adopt them, although many ETPA communities have not adopted either program or if they have, not to the $50,000 maximum.  The Senior Citizen Rent Increase Exemption (SCRIE) freezes rent for seniors who are in rent-regulated units, are the head of the household, make less than $50,000, and pay more than one-third of their income to rent. The amount that the senior tenant is exempted from paying is returned to the owner as a property tax abatement credit. The Disability Rent Increase Exemption (DRIE) exists for disabled individuals and also provides owners with tax credits. There is no reason these programs cannot be extended to any elderly or disabled people who meet the income qualifications, not just those who live in ETPA units. Clearly, programs already exist that are rationally related to accomplishing the goal of providing affordable housing without effecting an uncompensated taking from other private individuals.

c.      Also, subsidies could be provided through a program providing assistance for home purchases, which would direct financial assistance to those who need it and would also promote home ownership. This would be particularly valuable for the suburban counties.  In Chicago and elsewhere, residents can receive down payment assistance even if they purchased a house before, so long as their income falls below a certain level. Unlike the HSTPA, which reduces housing stock and perpetuates permanent renting, a down payment assistance program available only to low-income residents would make housing more affordable to New Yorkers.

d.      Another alternative to the HSTPA is a State renter's tax credit. New York State already  provides a tax credit of up to $500 to New York City  renters whose household income do not exceed $200,000. Rather than fund low-income housing through ETPA tenancies and compelling property owners to bear the burden, this tax credit program could be

increased and better targeted at those lower-income tenants who spend more than 30% of their income on rent.  It is a natural benefit for the many local communities in Westchester subject to ETPA and the HSTPA.

       e.      Another answer to a shortage of high-quality affordable housing is more affordable and/or low rent housing. There are many well-tested ways for states, cities and local municipalities to increase the supply of housing. For example, communities require a 'set aside" of 10% or even 20% (such as in the Village of Ossining of multi family dwellings of more than 20 units in order to opt out of ETPA) of affordable housing in either new construction or perhaps existing housing (as in Ossining). Another alternative is to promote partnerships between the local government and the private sector, which would both address the vacancy issues and could also be targeted to low-income tenants.  Direct government subsidies or innovative financing programs can also encourage new construction to be provided to would-be tenants. In Denver, Colorado, for example, the city instituted a Revolving Affordable Housing Loan Fund in order to bridge the gap for developers between the federal government's 4% Low-Income Housing Tax Credit and the amount of financing needed to make certain low-income housing projects feasible.  As developers pay back their loans, money goes back into the fund to pay for future affordable housing projects. New York City has developed similar financing programs, including the Extremely Low and Low Income Affordability (ELLA) program and the HPD "Mix and Match" program.  Each of those programs are much more focused than is HSTPA on providing benefits to low- and middle-income tenants. The ELLA program targets development of housing for those with incomes between 30% and 50% of the area median income, and the Mix and Match program targets development of housing serving households with 60% to 130% of area median income. Local communities in Westchester and the other suburban counties could do the same.

48.     In a recent proposal, Alex Roberts of the Community Housing Program, proposed direct subsidies by the communities for affordable housing apartments.  This suggestion by a local affordable housing advocate and developer should be taken seriously and implemented to avoid the deleterious consequences of the HSTPA. Mr. Roberts proposals provide that

Instead of asking developers to build new apartments at $400,000 each for low income tenants—at a required subsidy of $300,000 per unit--we may produce three times the number of units by simply paying existing landlords a lump sum to set aside apartments for low income tenants at affordable rents for a period of 30 years. I call it the" Vacant Apartment Acquisition Program (VAAP). Government could offer multifamily landlords in New Rochelle a lump sum payment in return for lowering the rent a few hundred dollars to make it affordable, and restrict the apartment to a low-income household.
***
The next step would be for the city to determine interest among landlords in New Rochelle through a Request for Proposals. The RFP would list the requirements, including (1) rent for studios, one, two and three bedroom apartments to be reduced to affordable levels for households with income at or below 60% AMI, (adjusted annually by HUD for inflation), (2) marketing/renting and qualifying of tenants by a nonprofit agency under contract with the town, (3) a 30-year term for the program, and 4) execution of of a deed restriction and lien with recapture obligation for the subsidy amount, which cannot be redeemed for at least 10 years, and then redemption allowed from year 10 to year 30, with the recapture obligation declining by 5% per year. Owners and landlords of two-family and multi-family buildings would then look at the difference between what they are charging for rent and the "affordable rent" and then make an offer to the town as to how much they would be willing to take as an up-front payment under the terms. In this way, there will be competition in the market for the subsidies, rather than placing an arbitrary payment on units that will be of varying quality, location and rents.

In a second proposal, Mr. Roberts also suggests that the community adopt a "vacant apartment program."   With public subsidies of up to $600,000 per unit needed to build affordable apartments, Roberts has a plan to make existing apartments affordable by providing upfront subsidies to local landlords. His plan builds on local affordable housing programs that require a certain number of affordable apartments in multi-family projects, but also allow developers to opt out of building the affordable units by paying fees to the municipality. Under Roberts' plan, a municipality would work with landlords with apartment vacancies in their buildings. The landlord would agree to keep the rent at levels available to tenants earning up to 60 percent of the average median income, which in Westchester is $50,500 for a single person, and $83,750 for a family of six. Local landlords would guarantee a unit remains affordable for 20 years to 30 years. In exchange, the landlord would

30

receive an upfront payment of about $60,000, which Roberts said would cover for the reduced rent over the term of the deal.

49.    In addition, zoning changes would enable developers to build more housing. There are some innovative programs that establish zones for the construction of affordable housing near public transportation.[6]  Many local communities in Westchester have adopted or considered this TOD zoning (see footnote), which is zoning calculated to encourage building near public transportation.

50.    The HSTPA's predecessor, the ETPA, has been applied continuously for 45 years but the evidence is overwhelming that the HSTPA is not rationally related to achieving any of the objectives or purposes spelled out therein. The HSTPA on its face therefore violates the federal Constitution's guarantee of Due Process:

a.    The HSTPA does not in any way achieve its goal of providing housing to low-income populations. There is no financial qualification standard at all for retaining or obtaining an apartment. The HSTPA is in no way rationally related to providing affordable housing for low-income individuals or families.  Even with the vacancy increases the rent was still more affordable than newly constructed non regulated apartments.

b.    For similar reasons, the HSTPA is not rationally related to promoting socio-economic or racial diversity. Nothing in the law directs HSTPA units to individuals

---

[6]    Transit Oriented Development (TOD), a commonly used planning strategy, strives to create mixed-use residential and commercial buildings near active train stations to promote walkability, use of public transit and reduced reliance on personal automobiles. Examples are found in virtually any community near a train station including Bronxville, Mt. Kisco, Pelham, Scarsdale and others. There is no density increase- zoning dimensional requirements changed to make redevelopment possible. Unit counts of 40 units per acre existed both before and after TOD zoning overlay changes. Incentives for mixed-use, below market-rate housing, and payments into a neighborhood stabilization fund.

and families who would increase diversity. In fact it is believed that the New York system of rent control of various iterations actually reduces diversity.

      c.     The HSTPA is not rationally related to increasing the supply of housing in New York. When one reviews the amount of housing construction in Westchester since all the ETPA communities but 3 have adopted ETPA, the result is that there is a glut of housing, well over the 5% threshold.

      d.     The HSTPA further limits the availability of apartments due to its elimination of a vacancy increases,  limitation on IAIs, elimination of high rent / income decontrol,  thereby removing the incentive of landlords to work with tenants to vacate apartments and thereafter renovate said apartments to bring them up to date in terms of kitchens and bathrooms, among other things, and further, to provide updated housing for larger and new families by giving older residents incentive to move out. That is now eliminated.  When an apartment now becomes vacant, the landlord has no incentive to upgrade the apartment to 2019 standards or in any meaningful fashion, leaving new tenants with old apartments, old kitchens, old appliances, old bathrooms, etc. and smaller apartments as well as less choice.

51.     As noted above, the Housing Stability and Tenant Protection Act of 2019 removes eliminates various avenues for income enhancement that, prior to 2019, existed where voted on by the RGB. In fact within the last decade the Westchester County Rent Guidelines Board on more than one occasion provided a low rent increase for those apartments with extremely low rents (2009/2010; 2011/2012; 2013/2014). That is now history.

52.     Regarding the new IAI restrictions, when tenants depart after years of occupancy, units often may need $50,000 or more in repairs and restorations to prepare that unit for the

market.  Under the Housing Stability and Tenant Protection Act of 2019, only $15,000 of those repairs could be passed along to tenants, temporarily.  Further, on a $15,000 investment, only $83 per month would be recoverable for buildings over 35 units, and after taxes, the amount recovered is closer to $62 per month. If that investment is funded with a loan to be repaid at 4% annually, the property owner will fail to recover even the full net present value of the $15,000 investment. As a result of those combined effects, building owners will either choose to re-let with minimal (if any or no) improvements, resulting in the not so gradual deterioration of the building, or they will simply choose not to re-let the unit at all. Under either scenario, either the quality of the housing stock, or the supply of that stock (or both) will be further restricted as a result of the amendments and new tenants will be denied a renovated apartment with new appliances and fixtures.   For example, one AOAC, CCAC and BRI member owns low rent units (a studio that rents for less than $600 per month) with the market rate being almost 3 times that.

53.     Another landlord has an MCI situation in which all of the work was completed and submitted to and received by DHCR before the new law took effect.  He then received a letter from DHCR requesting that he recast the MCI in the form of the HSTPA, thereby losing the IAI increase for an amount much larger than $15,000 he spent, which was formerly not limited to the 30 year period.  That apartment has been occupied by the same tenant for more than four decades. The unit needs substantial repairs before it can be re-rented, and in light of the Housing Stability and Tenant Protection Act of 2019, (1) the member can recoup only $15,000 of the costs of those repairs and (2) the unit will remain ETPA post-vacancy. The economics have made the decision. The  member will turn off the lights and leave the unit vacant.  These are but examples and not isolated, but all to frequent.

54,     In addition to the limit on recovery of IAI expenditures, the Housing Stability and Tenant Protection Act of 2019 also dramatically limits the recovery of expenditures on Major

Capital Improvements (MCIs), by increasing the amortization period for recovering those investments, (ii) capping the total period for recovering those investments to 30 years (after which they must be disentangled from other increases and removed from the rent), and (iii) limiting any rent increase needed to pay for such MCI to 2% per year (e.g., $30 on a $1,500/month lease). The collective limitations on MCIs will prevent owners from recovering the cost of many significant MCIs. For example, if an owner of a 30-unit building with an average rent per unit of $1,300 per month invested $200,000 in an MCI financed at 6% interest, the present value to the owner of the permissible rent increases per unit would be less than the present value of the MCI investment. As a result, many owners will choose not to reinvest through MCIs in their buildings and this will inevitably lead to the deterioration of the buildings.

55.    Absent investments in MCIs, building maintenance will be limited to only necessary repairs, resulting in dilapidated housing units and eventually the likely withdrawal of housing units from the housing stock. Buildings will deteriorate thus reducing the availability of affordable housing stock in the suburbs.

56.    Despite a stated goal of increasing quality housing stock the Housing Stability and Tenant Protection Act of 2019 (and in particular the caps on the IAIs and MCIs) will result in a deterioration of the quality and quantity of the housing. Landlords cannot afford to renovate apartments, even on vacancy, now that the vacancy increase as well as the IAI increase has been eliminated. Moreover, with the substantial reduction in MCI reimbursement, multi family owners of HSTPA housing, as stated, will not be able to install major capital improvements such as new boilers / burners / roofs / sidewalks; windows and other areas of housing improvement that would have been done with the prior MCI, granting up to 15% a year reimbursement. The reduction to and limitation of 2% a year reimbursement does not even pay for the financing of the MCI. The

34

lack of renovation of the housing stock will lead to an elimination of units from available capacity. Both outcomes demonstrate that the HSTPA is not rationally related to achieving their desired ends and therefore constitutionally defective.

57.     Studies of the New York City and Westchester, Nassau and Rockland rental markets have consistently shown that rent regulation decreases residential mobility. Put another way, tenants fortunate enough to obtain ETPA units stay in them, regardless of the suitability of the unit for the tenant in terms of need, size, location, and affordability relative to tenant wealth.

58.     In New York City, the Citizens Budget Committee reached a conclusion in 2010 regarding the misallocation of housing space in New York City resulting from rent regulation. It found that households in ETPA units tend not to move to smaller units when the number of members in the household declines. And the CBC observed a corresponding mismatch effect in the unregulated sector: households in the unregulated sector likely consume less space than they would absent rent regulation, due to reduced supply and higher market rents. The situation in Westchester is similar. For all of these reasons, the HSTPA cannot be justified as rationally related to the goal of increasing the apartment vacancy rate so that more apartments are available to individuals and families seeking to move to Westchester apartments, nor for any of the other alleged rationale for the passage of the law. Rather, the HSTPA's effect is to increase the affordable housing shortage in virtually every municipality where it has been adopted and in doing so at the expense not only of prospective tenants looking for affordable housing but at the expense of the Landlords.

59.     There are many articles by noted Economists as well as studies showing that the ETPA as well as the HSTPA does not achieve the purposes for which they allegedly were passed by the New York State legislature and incorporated in the HSTPA. For example,

a. A study from a group of Stanford University researchers shows that San Francisco's rent-stabilization efforts failed. Effects such as these drove down the supply of rental housing and, therefore, drove up rents across the city — by 5.1 percent.

The California law would cap the rise in rents statewide to inflation plus 5 percent annually. Oregon would set the cap at inflation plus 7 percent.

Mr. Sanders would restrict rent increases nationally to 3 percent or 1.5 times inflation, whichever is greater. To many struggling to afford housing in super-expensive parts of New York, San Francisco or the District, these plans no doubt sound great. Yet these cities already have rent-stabilization policies, and they have not worked.

Washington Post Editorial 9/21/19.

b. Indeed, it is difficult to think of another policy where conservative economist Thomas Sowell, who once observed that "the goals of rent control and its actual consequences are at opposite poles," can agree with liberal economist Paul Krugman. As Krugman, a *New York Times* columnist, explained in 2000, introductory economics teaches that artificially compressing rents results in a shortage of rentable properties. The lower fixed price increases the demand for rental housing while reducing the quantity of it offered for rent.

\*\*\*

The truth about housing affordability is that high rental prices communicate that the supply of rentable property in the market is scarce relative to demand. The urgent message emanating from many desirable U.S. cities is that too few rentable units have been produced over long periods. But crude rent controls will worsen this shortage. And more flexible rent regulation amounts to just suppressing this price message for a lucky few tenants in the short term, in ways likely to worsen affordability more broadly.

Rent control can't overcome the structural challenges to affordability that high-cost cities face, and a rent-control revival diverts attention from pro-development reforms that matter. Policymakers who care about housing affordability should leave rent control where it belongs: in the past.

Vanessa Brown Calder is a policy analyst at the Cato Institute. Ryan Bourne occupies the R. Evan Scharf Chair for the Public Understanding of Economics at the Cato Institute.

c. New research examining how rent control affects tenants and housing markets offers insight into how rent control affects markets.. While rent control appears to help current tenants in the short run, in the long run it decreases affordability, fuels gentrification, and creates negative spillovers on the surrounding neighborhood.

Rebecca Diamond, Assoc. Prof. of Economics, Stanford Graduate School of Business, 10/18/18.

36

60.    Substantial research regarding the New York housing market as well as the effects of rent controls consistently shows that the rent regulation windfall is not targeted to low-income residents, but rather is dispensed quite randomly.    The same is true for Westchester and the suburban areas.  In a 1987 study in the Journal of Urban Economics, Peter Linneman concluded, using data from the 1981 New York City Housing and Vacancy Survey ("HVS"), that both the City's rent control and rent stabilization programs were targeted haphazardly, with benefits distributed quite randomly, leading Linneman to conclude that "the targeting of these benefits was poor." See Peter Linneman, The Effect of Rent Control on the Distribution of Income among New York City Renters, 22 J. of Urban Economics 14-34 (1987).  A 2000 study by Dirk Early (using data from 1996) concluded not only that rent control and rent stabilization in New York City were poorly targeted, but also that the city's laws induced property owners to change the way they recruited tenants, giving preference to older and smaller households. See Dirk Early, Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits, 48 Journal of Urban Economics 185-204 (2000).

61.    Data from 2010 published by New York University's Furman Center confirm that the percentage of low-income households living in ETPA and controlled units (65.8%) is only 12% higher than the percentage of low-income households living in market-rate units (53.1%). And outside of core Manhattan, there is only an 8% difference, meaning that both market-rate and ETPA units serve low income households in similar proportions.  See https://cbcny.org/ sites / default /files / REPORT _Rent Reg _ 06022010.  pdf.    Also in 2010, the Citizens Budget Commission ("CBC") published an analysis of rent-regulated units in New York City using 2008 data, and reached the same conclusion as the preceding studies: the subsidy associated with rent regulation in New York City is poorly targeted. See Rent Regulation: Beyond the rhetoric, see

Citizens Budget Committee (2010) available at https://cbcny.org/research/rent-regulation-beyond-rhetoric. The CBC found that Overall the average discount is about 31 percent or $5,500 annually. However, the discounts vary by income group. The greatest percentage discounts are for those with incomes below $20,000 annually and also for those with incomes between $125,000 and $175,000. The same basic statistics can be said to be valid when applied to the suburban counties to which EPTA is applicable. These New York City specific studies are corroborated by research in other U.S. cities as well. In a 2007 study involving the effects of the end of rent regulation in Boston, David Sims concluded that low-income families were not well-served by rent regulation, with 26% of rent- controlled units occupied by tenants with incomes in the bottom quartile of the population, while 30% of rent-controlled units were occupied by tenants in the top half of the income distribution. See David P. Sims, Out of Control: What Can We Learn from the End of Massachusetts Rent Control?, 61 J. of Urban Economics 129-51 (2007). Margery Turner reached a similar conclusion regarding the Washington DC rental market. She determined that rent regulation did not benefit low-income renters efficiently and favored long-term renters (regardless of income level) over frequent movers. Margery A. Turner, Housing Market Impacts of Rent Control: The Washington, D.C. Experience, Urban Institute Report 90-1 (1990).

62.     In a New York City study, using 2017 HVS data (the most recent HVS data available) to compare the characteristics of tenants in stabilized and destabilized units to the characteristics of the population of severely cost-burdened renters in New York City. This examination produced several conclusions:

a.     First, tenants in ETPA units have much higher incomes than the population of severely cost burdened renters. While almost 90% of severely cost-burdened renters have incomes less than $35,000, only 37.7% of ETPA tenants have incomes below $35,000. Thus the

38

HSTPA does a particularly poor job at connecting the lowest-income renters (incomes below $35,000) with affordable housing.

        b.     Second, ETPA units also do not do a significantly better job of serving lower-income tenants than do unregulated units. For example, 12% of residents of unregulated units have incomes between $20,000 and $34,999 compared to 16.5% of stabilized tenants. The HSTPA similarly fails to target lower or moderate-income tenants at a rate substantially greater than unregulated units. 78% of ETPA units are rented by households with incomes under $100,000, but so are 64% of unregulated units.

        c.     Third, the HSTPA distributes a significant portion of its benefits to higher-income renters. For example, over one third (34.2%) of ETPA units (and half of post-1947 ETPA units) in Manhattan are occupied by tenants with incomes of $100,000 or more. Twenty-two percent of all ETPA units, over 200,000 units, are rented to households with a family income of $100,000 or more. The proportions are deemed to be comparable in Westchester.

        d. Fourth, the HSTPA does not target the households most likely to face cost burdens due to rent. Married couples without children constitute the household type least likely to face a severe rental-cost burden—yet they are overrepresented among ETPA renters. Underrepresented among ETPA renters are single-parent households. Indeed, the average regulated tenant is only 34 years old, three years older than the average market-rate tenant.  It has been pointed out for years in Westchester before the Rent Guidelines Board at the yearly hearings that the end result of continued controls, now exacerbated, result in less available apartments for young families since the emphasis is to protect those who have been in their apartments for many years and are benefit from the continuation of lower rents and extremely limited increases. The HSTPA, now formally and forever locking in controls for rentals at substantially lower than market

rentals (particularly in Westchester), will even worsen the situation making many less apartments available for young families, while protecting those with higher income and less need for bigger apartments.

### 2019 Housing Stability and Tenant Protection Act is Not a Rational Means of Ensuring Socio-Economic or Racial Diversity

63.     For many of the same reasons that rent regulation does not effectively target low-income households in need of affordable housing, it is not reasonably related to the goal of promoting socio-economic or racial diversity. The HSTPA is not targeted to assist underserved groups and, in fact, has instead been shown to increase gentrification and will, as with ETPA, reduce the availability of apartments for families as well as low income tenants. For example, a Wall Street Journal analysis explained that white renters in rent-protected apartments benefited more than any other racial group, with a discount of 36% from market rates, compared with 16% for black renters and 17% for Hispanic renters. In a 2002 study of rent regulation in New Jersey, Harvard researcher Edward Glaeser concluded that regulation was associated with an increase in economic segregation in municipalities. See Edward L. Glaeser, Does Rent Control Reduce Segregation? Harvard Institute of Economic Research Discussion Paper No. 1985 (2002). Regulation was similarly found to be an ineffective tool for economic and racial integration in California and Massachusetts. See Ned Levine, et al., Who benefits from rent control? Effects on tenants in Santa Monica, California, 56 J. of the American Planning Association 140-52 (1990); David P. Sims, Rent Control Rationing and Community Composition: Evidence from Massachusetts, 11 B.E. J. of Economic Analysis & Policy 1-30 (2011). There are a multitude of articles showing that the elimination of rent regulation benefits a community  The HSTPA does a poor job of targeting the racial or ethnic groups most in need.  ETPA units serve disproportionately high shares of white renters compared to the race and ethnicity of severely cost burdened renters.

For example, although only 27% of severely cost-burdened renters are white, 35% of ETPA units are occupied by white tenants.

### The 2019 Housing Stability and Tenant Protection Act is Not a Rational Means of Increasing the Vacancy Rate or Making More Housing Units Available

64.     The Housing Stability and Tenant Protection Act of 2019 also increases the adverse effect on supply in two ways. First, by eliminating opportunities for rent increases at times of vacancy or upon decontrol of units, (since there is no more decontrol) the law makes continued operation and leasing of such units less attractive and precludes the additional income needed to fund creation of new units. Second, by capping the ability to recover investments for individual apartment improvements and major capital improvements, it deters the re-development necessary both to the return of units to market after vacancy and to the maintenance, repair and renovation of the housing stock. The HSTPA also incentivizes tenants to stay in units longer, even if the units are no longer appropriately sized for the tenants' needs. The result is reduced turn-over and availability of apartments in Westchester County, exaggerating the very impact—low vacancy rates and less availability of affordable units for families and newly marrieds —that the law was purportedly intended to address.

### 2019 Housing Stability and Tenant Protection Act Deters Development.

65.     The negative impact of rent controls on the supply and availability of affordable housing can be observed in the suburban Westchester housing market—the HSTPA aggravates the very problems it is claimed to address by inhibiting re-development of existing properties as well as inhibiting the creation of new rental units and reducing the economic incentive to maintain existing units and buildings.  The ETPA as modified and strengthened by the HSTPA plays a key role in inhibiting development and both reduces earnings from buildings that could be reinvested into further development as well as continued maintenance of those buildings, and also tightly

restricts an owners' ability to demolish and rebuild their own buildings to provide additional capacity.

66.     Using data from the New York City Department of City Planning, one report estimates that "[t]here is 1.8 billion square feet of unused development rights in residential zones alone. Built to their maximum envelope, these properties could accommodate more than a million units of housing." A similar situation exists in Westchester. Despite the available zoning capacity, data demonstrates that buildings subject to ETPA regulation are not developed to capacity. On average, the unregulated properties were developed to a level 22% greater than the zoned capacity. If the heavily ETPA properties were developed to the same extent as the unregulated peer group, the result would be additional living space. This disparity of development between regulated and unregulated properties evidences that the HSTPA significantly adds to and contributes to the underdevelopment of properties and the reduction of housing stock, creating the very purported scarcity of units that is then used to justify continuing ETPA's existence.

67.     The underdevelopment of ETPA regulated properties is a direct result of the restrictions imposed and worsened by the HSTPA. As discussed, *infra*, mandatory lease renewals, succession rights, elimination of vacancy increases, restrictions on the amount of money an owner can spend and recoup on individual apartment improvements and major capital improvements as well as limitations on an owner's ability to recover units under the HSTPA create massive barriers to redeveloping a building and increasing the housing stock. ETPA tenants—imbued by the HSTPA with a de facto and now virtually permanent property right in the ETPA unit—can simply refuse to leave and the Owner has effectively no right to reclaim possession. As one report from New York University's Furman Center observed, "most incremental residential development will,

by necessity, require the demolition of existing buildings and new construction on assembled sites. However, under state law, rent-regulated tenants have certain rights which make it very difficult and costly for the owners of buildings to gain vacant possession of their properties for redevelopment." Stories of hold-out tenants and large property owner buy-outs are commonplace.

**The 2019 Housing Stability and Tenant Protection Act Leads to Higher Rents in Unregulated Units.**

68.    The shortage of available rental housing caused by the HSTPA produces higher rents in the unregulated market. See Dirk W. Early, Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits, Journal of Urban Economics 48(2).. Other researchers have found a more profound impact on market rents. A 1993 study by Steven B. Caudill, concluded that rents in uncontrolled units in New York City were between 22% and 25% higher than they would be in the absence of New York's rent regulatory scheme. See Steven B. Caudill 1993. Estimating the Costs of Partial-Coverage Rent Controls: A Stochastic Frontier Approach. Review of Economics and Statistics 75(4): 727-731.   Again, the situation in the suburban counties, including Westchester, is no different and note is taken of the various economic experts referenced *infra*.

**The 2019 Housing Stability and Tenant Protection Act Reduces Property Taxes from Multi-Family Dwellings and has a Negative Impact on the Taxpayers of the Local Communities That Have Adopted ETPA**

69.    The irrational and arbitrary relationship, which supports the lack of constitutional basis for the HSTPA and the "housing emergency" it is claimed to address is further evidenced by the law's negative impacts in Westchester County, including higher rents in the unregulated market and reduced tax revenues for the various municipalities. This is an unintended result of these laws because the HSTPA serves to lower the value of the various multi-family properties, thereby reducing the assessed valuations and thereafter the tax revenues attributable thereto. This

result will ultimately result in not only lower tax revenues from multi-family buildings, but higher taxes on single family dwellings in the various municipalities that have ETPA and the HSTPA because the lost revenue will have to be made up by other real estate owners. Moreover, the lower assessments will result in more tax assessment reduction proceedings ("certioraris") which will impact negatively on the local communities faced with lower tax revenues and greater tax refunds.

70.     Additionally, less MCIs and IAIs will result in less renovation and construction work and a drop in economic activity.  This will affect, in many ETPA Westchester communities, a minority population that makes up a significant portion of the local contractors, who will now be denied the work derived from the IAIs as well as the MCIs, that given the lack of adequate reimbursement, will not go forward.  This is one of the many 'unintended consequences' of this ill conceived and devastatingly detrimental legislation.

## FOR A SECOND CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

### The 2019 HSTPA Impacts Detrimentally  and Limits a Property Owner's Reasonable Return on its Investments Which Constitutes an Unconstitutional Taking

71.     The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

72.     Due to the HSTPA, multi family rent regulated landlords who are now prevented from modernizing, repairing, maintaining their buildings and the apartments therein are also prevented from  realizing a reasonable return on their investments, all of which is  without due process. As the  United States Supreme Court said in *Loretto v. Teleprompter Manhattan CATV Corp.,* 485 US 4419, 102 S.Ct. 3164,

> 'The economic impact of the regulation, especially the degree of interference with investment-backed expectations, is of particular significance. So., to, is the character of the governmental action. A 'taking' may more readily be found when the interference with property can be  characterized as a physical invasion by

44

government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the economic good....'

73.     This is exactly the Plaintiffs' complaint herein, i.e., that the government has taken the Defendants' property and has clearly interfered with the investment backed expectations by multi family property owners who purchased properties with the intention of increasing the rent roll, mainly through vacancies and IAIs, or high rent or high income decontrol and now are virtually precluded from raising those rents.  Moreover, the public good cannot be promoted when the natural consequence of the HSTPA will be the deterioration of multi family buildings and the lack of renovation and deterioration of the apartments therein. The HSTPA is counter-productive.

74.     As was held in the case of *Lincoln Plaza Associates v. Barbarisi,* 60 Misc. 2d 905 (NYC Civ. Ct., 1969),

> The constitutional protection granted to the owner of real property does not include, necessarily, the right to demolish the property; **the constitution merely mandates that a landlord earn a reasonable return.**  (emphasis added)

75.     A recent publication by a well known New York real estate firm, on November 11, 2019,  set forth the devastating impact of the HSTPA on the market for multi family rent regulated housing:

> **With the value-add multifamily business in NYC all but eliminated by the Housing Stability and Tenant Protection Act of 2019,** many investors are looking for new avenues to invest in NY. *** Our esteemed panel of experts will dive into these questions and more as we continue to explore the fallout from the rent law changes and search for opportunity in this new landscape.(emphasis added)
>
> Andrew Dansker, First Vice President of Finance**,** Dansker Capital Group at Marcus & Millichap

76.     The HSTPA mandates that owners offer below-market rents to tenants for indefinite and virtually permanent periods of time and with no sunset date in the law, making it permanent.

77.     A permanent "emergency" is a violation of the law and the constitution.  Previous to the HSTPA, an owner of ETPA units might increase the rent to existing tenants for any particular one- or two-year lease period by the amount set by the Rent Guidelines Board and upon a vacancy with the utilization of a vacancy increase of 20% in the case of a one year lease or a slightly lesser percentage for a 2 year lease, depending on the most recent guideline.  In addition, there was also the possibility of a bonus for having to have kept a long term tenant with a point six (.6%) percent bonus for each year a tenant resided in a unit over 8 years. This enabled landlords, for new tenants (not existing tenants) to increase the rent to more closely approach a market rent, and also renovate an apartment using an IAI, thereby utilizing a vacancy increase to make up for the minimal RGB increases, while still protecting existing tenants, whose rents could only be increased by the RGB rate.  Moreover, the existing ETPA also allowed a landlord to protect its asset by modernizing vacant apartments and receiving an increase of $1/40^{th}$ of the monetary expenditure per month for the upgraded and modernized apartment, while still keeping rents within affordable limits. This individual apartment improvement (IAI) increase served multiple purposes: provide new tenants with upgraded apartments with new appliances and fixtures; allowed landlords to raise the rent roll of their buildings and the rent of individual apartments to get close to "fair market rents," and increase the return on as well as the  value of their investment.  These multiple purposes were served with the result of maintaining what frequently were 100 year old buildings; the ability to maintain and improve old housing stock at a reasonable level. The HSTPA prevents that.  One recent example was broadcast by Verizon FIOS-1 on October 14, 2019, citing the example of a landlord who was in the process of renovating an apartment who stopped that renovation because he could not get reimbursed for the cost of the renovation. This same landlord was also going to renovate another  apartment that was rife with mold, but because of the HSTPA

could only clear up the health condition and not renovate that apartment either – leaving both vacant and thereby resulting in exactly what the HSTPA was intended to prevent, second class un-renovated old housing. This example is repeated on a multitude of occasions due to the inability to secure adequate compensation for the apartment improvements or major capital improvements, which now do not even pay for the cost of the repairs, not even considering the cost of financing the repairs and/or improvements.

78.     The Westchester County RGB determined in 2018 and again in June of 2019 that property owners would be permitted to increase rents by 2 and 3% and then 1.75 and 2.75 % respectively for one-year and two-year leases. For the six-year period from 2014 through 2019, the one-year rent increases have been an average of 1.6% and the 2 year rent increase have been an average of 2.4% over that period.  It must be noted that with a 2 year increase, that is one increase for the stated amount at the start of the lease period for 2 years and there is no other increase during the 2 year period.  As stated *infra* these increases did not keep up with the 10% increase in expenses, and the increases were only half the increase in expenses.  The compounded effect of those sub-cost permitted rent increases over the last 20-year period has been to increase stabilized rents by a total of which is approximately a third to a half of the increase in costs.  The loss of the vacancy increase has exacerbated the financial woes suffered by every HSTPA afflicted landlord. Under the HSTPA the vacancy increases are eliminated, thereby depriving property owners of a fair return on their investment and the ability to control the income from as well as the disposition of their properties, a taking under the constitutions "takings" clause as well as a violation of due process in denying the owners their constitutional right to own and dispose of their own properties as well as earn reasonable income therefrom.

79.    By requiring rents to remain at below-market averages for an indefinite period in making ETPA permanent and in imposing its other regulatory restrictions, the HSTPA significantly reduced the value of regulated properties and deprived building owners of a reasonable market return on their investment.  Given that the goal of the HSTPA was to reduce the rents paid by tenants (at the expense of property owners- note Andrea Stewart Cousins statement) it is not surprising that rents in HSTPA units are significantly below the rents for non-regulated units. The Wall Street Journal reported that median regulated rents in Manhattan were 53% below the median market rates in the Borough. The New York Department of Finance estimates that in Manhattan, the income from non-regulated units can be as much as 60-90% higher than regulated units for units built before 1974. The same lower rents are true in Westchester and extrapolating the examples given herein, the regulated units rent is even less than in Manhattan. One member of plaintiff AOAC reports that for certain apartment units, the rental rates he is permitted to charge his ETPA tenants are 70-80% lower than the rates charged for comparable market-rate apartments in the same building.

80.    Over the past six years, the disparity between stabilized rental rates and market rental rates have only increased because the RGB has restricted stabilized units to *de minimis* annual rental increases promulgated by the RGB, i.e., an average of 1.3% a year between 2015 and 2020, less even than the cost of living and less than the percentage rise of expenses as shown by the HCR surveys from landlords of over 50% of the units subject to ETPA in Westchester, which increase in expenses over the last 3 years in Westchester has been 10%.  The reality is that the increase in expenses over the last 5 years has outpaced the increases in income shown by the surveys.  This disparity will only continue to grow because the legislature has removed all options for increasing legal rents other than the RGB authorized increases.  For the years 2016 to 2020

48

RGB increases have been an average of 1.6% a year for one year renewals and 1.33 from 2014 through 2020 for one year renewals and 2.33% for every other year for the period from 2015 to 2020 (2015, 2017) for 2 year renewals or 2% a year from 2014 through 2019 (2014, 2016, 2018) for 2 year renewals. However, expenses in the period between 2016 and 2018 increased 9% or an average of 3% per year – between almost 100% higher each year for 1 year renewals and 50% higher for 2 year renewals. Thus, HCR's own numbers from the yearly surveys confirm that owners' net operating income is being reduced each year. In fact, particularly for units with long-term tenants, the cumulative impact of the RGB extremely low increases could eliminate the owner's net operating income entirely now that the HSTPA eliminates virtually all other sources of income. This is the essence of a "taking" in violation of the Constitution.

81.     Based on an analysis of data originating from the New York Department of Finance, the value of buildings with predominantly non-stabilized units is approximately double, or more, the value of a buildings with predominantly ETPA units. For example, using market value data for properties that sold in 2016 shows that properties with 25% or less rent stabilized units sold for twice the square foot price of buildings with 75% or more rent stabilized units. Put differently, properties with predominantly rent stabilized units were worth half as much as properties with predominantly non-regulated units. In fact, the data demonstrates a linear relationship in the per-square foot value of a building based on the percent of the building units that are subject to the HSTPA. In other words, the sales price per square foot of a building is reduced in direct relationship to the amount of square feet that are regulated by the HSTPA. Buildings where HSTPA units account for almost 100% of the units can expect a price per square foot of two-thirds less than the price per square foot of buildings where rent stabilized units account for almost 0-20% of the units. The reduced value of the regulated units is further confirmed

by the New York City's Department of Finance assessed values of properties, which computations are comparable for Westchester County. For example, in 2019, the market value of a building with 25% or fewer regulated units had a per square foot market value ($233/sq. ft.) or more than double the value of buildings in which 75% or more of the units were regulated ($97/sq. ft.). When properties that are eligible for a full tax exemption are removed from the database, the disparity becomes even greater. Then, properties with 25% or fewer stabilized units have a value assessed by the City that is more than 2.5 times greater than the buildings with 75% or more of the units regulated. The statistics in Westchester County can be presumed to be similar.

82.     New York City's Department of Finance's 2019 "Assessment Guidelines for Properties Values Based on the Income Approach" is itself an admission by the City that rent stabilized units have a lower value than comparable unregulated units. Westchester is no different. Those guidelines include a range of values per square foot for various properties including both regulated and unregulated residential properties. For example, for rental properties built post-1973 in Manhattan, the Assessment Guidelines concede that unregulated properties have a value that is 11% to 45% greater than their regulated counterparts. For rental properties in Manhattan built pre-1973, the guidelines admit that the value of regulated properties are half that of their unregulated property peers. In other words, by designating a property for ETPA, Defendants take at least half the value of that property from its owner. Thus, even prior to the Housing Stability and Tenant Protection Act of 2019, half to two-thirds of the value of buildings with a significant percentage of ETPA units was eliminated and the HSTPA has made that even worse. The HSTPA has virtually taken away an owners' ability to increase rents to pay for needed improvements, maintenance, upkeep, capital improvements and repairs and have in most cases eliminated an

owners' ability to remove units from the ETPA coverage and virtually destroyed the value of these buildings (See Dansker, *supra.*).

83.     The perpetual renewal of a nominally temporary remedy itself interferes with the reasonable expectations of owners. Indeed, the ETPA declares that "the ultimate objective of state policy" is "the transition from regulation to a normal market of free bargaining between landlord and tenant,"*supra.* Having defined the ETPA to be a temporary measure, the HSTPA now makes it permanent.  Defendants should be estopped from challenging the reasonableness of owners in relying upon those very representations. The HSTPA has virtually eliminated a real estate investor's reasonable investment-backed expectations by, among other things, compounding the limitations on the various economic rights of property owners. By limiting permissible rental rate increases to very small amounts each year for the past six years, the Defendants have further prevented owners from achieving the growth in rents that would be reasonably expected by any investor. By eliminating the availability of such vacancy rent increases, the HSTPA denies owners any meaningful ability to partially offset the sub-market-rate rents and to recover for those costs of vacancies.


**FOR A THIRD  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The HSTPA Violates Due Process In That It Does Not meet Statutory Goals as it Negatively Affects Cooperatives, Condominiums, Single Family Homes**

84.     The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

85. Among other things, the 2019 Housing Stability and Tenant Protection Act also detrimentally affects not only ETPA landlords, but others, including cooperatives, condominiums and single family house owners and it affects all landlord groups in that it:

a) Limits the amount of security or advance payment that a landlord can collect to one month and issues now exist as to one payment leases such as for vacation homes;[7]

b) Abolishes the common law rule and now requires landlords to take "good faith" steps to re-rent if tenant vacates during lease term;

c) Prohibits collecting more than $20 per applicant by a landlord for an application and then only for credit check;

d) Imposes multiple inspection periods for security deposit and return;

e) Limits the amount of late fees to $50 or 5% of rent, whichever is less, no matter what the amount of rent, therefore, if the rent is $7500 a month, the late charge cannot exceed $50.00;

f) Cannot review prior court eviction actions for prospective tenants thereby leaving landlords open to renting an EPTA apartment to a serial non payer or problem tenant and also prohibiting cooperatives from similarly investigating to assure proper due diligence in financial verification of prospective shareholders;

g) Prohibits suing in an eviction proceeding for 'additional rent,' such as outstanding legal fees, late fees, repair fees, air conditioning charges, unpaid coop assessments, sublet fees, etc. thereby removing the ability of a landlord (and cooperative or condominium or home owner) from effectively having a timely enforcement mechanism for collection of these items;

h) Prohibits legal fees to be awarded on a defaulted non payment eviction proceeding, causing the landlord or cooperative to bear the legal fee burden;

i) Extends the time for the bringing of an eviction proceeding by requiring 5 day notice if rent not paid on time; and an additional  14 day notice rather than the traditional

---

[7]        For example, if a vacation rental is prepaid for the season, that now appears to be illegal; if a cooperative is willing to take a chance on an applicant and asks for a year's maintenance in escrow to assure compliance with the payment of maintenance, that is now forbidden and therefore will lead to more applicant rejections.

3 day notice of non payment; and finally by delaying the Marshal's notice from 72 hours to 14 days. Duplication of notices adds nothing but time and cost to the lessor;

j)  Extends the time a judge can grant a tenant to vacate for up to a year; and extends timing for bringing eviction action from 5 to 12 days to 10 to 17 days.

k)  Requires notices from 30 to 90 days if Landlord does not intend to renew the lease or increase the rent more than 5%;

l)  Provides 14 day delay of trial if tenant requests an adjournment rather than the former requirement of trial within 10 days;

m) Eliminates increases in preferential rent on lease renewals;

n)  Seemingly prohibits Landlords from terminating month to month tenancies.

o)  Eliminates vacancy and longevity increases, limiting return on investment and less income to run buildings;

p)  Limits Individual Apartment Increases for renovation work on an apartment to $15,000 total expenditure over 15 years for no more than 3 renovations and must be removed after 30 years together with RGB increases; (will lead to less apartment renovation or upkeep), thereby leading to less improvements to apartments with new tenants having to take older kitchens / bathrooms / balance of apartments;

q)  Limits Major Capital Improvement increases to 2% of the tenant's rent and must be removed after 30 years together with RGB increases, thus leading to a deterioration of the housing stock because of less MCIs due to inability to be paid back for cost of MCIs;

r)  Prohibits the Rent Guidelines Board from granting vacancy increases or low rent increases;

s)  Extends overcharge period to 6 years and allows HCR to go back any period to determine correct rent, thereby requiring Landlords to keep records virtually forever;

t)  Eliminated "safe harbor" for overcharge complaint thereby making treble damages compulsory without allowing Landlords to rectify mistake and pay back overcharge before finding issued;

u)  Eliminates high rent decontrol;

v)  Eliminates high income decontrol;

53

w) Limits income thereby reducing the return on investments as well as funds available for maintenance,  upkeep and repair of apartments and buildings;

x) Eliminates eviction plans for conversion to cooperative or condominium ownership of rental properties;

y) Raises bar to effectively prohibit conversion plans for conversion to cooperative ownership for non eviction plans, raising number of assenting renters to 51% from 15% of renters or purchasers;

z) Written receipt must be supplied by landlord if payment by any method other than personal check, therefore, direct deposit payments must generate written receipt;

aa) Made the Emergency Tenant Protection Act, as modified by the HSTPA of 2019 virtually permanent regardless of the fact that the concept of the ETPA was to work towards market rate housing, a goal that can never be obtained given the HSTPA.

86.   The HSTPA therefor, as an apparent unintended consequence has negatively affected the Cooperative industry in New York by imposing on its many financial limitations that can only serve to destroy the very housing market, i.e., affordable ownership housing, that the Legislature should be supporting.  Even the one proposed law to limit the damage is very narrowly tailored and does not deal with many of the difficulties that the HSTPA causes cooperatives.

**FOR A FOURTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**THE FAILURE TO REVISIT THE 5% THRESHHOLD AS WELL AS THE DECLARATION OF EMERGENCY IN THE ETPA BURDENED WESTCHESTER COMMUNITIES  IS A VIOLATION OF DUE PROCESS**

**The 5% Vacancy Threshold is Long Outdated**

87.     The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

88.      82% of the ETPA apartments in Westchester are in the cities of Yonkers (40%, adopted 10/15/78); Mt. Vernon (19%, adopted 9/27/78); New Rochelle (14%, adopted 12/27/79)

and White Plains (9%, adopted 10/6/80).   The other 18% are in various other communities where the existence of a housing emergency is more than questionable, particularly in light of the new construction (see Mamaroneck and Harrison below).   Since that time there have been no surveys since ETPA was initially adopted.   This is an outright constitutional violation, particularly in light of the fact that there has been substantial construction of multi family apartment units completed in the interim, with more planned for the near future. Specifically, in;

      a.    Yonkers, 1165 apartments units have been constructed with 590 additional under construction, resulting in 1765 new apartment units;

      b.    New Rochelle;  1000 apartment units have been constructed;

      c.    White Plains:   825 apartment units have been completed, 430 more are under construction and 800 planned, resulting in 2059 new apartment units.

      d.    Mamaroneck;  227 new housing units completed;

      e.    Harrison:      36 new housing units completed;

      f.    Hastings on Hudson: 66 new housing units completed.

    89    The addition of the apartment units in each of these communities should, at a minimum, have resulted in a new study to determine whether in fact, in light of the amount of new housing, there is an emergency that requires the continued existence of the HSTPA.   To not conduct surveys in almost 40  years in light of the expanded residential opportunities is a violation of the due process rights of every landlord in these ETPA / HSTPA communities.   Most significantly, particularly in light of the above, no municipality has revised or reviewed or revisited the 5% threshold on a regular basis to determine whether in fact a housing emergency or "acute shortage of housing" still exists, and thus satisfying and confirming the initial rationale for the emergency declaration, nor is there any rationale for continuing to use the 5% threshold. Therefore,

the underlying basis for the legislation cannot be said to still exist in most of the municipalities that adopted and opted into the ETPA approximately 40 years ago[8] and now are also bound by the HSTPA; a violation of the constitutional rights of all subject to these out of date laws where no vacancy surveys have been done in the approximately 40 years.  Therefore, without legal rationale and I not revisiting or revising the 5% threshold, the local communities continuation of the ETPA through the HSTPA as well as the grounds renders the HSTPA unconstitutional.

90.    Under the ETPA, a municipality that has declared a housing emergency may declare that the regulation of rents does or does not serve to abate the emergency, and  also may remove one or more (or all) classes of accommodations from rent regulation.  Yet, neither any municipality in the suburbs of New York City, nor any of the Defendants have exercised that authority to determine whether rent regulation serves to abate any purported emergency nor have any of the municipalities, except as set forth hereinabove as to Ossining, conducted a survey in decades, to determine whether the 5% vacancy rate still exists in the individual communities.  The failure of the suburban communities to conduct a survey since the initial adoption of the ETPA violates the due process rights of every Landlord / Owner since it is patently clear that with all the new construction, particularly in the cities, the vacancy rate rises well above the statutory 5% requirement.[9]  Defendants' failure and refusal to exercise that statutory authority further deprives the Plaintiffs of their substantive right to Due Process.

---

[8] As stated, except for Ossining  (in 2018 and 2019) which adopted ETPA for buildings over 20 units and provided an "opt-out" if a 20% affordable housing set aside was agreed to, and Croton and Port Chester, both of which adopted ETPA as to one building, the balance of the 18 Westchester communities adopted ETPA no later than  1981.

[9]     Ossining is the only exception having voted in ETPA in the last year, using a faulty survey of vacancies that eliminated from consideration all vacant apartments that were being renovated, or painted or improved for new tenancies.  Moreover, several vacant apartments were not counted in buildings where the surveyors could not get access.

91. The HSTPA applies in Westchester, Rockland and Nassau Counties as well as in New York City. The continuation of ETPA without a review of the 5% threshold in the various communities in Westchester on its face violates Due Process and is arbitrary and irrational and a violation of law and lawful procedure as well as the constitutional rights of property owner.

92. The governing statute permits the local communities in Westchester to declare a housing emergency when there is a vacancy rate of 5% or less—but provides that "[a]ny such determination" is to be made not just "on the basis of the supply of housing accommodations…," but also "the condition of such accommodations and the need for regulating and controlling residential rents…."N.Y. UNCONSOL. LAW § 8623.a (McKinney).

93. The various communities in Westchester have continued the ETPA and now the HSTPA without any meaningful support for or analysis of whether a housing emergency still exists or whether only a particular class of housing is experiencing an emergency; or whether an emergency would be ameliorated by "regulating and controlling residential rents." This violates the various constitutional protections.

94. The various communities have not, since the initial declaration of an "emergency" established any rational basis or surveys for determining that a housing emergency still exists—the finding required by the statute. In fact, Defendants have failed to even identify the variables that should be used to determine whether an emergency still exists (let alone the threshold at which those variables might be indicative of an emergency). That renders the promulgation of the HSTPA arbitrary and violative of Due Process.

95. The HSTPA applies in 21 Westchester communities as a result of the initial declaration by each community of a housing emergency within that community without thereafter

ever doing a survey to see if the 5% threshold has been met or kept. This violates Due Process and is arbitrary and irrational.

96.      The ETPA provides that a municipality that has declared a housing emergency may at any time declare that the emergency is wholly or partially abated, or that the regulation of rents does not serve to abate the emergency, and in that way may remove one or more (or all) classes of accommodations from rent regulation. The New York statute permits the declaration of an emergency only if the vacancy rate is at or below 5%. Put another way, the mere fact that there was or is a 5% (or lower) vacancy rate does not by itself provide a justification for declaring a housing emergency, but is instead a precondition to making a determination of whether such an emergency exists and there is "the need for regulating and controlling residential rents." UNCONSOL. LAW § 8623.a (McKinney). Even when the vacancy rate in a local community is shown to be less than 5%, the community must separately consider and decide whether a housing emergency still exists. Virtually none of the 21 communities that have adopted ETPA have conducted a survey since initially adopting ETPA to assure that there is still a 5% vacancy rate in the community,[10] nor have any of them adopted a resolution since the initial adoption of ETPA with a determination that a "housing emergency" still exists. This again violates due process and is arbitrary and capricious. In fact, after 45 years-plus of ETPA, the local communities continue to ignore the requirement that there be less than 5% vacancies. This is a violation of the standards established under the Due Process clause of the Constitution.

---

[10] The Village of Ossining initially adopted ETPA in 2018 with a questionable survey that eliminated many vacant apartments from consideration. Thereafter, in February 2019, it exempted all housing of 20 or less units and provided that a landlord with more than those number of units could opt out of ETPA if it agreed to provide 20% of its units for lower income tenants.

97.     Defendants have not established any rational basis for determining that a housing emergency still exists in any of the 20 communities (excluding Ossining) in decades—the finding required by the statute. In fact, Defendants have failed even to identify the variables that should be used to determine whether an emergency exists (let alone the threshold at which those variables might be indicative of an emergency). Every community with ETPA has, for decades, failed to offer either a rational explanation or justification for the continuation of ETPA and now the promulgation by the state of the HSTPA. They have failed to identify any thresholds constituting an "emergency," failed to articulate the criteria or bases for their lack of a determination and further surveys, and failed to explain, or even consider, whether the continued and expanded rent regulation under the HSTPA that follows from their lack of a determinations actually addresses the perceived housing emergency. As a result, the determinations on which the continuation of the ETPA system as well as the promulgation of the HSTPA rests are arbitrary and irrational and a violation of the Due Process and property rights of Plaintiffs and their members.

98.     Moreover, even if one assumes that the vacancy rate is less than 5% it does not justify the conclusion that a housing emergency still exists in each and every community that has since 1974 adopted ETPA. The Communities that have adopted ETPA appear to incorrectly believe that so long as the vacancy rate is below 5%, an emergency exists regardless of other circumstances. This is wrong. Communities such as Yonkers, White Plains and New Rochelle, among others, have had a resurgence of building with thousands of new housing units coming on board. These units should be considered as to the 5% vacancy claim and certainly, if there is another survey, the 5% vacancy rate would be significantly higher than 5%. The arbitrary 5% vacancy-rate threshold established by statute as authorizing a municipality to consider declaring a housing emergency determination only emphasizes the need for careful consideration by every municipal

government and governing body —separate and apart from the vacancy rate itself—whether a housing emergency actually exists.[11]   But the lack of any record compiled in connection with the continued emergency finding provides no basis whatsoever for any of the local communities to continue ETPA and the HSTPA without further review and analysis of whether there is an emergency.  While perhaps politically popular, the rote renewal and permanency of the ETPA by the HSTPA on the basis of such an outdated "emergency finding" without further surveys to determine whether there is still a 5% vacancy, violates Due Process.

## FOR A FIFTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

### THE  2019 HOUSING STABILITY AND TENANT PROTECTION ACT  EFFECTS A *PHYSICAL* TAKING OF THE PROPERTIES STILL AND CONTINUING TO BE SUBJECT TO ETPA REGULATION, INCLUDING NOT HAVING THE RIGHT TO EXCLUDE OR CHOOSE

98.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

99.    The HSTPA deprives property owners of their basic ownership right to either choose, include or exclude those that it selects from their property and to possess, use,

---

11 Emergency Tenant Protection Act, Chap. 576, Laws of 1974 The local governing body of a city, town or village having declared an emergency pursuant to subdivision a of this section may at any time, on the basis of the supply of housing accommodations within such city, town or village, the condition of such accommodations and the need for continued regulation and control of residential rents within such municipality, declare that the emergency is either wholly or partially abated or that the regulation of rents pursuant to this act does not serve to abate such emergency and thereby remove one or more classes of accommodations from regulation under this act. The emergency must be declared at an end once the vacancy rate described in subdivision a of this section exceeds five percent.

***

c. No resolution declaring the existence or end of an emergency, as authorized by subdivisions a and b of this section, may be adopted except after public hearing held on not less than ten days public notice, as the local legislative body may reasonably provide.

and dispose of their property or concomitantly, to use, rent and own their property without improper, illegal and unconstitutional government interference and restriction. That physical taking without compensation renders the HSTPA  on its face a per se violation of the federal Constitution's Takings Clause.

100.    The HSTPA  accomplishes this taking through a web of regulations that effects a  physical taking of rental properties just as clearly as if New York State commandeered a leasehold interest or easement in HSTPA regulated apartments outright. Some of the restrictions, in addition to those set forth *infra*,  that are newly imposed or added to the former limitations are as follows:

a.    The government mandates the now PERMANENT, continued, indefinite occupation of rental properties by tenants – the ETPA no longer "sunsets" every 4 or so years, HSTPA never sunsets.

b.    HSTPA owners cannot refuse to renew leases except in extremely few and far between narrow circumstances.

c.    Owners cannot increase rent by more than 5% or refuse to renew a lease without a 30, 60 or 90 days' notice, as the case may be.

d.    The elimination of this right to exclude is not limited to the original tenant—the tenant may give his or her right to the unit to another person, the so called 'succession' right, and the property owner must allow that "successor" to renew his or her lease on government-dictated terms. The law thus confers a life estate with inheritance rights once an apartment is rented in an ETPA covered unit.

e.    The Housing Stability and Tenant Protection Act of 2019 further limits a property owner's ability to evict a tenant, including a stay of eviction for up to one year, multiple

redundant notices, lengthy court proceedings, virtually automatic adjournments of court proceedings to tenants, etc. The HSTPA and its restrictions are permanent, forever and never to be eliminated.

f.    The HSTPA effectively denies property owners the right to possess and use their own property. Although the law appears to give owners the right to recover possession for personal use, that provision is hedged with restrictions: the unit must be used as a primary residence, recovery of possession is not available to owners who hold property through a corporate form, and extends to only  one owner even if the property is owned by multiple owners and limits the ability to obtain the premises from tenants who have been in occupancy less than 15 years (reduced from the former 20 years) and with other restrictions. The HSTPA added a one-unit limitation and imposes other new restrictions, replacing the previous "good  faith" requirement with a showing of "immediate and compelling necessity" (a demanding standard), and precluding the recovery of possession for personal use if the tenant has lived in the building for 15 years, unless the owner offers equivalent housing accommodation at the same ETPA rent in the same or nearby building. Moreover, in, for example a building of 250 units, an owner is prohibited from reclaiming more than one apartment, even though it would have a negligible impact on the building.   When the government decrees that a tenant's rights take precedence over the owner's own use and occupancy of a unit or building, the government has effectively seized that property to the same extent as if it had taken over the building as a government housing facility, again an unconstitutional taking and one without compensation.  Furthermore, an owner is also limited in recovering an apartment "where a tenant or the spouse of a tenant lawfully occupying the dwelling unit is sixty-two years of age or older, or has an impairment which results  from

anatomical, physiological or psychological conditions" which prevents "substantial gainful employment." It does not matter whether the owner also is 62 or older, or has an impairment, or is even decades older than the tenant—the tenant still receives priority over the property owner. When the tenant is over 62 or disabled, the owner must "offer[] to provide and if requested, provide[] an equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area" in order to regain his property for his own use." This is an absolute restriction on the Owner's right to the use of its real property giving the Tenant a veto power over the landlord.

g.    Decisions in the analogous rent control context highlight how great a burden the "immediate and compelling necessity" test imposes on property owners. For example, in *Boland v. Beebe,* 62 N.Y.S.2d 8, 12 (Syracuse Municipal Court, 1946), the court found that "the landlord and her family are seriously overcrowded," with several children and their spouses living in one flat, and found that access to the rented unit was a "necessity," but deemed it not to be an immediate compelling necessity. Similarly, in *Cupo v. McGoldrick*, 278 A.D. 108 (N.Y. App. Div. 1951), a property owner with an enlarged heart attempted to move from the fourth floor of her walk-up to the ground floor. Despite sworn testimony from the property owner's doctor that the fourth-floor apartment would "become increasingly dangerous to her health," the court affirmed a finding of no "immediate and compelling" necessity after the tenant claimed that he once saw the property owner "climbing the stairs unnecessarily." *Id.* at 109–10. Thus, under the HSTPA not only would an owner have no ability to obtain for her own use a second (or alternative) unit in his or her own building, if he or she had not already lived in that building, the owner would likely be unable to even meet the showing of "immediate and compelling" necessity to obtain the use

of a single unit in his or her own building.  Even in the rare circumstance in which the owner is able to demonstrate an immediate and compelling necessity, the unit cannot be obtained if it is occupied by a tenured, elderly or infirm tenant. Thus the owner is still limited in his rights to use that property. The owner is then forbidden for three years from "rent[ing], leas[ing], subleas[ing] or assign[ing]" the unit "to any [other] person" except for "the tenant in occupancy at the time of recovery under the same terms as the original lease."  In other words, the owner cannot even sublease the property during that three-year period, a right that his tenants would enjoy if they occupied the property.   These multiple restrictions on an owner's ability to regain possession of units for the owner's personal use separately and together deny owners the right to occupy, possess and use their own property and effect an uncompensated physical taking of the property and constitute constitutional infirmities that render HSTPA unconstitutional

h.    Prior to the HSTPA property owners could convert buildings into cooperatives or condominiums using either eviction or non-eviction plans and as stated this has been virtually eliminated.

101.    Through the HSTPA, Defendants are violating this fundamental principle, depriving Westchester County multi-family property owners of their fundamental property rights, including their right to choose and/or exclude others from their property, and to possess, use and dispose of that  property and achieve a reasonable return on their investment.   A government-sanctioned physical invasion of private property is a *per se* taking requiring compensation. The category of *per se* takings is not limited to physical seizure of property by the government; it also encompasses access easements of indefinite duration *(Dolan v. City of Tigard*, 512 U.S. 374 (1994)), and even flyovers that appropriate airspace if it renders the "taken" areas uninhabitable

(*United States v. Causby*, 328 U.S. 256 (1946)). The Supreme Court has held specifically that granting a "permanent and continuous right to pass to and fro'" over private property is a "permanent physical occupation." *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–32 (1987). As described herein, multiple provisions of the HSTPA subject property owners to such physical invasions due to the fact that the landlord of multi family dwellings subject to the EPTA and the HSTPA are the only group that bears the burden of this legislation and restrictions attendant thereto. In *Dolan*, Chief Justice Rehnquist, in writing for the Court, held that the City's conditioning of a permit to redevelop a site upon the dedication of a portion of the site to the establishment of a drainage system and an additional strip of land for a bicycle pathway violated the Takings Clause. The same exists herein with the legislature more than conditioning and basically restricting not only the economic return, but the ability to freely use and/or dispose of one's own property.

102.    The HSTPA imposes unconstitutional conditions on building owners' use of their property. In order to rent out a pre-1974, six-unit-plus building covered by the HSTPA, a building owner must acquiesce in a set of rules that impose on the owner the indefinite physical occupation of rented units by tenants and their successors at below-market rents with any increases controlled by government regulation. An owner of a pre-1974 six unit plus building cannot participate in the rental market without acquiescing in that regulatory system, which (as discussed in detail herein) effects a per se taking. And once a property is placed into that rental market, the owner's ability to make a reasonable return on investment with this now permanent restrictive legislation is virtually eliminated.

103.    While government cannot condition an owner's ability to rent its property on the elimination of the owner's rights to include or exclude others from its property, and to possess, use and dispose of that property, the HSTPA has done just that. See *Loretto*, 458 U.S. at 439 n.17

65

(holding that New York law effected a taking because "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation"); Thus, the adoption of the HSTPA violates the constitutional rights of every multi family ETPA restricted property owner subject to the terms and restrictions included therein.

104.   Practically each individual provision of the HSTPA constitute a per se taking.

a.   First, the HSTPA mandates the continued occupation of rental properties by tenants, and owners cannot refuse to renew leases to those tenants except under the narrowest of circumstances. Not only do owners have no way to remove the original tenant in the property, but they must suffer the intrusion of strangers—sub-lessors and successors of the tenant—the selection and admission of whom the owner is given no right to oppose. The "right to exclude others" from "one's property" is "'one of the most essential sticks in the bundle of rights'" that characterize property, yet the HSTPA restricts just that. *Dolan*, 512 U.S. at 393 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). That the HSTPA deprives property owners of that "essential stick" demonstrates that the law effects a per se taking of the owner's property.

b.   Second, the HSTPA completes the physical occupation of the Plaintiffs' property by taking from the property owners the right to possess, use, and dispose of property. "Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.' To the extent that the government permanently occupies physical property, it effectively destroys each of these rights." *Loretto*, 458 U.S. at 435 (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)). The HSTPA not only denies property owners the fundamental right to exclude others, but also denies them the rights of use, possession, and disposal, leaving property owners with only the shell of ownership.

66

c.      Third, the HSTPA also dramatically limits the property owner's ability to dispose of his or her own property. Tenants may not be denied a lease renewal even if the owner wants to repurpose the building to non-housing rental purposes. See 9 NYCRR § 2504. If an owner wanted to cease offering the property for rent entirely—if the owner effectively wanted to go out of business and not use the property for any purpose the owner can only, with restrictions, demolish the property and cannot convert it to another use.

105.    In passing the Housing Stability and Tenant Protection Act of 2019, New York has eliminated almost every avenue that allowed a transition from regulation to free market,[12] eliminated any sunset period for the law, and imposed obligations on owners that extend more than thirty years into the future. The HSTPA is of "indefinite duration." Unlike other rent control ordinances that merely fix a cap on the rents that can be charged, the HSTPA imposes a physical occupation on the property owner, denying the owner all the significant elements of its constitutionally protected bundle of property rights. Thus, "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435. In so doing, the HSTPA constitutes a per se taking, for which the property owner receives no compensation at all.

106.    "[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within th[e] category of interests that the Government cannot take without compensation." *Kaiser Aetna*, 444 U.S. at 179–80 (holding that a government order that the owner of a marina open it to the general public imposed "an actual physical invasion of the privately owned marina"). This right is denied property owners of ETPA rental housing in Westchester

---

[12]    The basic ETPA "purpose" clause provides that the ultimate goal is to arrive at a free market rental structure, now a virtual impossibility.

County in that, simply, they have to rent and continue to rent to those who are living in an apartment and moreover, have the absolute right to renew their leases every 1 and 2 years. The HSTPA requires property owners to provide tenants the option to renew their lease at RGB prescribed rates.

107.   By requiring the owner to renew the lease of the existing lessee (and their successors under the law – not even the persons that the landlord / owner first rented to), the law deprives the owner of his or her fundamental right to exclude others from his or her own property. This imposition of a right for the tenant and successor, to renew his or her lease into the indefinite future, and fixing the terms of the offer for renewal, is a physical taking for which the Fifth Amendment requires just compensation. Yet owners receive **no** compensation for the forced housing of individuals not of their choosing at below market rents. That elimination of the right to exclude is not limited to the original tenant. There are a host of legal requirements that allow the tenant to give to another person the tenant's rights to the unit. These "succession" rights prevent owners from excluding strangers from the property, because they are forced to continue permitting the new "successor" tenant to renew his or her lease at below market rates. The original tenant, for example, retains the right to give the ETPA unit and the right to lease renewal to "any member of such tenant's family … who has resided with the tenant in the housing accommodation as a primary residence for a period of no less than two years, or where such person is a 'senior citizen,' or a 'disabled person' … for a period of no less than one year, immediately prior to the permanent vacating of the housing accommodation by the tenant, or from the inception of the tenancy or commencement of the relationship, if for less than such

periods, shall be entitled to be named as a tenant on the renewal lease.".[13] Family members who resided with the tenant for 2 years immediately preceding the death or permanent departure of the tenant scan receive this benefit and "[a]ny other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person and the tenant or permanent tenant" or for 1 year for a disabled person or senior citizen.

108.    By denying the property owner the right to exclude a tenant upon the expiration of the tenant's lease, by denying the property owner the right to exclude successor tenants the HSTPA has fundamentally constricted to the point of nonexistence the property owner's "right to exclude." This deprivation is even greater than an access easement (as in *Dolan*) where individuals are permitted to pass periodically. Under the HSTPA, individuals (many not of the owner's choosing) are permitted to take up permanent residency on a property, go to and fro as they wish, and for all practical purposes treat the property as their own, bequeathing to family members, or even selling their interest in the property back to its rightful owner. As the Supreme Court has noted, "an owner suffers a special kind of injury when a stranger directly invades and occupies the owner's property. . . To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." *Loretto*, 458 at 436.

---

[13] (1) Unless otherwise prohibited by occupancy restrictions based upon income limitations pursuant to federal, state or local law, regulations or other requirements of governmental agencies, if an offer is made to the tenant pursuant to the provisions of subdivision (a) of this section and such tenant has permanently vacated the housing accommodation, any member of such tenant's family, as defined in section 2520.6(o) of this Title, who has resided with the tenant in the housing accommodation as a primary residence for a period of no less than two years, or where such person is a "senior citizen," or a "disabled person" as defined in paragraph (4) of this subdivision, for a period of no less than one year, immediately prior to the permanent vacating of the housing accommodation by the tenant, or from the inception of the tenancy or commencement of the relationship, if for less than such periods, shall be entitled to be named as a tenant on the renewal lease.

109.    The HSTPA both significantly limits the owner's right not to renew a tenant's lease and also substantially eliminates the owner's ability to remove a tenant. Even before the HSTPA, the property owner could only evict a tenant for failing to pay rent, creating a nuisance, or for violating the lease or the law—conduct that is solely within the tenant's control.  As a result of the Housing Stability and Tenant Protection Act of 2019, the property owner's ability to evict a tenant is even more significantly constrained. For example, this law also permits a stay of execution of eviction for a period of one year if the tenant can demonstrate an inability to obtain other housing or to prevent hardship, such as a child in school. Thus, even tenants who are breaking the law or failing to pay the rent on time may be entitled to a year of tenancy upon a showing of "hardship."  Further, the following additional restraints have been placed on Landlords seeking to evict tenants:  increasing the 3 day notice period to 14 days; increasing the 72 hour notice period by a Marshall after a judgment has been awarded and a warrant served from 72 hours to 14 days; increasing the return date time from 5 to 12 days to 10 to 17 days; giving tenants the right to adjourn a trial automatically to 14 days from requiring a trial within 10 days; requiring an additional notice to a tenant that the tenant is late in payment of rent- service after 5 days by certified mail only, etc.

110.    Not only does the Housing Stability and Tenant Protection Act of 2019 make it more difficult to evict a tenant, but it also makes it more difficult to select tenants in the first place. For example, the  HSTPA precludes property owners from refusing to lease to a tenant due to the tenant's past or pending landlord/tenant action(s), seals records of evictions, and precludes the  sale  of  data regarding judicial proceedings related to residential tenancy. By precluding owners from refusing to offer leases to tenants with prior rental violations, the HSTPA turns tenants with bad rental backgrounds into "protected classes," and precludes owners from excluding

such tenants from their units. Through these revisions, the HSTPA dramatically reduces the ability of owners to exercise their right to exclude through due diligence. It also increases the exposure for rent overcharges to 6 years from 4, and allows HCR to consider the proper rent with no time limit backwards. Further, under the HSTPA even investigating as to prior court histories as to tenants is illegal. Also under HSTPA units that were rented to charitable organizations to house vulnerable individuals or those who were homeless or at risk of becoming homeless (which units had previously been exempted from rent stabilization) will become subject to stabilization, and the individuals living in those units are deemed to be tenants under the HSTPA. By extending the lease renewal protections to such tenants, the Amendments further impair owners' ability to select the tenants who live in their buildings and may even require lease renewals to those tenants of these entities. This precludes the entities themselves from choosing their occupants who may require supervision and similar assistance, clearly another unintended consequence since these agencies frequently only want or accept short term tenants.

111.     The principal permissible reasons for tenant eviction all remain within the tenant's control, such as the tenant's non-payment of rent, the tenant's violation of a substantial obligation of his tenancy, the tenant's committing a nuisance, or the tenant's use of the unit for an illegal purpose.. Although non- renewal of a lease is permitted in certain limited circumstances where the owner seeks to occupy a unit or demolish a building, those exceptions are limited to the point of impracticability by the HSTPA.

112.     The lease renewal obligation extends not only to the tenant or tenants but also to "successors," such as the tenant's family members or any person residing with the tenant as a primary residence who can prove emotional or financial commitment and interdependence with the tenant. And the tenant's right to renew the lease persists even if the tenant subleases the

apartment for up to two years in any four-year period, and even if the sublease extends beyond the term of the tenant's lease.  With regard to succession "rights" that rest only with the tenant.  Some examples in one small building are three (3) apartments where the tenant's daughter is succeeding; the tenant's grand-daughter is succeeding and the tenant's son is succeeding.  That is only one building among all the hundreds of buildings in Westchester where there are succession rights that constitute a substantial limitation on landlords.

113.    The HSTPA substantially limits an owner's ability to dispose of its own property. For example, owners may not demolish their own buildings without finding each and every tenant suitable housing and paying for all relocation expenses.

114.    By denying the property owner the right to exclude a tenant upon the expiration of the tenant's lease, by denying the property owner the right to exclude successor tenants the HSTPA has fundamentally constricted to the point of nonexistence the property owner's "right to exclude," a fundamental stick in the bundle of the tenant's property ownership rights.  This deprivation is even greater than an access easement (as in *Dolan*) where individuals are permitted to pass periodically.   Under the HSTPA, individuals (many not of the owner's choosing) are permitted to take up permanent residency on a property, go to and fro as they wish, and for all practical purposes treat the property as their own, bequeathing to family members, or even selling their interest in the property back to its rightful owner. As the Supreme Court has noted, "an owner suffers a special kind of injury when a stranger directly invades and occupies the owner's property. . . To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." *Loretto*, 458 at 436.H

115.    The HSTPA both significantly limits the owner's right not to renew a tenant's lease and also substantially eliminates the owner's ability to remove a tenant. Even before the

HSTPA, the property owner could only evict a tenant for failing to pay rent, creating a nuisance, or for violating the lease or the law—conduct that is solely within the tenant's control.  As a result of the Housing Stability and Tenant Protection Act of 2019, the property owner's ability to evict a tenant is even more significantly constrained. For example, this law also permits a stay of execution of eviction for a period of one year if the tenant can demonstrate an inability to obtain other housing or to prevent hardship, such as a child in school. Thus, even tenants who are breaking the law or failing to pay the rent on time may be entitled to a year of tenancy upon a showing of "hardship."  Further, the following additional restraints have been placed on Landlords seeking to evict tenants:  increasing the 3 day notice period to 14 days; increasing the 72 hour notice period by a Marshall after a judgment has been awarded and a warrant served from 72 hours to 14 days; increasing the return date time from 5 to 12 days to 10 to 17 days; giving tenants the right to adjourn a trial automatically to 14 days from requiring a trial within 10 days; requiring an additional notice to a tenant that the tenant is late in payment of rent- service after 5 days by certified mail only, etc.

116.    Not only does the Housing Stability and Tenant Protection Act of 2019 make it more difficult to evict a tenant, but it also makes it more difficult to select tenants in the first place. For example, the  HSTPA precludes property owners from refusing to lease to a tenant due to the tenant's past or pending landlord/tenant action(s), seals records of evictions, and precludes the  sale  of  data regarding judicial proceedings related to residential tenancy. By precluding owners from refusing to offer leases to tenants with prior rental violations, the HSTPA turns tenants with bad rental backgrounds into "protected classes," and precludes owners from excluding such tenants from their units. Through these revisions, the HSTPA dramatically reduces the ability of owners to exercise their right to exclude through due diligence.  It also increases the exposure

for rent overcharges to 6 years from 4, and allows HCR to consider the proper rent with no time limit backwards.  Further, under the HSTPA even investigating as to prior court histories as to tenants is illegal.  Also under HSTPA units that were rented to charitable organizations to house vulnerable individuals or those who were homeless or at risk of becoming homeless (which units had previously  been exempted from rent stabilization) will become subject to stabilization, and the individuals living in those units are deemed to be tenants under the HSTPA. By extending the lease renewal protections to such tenants, the Amendments further impair owners' ability to select the tenants who live in their buildings and may even require lease renewals to those tenants of these entities. This precludes the entities themselves from choosing their occupants who may require supervision and similar assistance, clearly another unintended consequence since these agencies frequently only want or accept short term tenants.

## FOR A SIXTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

### The 2019 Housing Stability and Tenant Protection Act Took Away Many of The Few Property Rights Remaining With Multi Family Rent Regulated Property Owners  Without Due Process that Had   Still Remained Under ETPA And Interfered With The Contracts (Leases) Entered Into By The Landlords and Tenants.

117.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

118.    On June 14, 2019, the New York State legislature passed what the New York Senate Majority Leader Andrea Stewart-Cousins in a Joint Statement with the Assembly Leader Hastie said:

> "These reforms give New Yorkers the strongest tenant protections in history. For too long, power has been tilted in favor of landlords and these measures finally restore equity and extends protections to tenants across the state. These reforms will pass both legislative houses and we are hopeful that the Governor will sign them into law. It is the right thing to do."

"None of these historic new tenant protections would be possible without the fact that New York finally has a united Democratic Legislature. Our appreciation also goes to the tenant advocacy groups and activists that fought so hard to make this possible."

119.    It is clear from this statement that the legislature intended to impose society's burdens on landlords.  Legislators alleged that the purpose of preserving those ETPA units was to subsidize the cost of housing for New Yorkers, particularly for low- and moderate-income New Yorkers. The justification offered in support of the HSTPA emphasized the need to "protect their regulated housing stock, which provides and maintains affordable housing for millions of low and middle income tenants."  Without statistical or rational support, Westchester County was dragged along with legislation that has no benefit to the many communities and no rationale for its adoption. In fact, several of the Assembly people from Westchester recognized the harmful nature of the legislation and voted against it.

120.    In furtherance of its goal of precluding owners from using their properties for any purpose other than ETPA housing and in enforcing the substantial limitations of the HSTPA, and in denying landlords their constitutional rights, and in further taking their properties without just compensation, the legislature adopted many significantly damaging and ruinous ETPA amendments in HSTPA, including the following: The personal Use Exemption Dramatically Reduced; the elimination of  property owners' ability to recover possession of more than one unit within their own property for their own personal use and occupancy. . Even the right to recover one unit for use as the owner's primary residence is permitted only if the owner can show an "immediate and compelling necessity" for that one unit. Thus, the ability of a landlord to use and/or live in his / her / their own property has been substantially diminished without any compensation. Other limitations in the HSTPA are as follows: Luxury Decontrol Eliminated; High Income Decontrol Eliminated; cooperative and Condominium Conversion Dramatically Limited.

121.    Also eliminated was the Property Owner's ability to restore legal regulated rent on a lease renewal. Preferential Rents were those rents where a landlord reduced the rent temporarily due to market conditions. Under the case law as well as statutory law, the Landlord was entitled to restore the rent on a lease renewal as well as on a vacancy, to the legal regulated rent. This is and was a contract and agreement between the parties that allowed the restoration of all or a portion of the reduced rent to the legal regulated rent.

122.    Under the HSTPA, the reduced rent cannot now be restored on a lease renewal, an action that interferes with the contract (Lease) the Landlord and Tenant had entered into when the lease was signed. This arguably is an interference with an existing contract, another violation of the U.S. Constitution which protects the right to contract. Under the HSTPA, the Landlord is not allowed to restore the rent by raising the preferential rents to return to legal regulated rent on a lease renewal -- Prior to the HSTPA if a Landlord reduced the rent for a tenant to a lower preferential rent, the landlord could restore the rent up to and including the Legal Regulated Rent upon a lease renewal. That has been eliminated and once the rent is reduced, it permanently stays reduced for that tenant and his/her/their successors. This is a further constitutional violation.

123.    Article I, Section 10, cl.1 of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." While the right of contract is subject to the State's police power, as set forth herein, the issue is whether or not the HSTPA is addressed to a legitimate end, incorporating the purposes of the statute, and with measures that are reasonable and appropriate to that end. When no survey has been undertaken in almost 40 years in virtually every ETPA community, and there has been no survey, and no review of whether or not an "emergency" exists, that does not survive the constitutional test. The legislation cannot be addressed to a legitimate end when there is no conformity or compliance with the legislative goals.

124.    Property owners may not simply withdraw their buildings from the rental market. Under the Housing Stability and Tenant Protection Act of 2019, property owners now are very significantly constrained from converting rental buildings into cooperatives and condominiums. By dramatically limiting the ability of property owners to dispose of their own property, the HSTPA effects an unconstitutional physical taking of the property.  That the owner must determine to utilize his property in a different fashion is virtually eliminated which demonstrates how complete a physical taking is effected by the HSTPA.

**FOR AN SEVENTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 Housing Stability And Tenant Protection Act On Its Face Effects An Uncompensated Regulatory Taking Of Private Property.**

125.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

126.    Each of the factors relevant to the Constitution's Takings Clause weighs strongly in favor of finding a regulatory taking.

a. The HSTPA has a significant adverse economic effect on property values. A study assessing the Impact of the law prior to the Housing Stability and Tenant Protection Act of 2019 found that buildings with predominantly ETPA units have 50% of the value of buildings with predominantly market-rate units. Property assessment  guidelines indicate that unregulated properties have a significantly greater value than regulated properties. The will further increase the economic burden on regulated properties, because it, among other things, imposes restrictions on recovering the cost of improvements and by its express terms prevents owners from recovering anything close to the real cost of those improvements—even improvements that are required by law to, for example, comply

with building and housing codes. Recovery for improvements to individual apartments, as stated, is very limited.

b. For the same reasons, the HSTPA interferes substantially with investment-backed expectations. The HSTPA has imposed significant limitations on property owners' ability to recover the reasonable expenses associated with maintaining apartment units. And the *de minimus* rent increases permitted by the Rent Guidelines Board each year—below the Board's own calculation of the increase required to equal the growth in property owners' operating costs and expenses, and including recent years of rate freezes—contribute to that interference. (It is noted that Ossining Village, in 2018, in their first Rent Guidelines Board determination, imposed a 0% increase for one year lease renewals and .5% for two year lease renewals although for the rest of Westchester's ETPA communities the guideline increase was 1.75 and 2.75% for 1 and 2 year renewals respectively). While the Individual Apartment Improvements are limited as set forth above, similarly the Major Capital Improvements are also limited to the extent that recouping the costs are virtually impossible, with increases limited to 2% of the rent and have to be removed after 30 years, together with the Rent Guideline increases included therein.

c. The HSTPA does not provide any reciprocal benefits to property owners or compensation for their loss. This law is nothing but a taking without just compensation. Regulations that impose restrictions on property—such as zoning—may be upheld because the restricted property also benefits from the restrictions on neighboring property but with the HSTPA there is no such reciprocity. HSTPA properties receive no tax breaks or other government assistance. They are subject to the same expenses as properties with market-rate rentals.

d. The New York Court of Appeals has authoritatively determined that "a tenant's rights under an ETPA lease are a local public assistance benefit." *Santiago-Monteverde v. Periera*, 22 N.E.3d 1012, 1015 (N.Y. 2014). It stated that "[w]hile the rent-stabilization Act does not provide a benefit paid for by the government, they do provide a benefit conferred by the government through regulation aimed at a population that the government deems in need of protection." *Id*. at 1016. The government "has created a public assistance benefit through a unique regulatory scheme applied to private owners of real property." Id. at 1017 (emphasis added).   Yet it is the landlords who are bearing the total cost of the HSTPA.

127.     As the United States Supreme Court has explained, the purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The HSTPA is thus a public assistance benefit program paid for by a limited and discrete group of property owners, who themselves receive no benefit at all from the stabilization program, which weighs heavily in favor of finding a taking without just compensation

128.     The HSTPA effects not only a *per se* unlawful physical taking by depriving owners of their rights to use, possess, dispose of, and exclude others from their property; or in fact to choose those tenants they see as suitable (it is also noted that the Landlord can no longer consider the poor payment records of a prospective tenant that culminated in various court eviction proceedings), it also constitutes a regulatory taking of rental properties subject to the ETPA. The HSTPA's regulatory burdens have dramatically reduced the market value of regulated properties, in some cases by over 50%. Even the City of New York's own tax assessment guidelines concede that unregulated properties are typically worth 20% to 40% more

than regulated properties, and in Manhattan regulated properties on average are worth less than half as much as unregulated properties. The same is true in Westchester as the plethora of certiorari proceedings proves.

129.    Despite permissible rental increases over the last five-year period of a very limited amount on both one and 2 year leases (1.75; 2.00; 1.00, 0. and 1.75% for a one  year lease and 2.75, 3, 1.5, .5 and 2.75% for 2 years leases), the Housing Stability and Tenant Protection Act of 2019 eliminated vacancy, low rent, high rent, IAI, preferential lease renewal and MCI increases designed to help owners modestly alleviate the disparity with market rates, including, as stated heretofore, vacancy and longevity as well as IAI increases.

### FOR A EIGHTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

### Plaintiffs Bring These Claims Under The Fifth And Fourteenth Amendments To The United States Constitution And Under 42 U.S.C. § 1983 And 28 U.S.C. § 1331, And Seek Attorneys' Fees Pursuant To 42 U.S.C. § 1988(B).

130.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

131.    Plaintiffs seek declaratory and injunctive relief; they do not in this suit seek damages or compensation for Defendants' violation of their constitutional rights. See 28 U.S.C. § 2201(a) (district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"); Fed. R Civ. Proc. 57 ("[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate"). Declaratory and injunctive relief against future enforcement of the HSTPA will not only halt the deprivation of the constitutional rights of property owners, but will result in increased development of rental properties, better housing for a larger universe of renters, the amelioration of a constrained housing market, significant increasing availability of housing,

the amelioration of a constrained housing market, significant increasing availability of housing, more mobility of tenants and will force New York State and local municipal Westchester County governments to adopt fairer and more efficient means of providing housing to those most in need.

## THE LEGAL FRAMEWORK AS TO REGULATORY TAKINGS

132.    In *Manocherian, supra,* the Court of Appeals held:

> We held that a "burden-shifting regulation" will constitute a taking "(1) if it denies an owner economically viable use of his [or her] property, *or* (2) if it does not substantially advance legitimate State interests" *(id.,* at 107, citing *Nollan v California Coastal Commn.,* 483 US 825, 834, *supra; see also, Agins v Tiburon,* 447 US 255, 260). Failure to measure up to either criterion can invalidate a governmental incursion or encumbrance on private property rights *(see, Seawall Assocs. v City of New York, supra; Lucas v South Carolina Coastal Council,* 505 US ___, ___, 112 S Ct 2886, 2894; *Nollan v California Coastal Commn., supra; Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US 470, 485, 495; *Armstrong v United States,* 364 US 40, *supra).* We are governed by this framework and discern no analytical basis or precedential authority to drop below this floor of constitutional protection for property owners or to alter well-established substantive and procedural rubrics and guidance in this complex field. In particular, we are satisfied that even if the economic impact aspect of this test *(see, Hodel v Irving,* 481 US 704, 714) were not to be satisfied, that feature alone could not defeat the owners' interests and claims in a controversy such as this, without consideration and fulfillment of the substantial State interest and close causal nexus prong of the governing test, even as to regulatory takings.

> *Manocherian v. Lenox Hill Hosp.,* 84 N.Y.2d 385, 392, 643 N.E.2d 479 (1994)

133.    A review of the facts set forth hereinabove reveals that this "burden shifting" law both denies the owners "economically viable use of [their...] properties and (not only "or") does not substantially advance legitimate state interests, as set forth above.

134.    Further on in the *Manocherian* opinon, the Court stated that :

> While the typical taking occurs when the government acts to physically intrude upon private property, governmental regulations which limit owners' rights to possess, use or dispose of property may also amount to a "taking" of the affected property *(see, e.g., Agins v Tiburon,* 447 US 255, *supra; Nectow v Cambridge,* 277 US 183,

188; *Seawall Assocs. v City of New York,* 74 NY2d 92, 101, *cert denied sub nom. Wilkerson v Seawall Assocs.,* 493 US 976, *supra).* We held in *Seawall* that the challenged local law effected a regulatory taking and was unconstitutional because the burdens imposed on owners did not substantially advance the stated public aim of alleviating homelessness. The combined effect on the instant case of these principles gains inexorable momentum from the twin temples of the Supremacy Clause flowing from pertinent United States Supreme Court precedents and the stare decisis import of our own decisions. *Id.*

\*\*\*

We conclude that the peripheral and generalized State interests offered as justification for the regulatory mandates of chapter 940 [the law challenged in *Manocherian*] fail to sustain the legislation, as constitutionally required for such State action. They are not closely or legitimately connected to the long-established and recognized goals of the RSL and ETPA, which seek to ameliorate the emergency housing shortage. The regime of this statute, in significant functional respects, contradicts an essential tenet of housing protection, at the root of rent-controlled and rent-stabilized enactments. An overarching goal of the RSL and ETPA is to afford some measure of security to occupants so they do not lose their scarce dwelling space due to unilateral, oppressive activities from more powerful entities in the societal equation, whether they be landlords or employers or both. The insupportable contradiction in this statute is cogently demonstrated by its unabashed transfer to the corporate employer of greater eviction rights over its affiliated and disaffiliated employee subtenants than the owner is allowed to retain.

135.    Further, the "ad hoc, factual inquiries" necessary to determine if government regulation amounts to a taking of private property that requires compensation are guided by "several factors that have particular significance" under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), and other decisions.   Factors relevant to the regulatory takings inquiry include, among others:

(a) "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with investment-backed expectations" (*Penn Central*, 438 U.S. at 124). Judicial decisions assess the economic impact of regulation on the property owner by looking to the extent in the diminution of value caused by the regulation, including "the change in the fair market value of the subject property" (*Arctic King*

*Fisheries, Inc. v. United States,* 59 Fed. Cl. 360, 374 (Fed. Cl. 2004)); "the value that has

been taken" compared "with the value that remains" (*Keystone Bituminous Coal Ass'n v.

DeBenedictis,* 480 U.S. 470, 497 (1987); whether the owner can obtain a "'reasonable

return' on its investment" (*Penn Central*, 438 U.S. at 136); "the owner's opportunity to

recoup its investment or better" (*Florida Rock Indus., Inc. v. United States,* 791 F.2d 893,

905 (Fed.Cir.1986)); the decrease in the property's profitability (*Rose Acre Farms, Inc. v.

United States*, 373 F.3d 1177, 1188 (Fed. Cir. 2004)); or some combination of these

analyses. Virtually every one of these cases supports the contentions herein that the HSTPA

was a taking, since it clearly impacted negatively on the market value of all multi-family

housing in Westchester's ETPA communities; adversely affected the investment

expectations of those who invested in multi-family stabilized housing and basically

prevents a reasonable return on the investment of multi family housing as well as limited

the economic return on pre-existing financial expenditures, whether the capital investment

in housing or the expense of an MCI or an IAI to "temporary" or retroactive for 7 years as

to MCIs lowering the yearly increase from to 2% and then only in multi family buildings

where more than 35% of the apartments are subject to ETPA.

(b)       Whether the regulation creates an "'average reciprocity of advantage,'" such that

burdens and reciprocal benefits are shared among those affected by the regulation.

*Pennsylvania Coal*, 260 U.S. at 415. This factor reflects the core principle of the Takings

Clause that the Fifth Amendment bars the "Government from forcing some people alone

to bear public burdens which, in all fairness and justice, should be borne by the public as

a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). See *Penn Central*, 438 U.S.

at 147 (Rehnquist, J., dissenting) (regulations may reduce individual property values

without effecting a taking provided "the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the [regulation] will be benefitted by another"); *Pennell v. City of San Jose*, 485 U.S. 1, 22 (*Scalia & O'Connor*, JJ, concurring in part and dissenting in part) (San Jose's rent regulation ordinance created an "'off budget'" "welfare program privately funded" by landlords and was therefore a taking); *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (finding a taking where "Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing)" but "the expense was placed disproportionately on a few private property owners"); *Guggenheim v. City of Goleta,* 638 F.3d 1111, 1132 (en banc) (Bea, J., dissenting) (ordinance worked a regulatory taking where it imposed "a high burden on a few private property owners instead of apportioning the burden more broadly among the tax base").

(c)      "[T]he character of the government action," including that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good" (*Penn Central*, 438 U.S. at 124) (internal citation omitted))—a test that is satisfied when government intrudes substantially on a property owner's rights to use, possess, dispose, and exclude, e.g., *Kaiser Aetna*, *supra*.

136.    The character of the HSTPA as a public assistance benefit funded solely by (some) building owners, and the absence of any reciprocity of advantage to those owners,  further establishes that it is a regulatory taking.  Accordingly, the HSTPA violates the basic Takings Clause principle that government may not force some property owners "alone to bear public

burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); see, e.g., *Pennell*, 485 U.S. at 22 (Scalia & O'Connor, JJ, concurring in part and dissenting in part) (condemning a rent regulation ordinance as an "'off budget'" "welfare program privately funded" by landlords and thus a taking). The HSTPA is exactly that – a public burden imposed on multi family property owners. All of these factors, and others set forth herein support the contention that the HSTPA constitutes a taking prohibited by the constitution.

### A NINTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

**An Order Enjoining The 2019 Housing Stability And Tenant Protection Act As A Violation Of Due Process And Declaring It To Be A Taking Of Private Property Would Improve, Not Harm, Westchester's Rental Housing Market**

137.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

138.    For the reasons set forth herein the HSTPA will cause and is causing irreparable harm to the Plaintiffs.

139.    For the reasons set forth herein, the irreparable harm cannot be rectified or cured by monetary damages.

140.    There is no adequate remedy at law.

141.    The Plaintiffs have a likelihood of success on the merits.

142.    The Plaintiffs have a prima facie right to the relief requested herein and a balance of the equities, particularly in light of the constitutional infirmities herein, favors the Plaintiffs.

143.    The Plaintiffs are seeking to maintain the status quo as it existed prior to the passage of the HSTPA.

144.    What the HSTPA does is impose on the landlords of Westchester a "public assistance benefit" and require the Plaintiffs herein as well as all other landlord under the HSTPA to provide what government should be providing, and to provide it without just compensation or due process.  The housing issues sought to be addressed are both public policy and public housing issues, which should be dealt with by governmental action and funding.  However, the HSTPA imposes the full burden, both financial and otherwise, on landlords alone- clearly discriminatory and a violation of due process.  It is not only unfair, but unconstitutional, to require one segment of society to bear the full burden of society's obligation to provide adequate, low cost and reasonable housing to the populace. What HSTPA does is require that landlords pay for and provide, and give up compensation for a 'public assistance" benefit, both an unconstitutional taking as well as a violation of the due process rights of all landlords subject to the ETPA. As the Court stated in *Manocherian*

> We conclude that chapter 940 fails the test of substantially advancing a legitimate State interest warranting the <u>indeterminate and unjustifiable burden draped disproportionately on the particular owners' shoulders</u>. That law, in the unusual development and circumstances of this case, must meet the constitutional safeguards on its own merits, not as an augmentation or complement to some generalized State interest found elsewhere in organic law or other statutes. Indeed, in significant respects, the particular statute contradicts two key goals of the RSL, to wit, occupant protection and <u>eventual market redemption</u>. These incongruities flow out of the transferral of power from a landlord to the employer of the actual occupants, and by the removal of the affected apartments entirely and permanently from marketplace availability or potentiality for other publicly interested or vying occupants at rent-stabilized rates. (emphasis added)

145.    Therefore, the holding in *Manocherian* although applicable in a case involving a primary residence subleasing issue, held that the statute did not advance legitimate state interest and effected an unconstitutional state regulatory taking, exactly the situation herein.

146.    This elimination of rent controls has not been a negative for the communities that have done so. Cambridge imposed rent controls from 1971 to 1994. Following rent de-control, Henry O. Pollakowski,[14] a Housing Economist at the MIT Center for Real Estate, published an economic study of the impact of the return to market rents.   He found that there was a "housing investment boom" after the return to market rate rents, and that "investment in previously rent-controlled buildings…increased by approximately 20 percent over what would have been the case in the absence of decontrol. Dr. Pollakowski concluded that post-regulation Cambridge experienced "a tremendous boom in housing investment, leading to major gains in housing quality. This research thus provides a concrete example of complete rent deregulation leading to  housing investment that would otherwise not have occurred. Given the need for better maintenance and increased renovation of New York City and Westchester's aging housing stock, such an increase represents a considerable potential boon to the areas' residents.

## A TENTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS

### The Unintended Consequences Of The 2019 Housing Stability And Tenant Protection Act Incorporates Cooperatives In The Provisions Of The Act Contrary To The Intent Thereof In Violation of Due Process.

147.    The Plaintiffs Repeat each and every allegation heretofore made herein with the full force and effect as if set forth at length herein.

148.    The HSTPA not only covers the 'normal' landlord-tenant situation, but is so broad, and unconstitutionally so, that it covers cooperative housing entities, clearly not a purpose intended

---

[14] Henry O. Pollakowski, Manhattan Institute Center for Civic Innovation, Civic Report No. 36 (May 2003), Rent Control and Housing Investment: Evidence from Deregulation in Cambridge, Massachusetts, available at https://www.manhattan-institute.org/pdf/cr_36.pdf.

in either the original ETPA legislation of the 'purposes' clauses of the HSTPA. Therefore, Section M of the HSTPA must be corrected to exclude co-ops because, among other things, cooperatives involve ownership and the leases there are appurtenant to the issuance of stock certificates and, in effect, ownership of the residential unit. Although all coop units have a lease, that is to enable the shareholder to have exclusive rights to reside in the unit, not as a true "tenant," but as an owner. Therefore, in reviewing many of the limitations set forth in the HSTPA, they are clearly not intended in accordance with the HSTPA statutory scheme to be applicable to cooperative apartment units.  The following are areas that must be addressed and eliminated and constitute a 'taking' of a shareholder's interest in the cooperative corporation:

      a)    Security deposits are limited to one month's maintenance (rent).  While that may be appropriate in rental situations it is not as to cooperatives.  It is not unusual for a cooperative to require more than one month's maintenance to be held in escrow relative to a prospective purchaser with questionable or borderline finances who applies to purchase or rent a coop apartment. This prohibition will cause less approvals for retired seniors and young families.

      b)    Landlords (also cooperatives who are lessors) are now prevented from doing their due diligence in investigating whether a prospective purchaser or renter was a litigious tenant or had multiple collection actions brought against them. The prohibition in the HSTPA is that a landlord (lessor) cannot obtain a report as to court actions involving a prospective 'tenant', or shareholder, thereby placing the cooperative at risk in taking a non 'cooperative' shareholder with a history of litigation, or non payment, or breach of lease issues such as noise, drugs, etc. This would limit the cooperatives ability to protect against

litigation expenses; loss of income; danger to the quality of life of residents of the building, etc.

    c)    There is a limitation of $20 on the charge to prospective shareholders and residents as to credit checks. Once again, if a cooperative is to do appropriate due diligence as to prospective shareholders or sub-lessors, it has to do not only a $20 credit check, but financial investigations of bank accounts, other financial accounts, employment verifications and other investigations. This cannot be done for $20 and will just impose a financial burden on every cooperative to pay for this without recompense.

    d)    The HSTPA prohibits a landlord from collecting "additional rent," such as charges for repairs, air conditioning, special assessments, administrative charges and legal fees as part of a summary non payment proceeding. A separate legal action must be brought to collect same, thereby causing the cooperative unnecessary legal fees and expenses, resulting in the maintenance having to be raised to shareholders to pay for these additional legal actions to collect validly invoiced and due monies.

    e)    Also limited by the HSTPA are late fees, to 5% of the maintenance or $50 whichever is less. While this may be reasonable with low cost housing, it is not reasonable when a shareholder does not pay the maintenance on time and the administrative charges to collect exceed the $50 maximum fee. Similarly limited is the ability of the cooperative to collect legal fees and costs in a non payment court proceeding. Legal expenses are substantial, now that multiple notices are required as well as the charges for court appearances. If the shareholder defaults and does not come to court, the court is now prohibited from awarding legal fees to the cooperative, causing the other shareholders to bear the brunt of defaulting shareholders legal collection costs.

f)      The HSTPA, for various reasons, unduly extends the court proceedings against a shareholder or resident who breaches the obligations under the proprietary lease or occupancy agreement by, among other things:  i) requiring multiple notices before a legal action can be brought, with a new 5 day notice that rent is overdue – query – what happens with successive months once a legal proceeding is brought; ii) extending the time for the former 3 day notice to 14 days; iii) extending the time for a court action from 5 to 12 days to 10 to 17 days;  iv) extending the Marshal's notice time after a Judgment of Eviction from 72 hours to 14 days; v) gives the tenant (in this case shareholder – with no guaranty that maintenance will be timely paid during the extension period) up to 1 year for matters of 'extreme hardship' – which includes having a child in school;  vi) non payment proceeding must be dismissed if shareholder (tenant) pays amount sued on prior to the court hearing [the court hearing may well be at a time when the amount sued for is stale and months are now due but not required to be paid, thereby causing serial non payment proceedings at a substantial legal cost to the cooperative]; vi) if a landlord intends to raise the rent by 5% or more or not renew the lease, then the landlord is obligated to give the tenant 30 to 90 days written notice and the failure to do so will result in an extension of the tenancy under the current lease terms until notice is given and the notice period has expired and even extends the cure period for another 30 days when a prior cure notice was served, a successful trial ensued and the Judgment was granted.   Therefore a cooperative must apparently have to provide a 90-day notice when maintenance is increased.

149.    By reason of the foregoing, Section M of the HSTPA violates the constitutional rights of cooperatives and shareholders and should be struck in light of the failure to comply with

due process as well as not provide consistency with the statutory purpose allegedly underlying the HSTPA.

**Causes of Action by Plaintiff Against Defendants:**

**FOR A FIRST  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 HSTPA Violates Due Process. And Is An Unconstitutional Taking In That In That It Does Not Meet Its Statutory Goals.**

**FOR A SECOND CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 HSTPA Impacts Detrimentally   And Limits A Property Owner's Reasonable Return On Its Investments Which Constitutes An Unconstitutional Taking**

**FOR A THIRD  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The HSTPA Violates Due Process In That It Does Not Meet Statutory Goals As It Negatively Affects Cooperatives, Condominiums, Single Family Homes**

**FOR A FOURTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The Failure To Revisit The 5% Threshhold As Well As The Declaration Of Emergency In The Westchester Communities Burdened by the ETPA Is A Violation Of Due Process**

**FOR A FIFTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 Housing Stability And Tenant Protection Act Effects A *Physical* Taking Of The Properties Still And Continuing To Be Subject To ETPA Regulation, Including Not Having The Right To Exclude Or Choose**

**FOR A SIXTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 Housing Stability And Tenant Protection Act Took Away Many Of The Few Property Rights Remaining With Multi Family Rent Regulated Property Owners  Without Due Process That Had  Still Remained Under Etpa And Interfered With The Contracts (Leases) Entered Into By The Landlords And Tenants.**

**FOR AN SEVENTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The 2019 Housing Stability And Tenant Protection Act On Its Face Effects An Uncompensated Regulatory Taking Of Private Property.**

**FOR A EIGHTH  CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**Plaintiffs Bring These Claims Under The Fifth And Fourteenth Amendments To The United States Constitution And Under 42 U.S.C. § 1983 And 28 U.S.C. § 1331, And Seek Attorneys' Fees Pursuant To 42 U.S.C. § 1988(B).**

**A NINTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**An Order Enjoining The 2019 Housing Stability And Tenant Protection Act As A Violation Of Due Process And Declaring It To Be A Taking Of Private Property Would Improve, Not Harm, Westchester's Rental Housing Market**

**A TENTH CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**

**The Unintended Consequences Of The 2019 Housing Stability And Tenant Protection Act Incorporates Cooperatives In The Provisions Of The Act Contrary To The Intent Thereof In Violation Of Due Process.**

**AS TO EACH OF THE ABOVE CAUSES OF ACTION, THE FOLLOWING CLAIMS  FOR RELIEF**

**Claim I (Against All Defendants):**
**Due Process (U.S. Const. Amend. XIV; 42 U.S.C. § 1983)**

A.    Plaintiffs incorporate by reference the preceding allegations of this complaint.

B.    A.    Defendants, acting under color of New York law by the passage of the HSTPA have caused, and will continue to cause Plaintiffs to be deprived of their property without due process of law in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution:

1.    The HSTPA is irrational. It fails to serve any of the goals that it purports to seek to achieve. Among other things, the HSTPA does not target affordable housing to those in need; is not a rational means of ensuring socio-economic or racial diversity; is not a rational means of

increasing the vacancy rate; has a deleterious impact on the community at large; and alternatives to the HSTPA are available that are more narrowly tailored to the goals claimed to underlie the HSTPA and denies the Plaintiffs reasonable investment based expectations and investment return.  The HSTPA serves no legitimate government purpose.

2.      Separately, without any rational basis or an adequately developed record for not conducting vacancy surveys since the initial inception of the adoption of the ETPA in each of the 21 Westchester communities where it the ETPA was adopted and thereupon the Defendants adopting the HSTPA; in not determining that a serious public emergency requiring rent regulation exists in the 21 communities in Westchester that have opted into ETPA and are now subject to the HSTPA—or even defining what, precisely, the emergency entails—and moreover those communities have never conducted another survey to determine whether the emergency still continues to exist in those communities.  The 21 communities while statutorily empowered to make the  emergency determination if the vacancy rate is at or below a 5% threshold (which is itself a violation of due process in being arbitrary and methodologically unsound), have not taken into account the condition of rental accommodations and the purported and unproven need for regulating and controlling residential rents nor conducted any further vacancy studies since the one that formed the predicate for opting into ETPA, a violation of due process.

3.      Defendants alleged rationale for what constitutes the "serious public emergency" has shifted over time. Defendants have variously justified the need for rent regulation by citing the unique problems in a 70 year old post-war housing market, low vacancy rates, lack of affordable housing options, the need to address and insure socio-economic housing concerns, the purported need to balance prior years alleged pro landlord legislation, to obtain cultural diversity and to

combat homelessness. However, data has shown overwhelmingly that the HSTPA is not a rational means of addressing any of these ends, a violation of due process.

4.      The twenty-one (21) Westchester communities that have opted into ETPA without considering or reviewing whether there is still an emergency.

5.      The 21 Westchester communities continuing declaration of an emergency and legislating the HSTPA without a rational basis for doing so and without conducting another survey to determine whether or not there is still a 5% vacancy factor deprives Plaintiffs and the organizational Plaintiffs' members of fundamental property rights without the benefit of Due Process required by the Constitution. Defendants' actions are arbitrary and are not rationally related to any legitimate government purpose.

B.      The HSTPA's destruction of building owners' fundamental property rights warrants strict scrutiny. Defendants cannot demonstrate that a compelling state interest is furthered by the HSTPA, nor can they demonstrate that the HSTPA is narrowly tailored to address any compelling state interest.

C.      The HSTPA's deprivation of the building owner's right to a reasonable return on investments and/or return on the anticipated investment backed expectations.

D.      The HSTPA illegally includes cooperatives without a state interest to do so and without complying with due process in including cooperatives;

E.      Absent injunctive and declaratory relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

F.      Wherefore, the Plaintiffs demand injunctive relief permanently staying the application of the HSTPA.

**Claim II (Against All Defendants):**
**Physical Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. §1983)**

Plaintiffs incorporate by reference the preceding allegations of this complaint.

A.      The Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their right to possess, use and dispose of their real property without just compensation in violation of the Takings Clause of the Constitution;

      1.   Through the HSTPA, and prior acts, and the various 21 communities refusal to conduct surveys of the vacancy rates and/or declaration of emergency, which continues the application of the ETPA by the HSTPA in Westchester County, the Defendants deprive Plaintiffs of fundamental rights associated with property ownership, including the rights to possess, use and dispose of the property as well as the right to select and exclude their tenants. Specifically, among other things, the HSTPA deprives owners of ETPA rent regulated buildings in Westchester County and the 21 communities that have opted into ETPA of the actual or practical ability to control who rents and lives in those buildings, to evict tenants outside of certain limited circumstances, or to dispose or convert their building(s) to cooperative and/or condominium ownership.

      2.   Owing to the permanency of the ETPA and the mandatory lease renewal provisions of the HSTPA the tenants subject thereto and their successors are able to occupy Plaintiffs' property for periods of indefinite duration, transferring de facto property rights of possession, use, and disposition from Plaintiffs to tenants without just compensation—thus effecting a *per se* physical taking

3. Those same provisions set forth above result in owners losing physical possession and economic control of their property operates as an unconstitutional taking and unconstitutional conditions on the use of private property.

4. The HSTPA violates the 'Contract Clause' of the U.S. Constitution and thereby unconstitutionally, for the aforesaid reasons, impairs the existing lease (contract) agreements.

5. Absent declaratory or injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their Constitutional rights.

B.      By reason of the foregoing demand is made that the Court issue a declaration that the HSTPA is violative of the constitutional rights of the Plaintiffs and therefore null and void and an injunction prohibiting the enforcement of any of the provisions of the HSTPA..


**Claim III (Against All Defendants):**
**Regulatory Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)**

Plaintiffs incorporate by reference the preceding allegations of this complaint.

A.      Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property without just compensation in violation of the Takings Clause of the Constitution:

1. Through the HSTPA, Chapter 36 of the Laws of 2019, and the 21 communities subject to ETPA refusal to regularly review and conduct vacancy studies of vacant  units in their communities so as to justify the continuation of the effectuation and the continued adoption of each of their respective emergency declarations which continue application of the ETPA and the HSTPA in the 21 communities and Westchester County, and in including cooperative housing entities the Defendants have effectuated a regulatory

taking of Plaintiffs' property without just compensation. Specifically, the HSTPA imposes significant regulatory restrictions and in addition requires Plaintiffs to rent their property at rates often far below market-based rates, while denying the Plaintiffs the right to choose their own tenants as well as placing limits on rent increases and the recovery of investments in improvements as well as a reasonable return on investments and investment expectations.

2.   The HSTPA, among other things, deprives property owners of a reasonable return on their investment, devalue their properties, and upset their investment-backed expectations. The character of Defendants' actions—providing for a public welfare program at the expense of a subset of private property owners and imposing a physical occupation on rent stabilized units—together with the extensive and negative economic impact of the HSTPA, renders them facially unconstitutional as a regulatory taking.

3.   Absent declaratory or injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their Constitutional rights.

B.      By reason of the foregoing demand is made that the Court issue a declaration that the 2019 Housing Stability and Tenant Protection Act is violative of the constitutional rights of the Plaintiffs and therefore null and void.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court:

1.      Declare the 2019 Housing Stability and Tenant Protection Act to be an unlawful violation of Due Process;

2.      Declare that the 2019 Housing Stability and Tenant Protection Act unlawfully interferes with the constitutionally protected right to contract;

3.      Enjoin the application and enforcement of the 2019 Housing Stability and Tenant Protection Act as a violation of Due Process;

4.      Declare the 2019 Housing Stability and Tenant Protection Act as effecting a physical taking of private property for public use that requires the payment of just compensation;

5.      Enjoin the application and enforcement of the 2019 Housing Stability and Tenant Protection Act as an unlawful physical taking of private property;

6.      Declare that the 2019 Housing Stability and Tenant Protection Act effects a regulatory taking of private property for public use that requires the payment of just compensation;

7.      Enjoin the application and enforcement of the 2019 Housing Stability and Tenant Protection Act  as an unlawful regulatory taking of private property;

8.      Eliminate Section M of the HSTPA as it applies to cooperative housing developments;

9..     Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including attorneys' fees, associated with this action; and

10.     Grant Plaintiffs such other relief as may be just and proper in the Premises.

Dated: October 30,  2019

By: **Kenneth J. Finger  6841**
**Carl L. Finger, 1515**
**Daniel S. Finger,  2491**
**Dorothy M. Finger,  3085**
***Finger & Finger, A Professional Corporation***
158 Grand Street,
White Plains, New York 10601
(914) 949-0308
Attorneys for Plaintiffs