UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUILDING AND REALTY INSTITUTE OF WESTCHESTER AND PUTNAM COUNTIES, INC., *et al.*, | |
| Plaintiffs, | |
| v. | No. 19-CV-11285 (KMK) |
| STATE OF NEW YORK, *et al.*, | |
| Defendants, | |
| and | |
| COMMUNITY VOICES HEARD, | |
| Defendant-Intervenor. | |
| G-MAX MANAGEMENT, INC., *et al.*, | |
| Plaintiffs, | |
| v. | No. 20-CV-634 (KMK) |
| STATE OF NEW YORK, *et al.*, | OPINION AND ORDER |
| Defendants, | |
| NEW YORK TENANTS & NEIGHBORS, and COMMUNITY VOICES HEARD, | |
| Defendant-Intervenors. | |

Appearances:

Kenneth J. Finger, Esq.
Finger & Finger, A Professional Corporation
White Plains, NY
*Counsel for Plaintiffs Building and Realty Institute of Westchester and Putnam Counties, Inc.;*
*Apartment Owners Advisory Council; Cooperative and Condominium Council; Stepping Stones*
*Associates, L.P.; Lisa DeRosa as Principal of Stepping Stones, L.P.; Jefferson House Associates,*
*L.P.; Shub Karman, Inc.; DiLaRe, Inc.; Property Management Associates; Nilsen Management*
*Co., Inc.*

Randy M. Mastro, Esq.
William J. Moccia, Esq.
Akiva Shapiro, Esq.
Gibson, Dunn & Crutcher, LLP
New York, NY
*Counsel for Plaintiffs G-Max Management, Inc.; 1139 Longfellow, LLC; Green Valley Realty, LLC; 4250 Van Cortlandt Park East Associates, LLC; 181 W. Tremont Associates, LLC; 2114 Haviland Associates, LLC; Siljay Holding LLC; 125 Holding LLC; Jane Ordway; Dexter Guerrieri; Brooklyn 637-240 LLC; 447-9 16th LLC*

Michael A. Berg, Esq.
Shi-Shi Wang, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants State of New York; Ruthanne Visnauskas in her official capacity as Commissioner of New York State Division of Housing and Community Renewal; Division of Homes and Community Renewal; Letitia James in her official capacity as Attorney General of the State of New York; Woody Pascal in his official capacity as Deputy Commissioner of the New York State Division of Housing and Community Renewal*

Rachel K. Moston, Esq.
Claudia Brodsky, Esq.
New York City Law Department
New York, NY
*Counsel for Defendant City of New York*

Caitlin J. Halligan, Esq.
Sean Patrick Baldwin, Esq.
Michael Duke, Esq.
Thaddeus C. Eagles, Esq.
Babak Ghafarzade, Esq.
Selendy & Gay, PLLC
New York, NY
*Counsel for Intervenors Community Voices Heard and N.Y. Tenants & Neighbors*

Ellen B. Davidson, Esq.
The Legal Aid Society
New York, NY
*Counsel for Intervenors Community Voices Heard and N.Y. Tenants & Neighbors*

KENNETH M. KARAS, United States District Judge:

On December 10, 2019, a group of ten Plaintiffs who are landlords and organizations in Westchester County, New York filed a Complaint against the State of New York ("New York" or the "State"), Ruthanne Visnauskas in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal ("Visnauskas"), and the Division of Homes and Community Renewal ("DHCR") (collectively, "BRI Defendants"), alleging that recent amendments to the Emergency Tenant Protection Act of 1974 (the "ETPA") violate their constitutional rights (the "BRI Action").  (*See* BRI Compl. (Dkt. No. 1, Case No. 19-CV-11285).)[1]  Specifically, BRI Plaintiffs allege violations of the Fifth and Fourteenth Amendments and the Contract Clause, U.S. CONST. art. I, § X, cl. 1; *id.* amends. V, XIV.  (*Id.* at 92–96.)[2]  BRI Plaintiffs request that this Court declare the Housing and Stability Tenant Protection Act (the "HSTPA") as unconstitutional and seek an injunction against its enforcement.  (BRI Compl. at 95–98.)[3]  The BRI Defendants move this Court to dismiss the BRI Complaint brought by BRI Plaintiffs for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  (BRI Defendants' Motion To Dismiss (Dkt. No. 60).)  Community Voices Heard ("CVH") filed a parallel Motion To Dismiss the BRI Complaint against the BRI Defendants for failure to state a

---

[1] BRI Plaintiffs are: Building and Realty Institute of Westchester and Putnam Counties, Inc.; Apartment Owners Advisory Council; Cooperative and Condominium Council; Stepping Stones Associates, L.P.; Lisa DeRosa as Principal of Stepping Stones, L.P.; Jefferson House Associates, L.P.; Shub Karman, Inc.; DiLaRe, Inc.; Property Management Associates; and Nilsen Management Co., Inc.

[2] The BRI Plaintiffs do not continue the use of numerical paragraphs on pages 91 to 98 of the BRI Complaint.  As such, facts from this portion will be cited by page number.

[3] 2019 N.Y. SESS. LAWS Ch. 36 (McKinney), hereinafter "HSTPA."  The HSTPA is also commonly referred to as the "2019 amendments," but the Court will use "HSTPA" for clarity.

claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (CVH Motion To Dismiss (together the "BRI Motions") Dkt. No. 62).)[4]

The BRI Action is one of five federal actions that real estate groups have filed in the United States District Courts for the Southern and Eastern Districts of New York, seeking to challenge the long-standing system of rent stabilization authorized under New York State law.[5] This opinion, however, concerns two cases: the BRI Action and *G-Max Management, Inc. et al. v. State Of New York et al.* (20-CV-634).  *G-Max* is a related case filed on January 23, 2020, brought by a group of 13 Plaintiffs who are "small landlord owners" (the "G-Max Plaintiffs"). The G-Max Plaintiffs filed the G-Max Complaint against the State of New York, Visnauskas, Letitia James in her official capacity as Attorney General of New York ("James"), Woody Pascal in his official capacity as Deputy Commissioner of the New York State Division of Housing and Community Renewal ("Pascal"), and New York City (collectively, "G-Max Defendants"), alleging violations of the Fifth and Fourteenth Amendments; the Contract Clause, U.S. CONST. art. I, § X, cl. 1; *id.* amends. V, XIV; the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*; and various provisions of the New York State Constitution (the "G-Max Action").  (*See* G-Max Compl. (Dkt. No. 1, Case No. 20-CV-634).)[6]  G-Max City Defendant moves this Court to

---

[4] CVH filed a Motion To Intervene in the BRI Action, which the Court granted.  (Dkt. No. 86.)

[5] *See also 335-7 LLC v. City of New York*, No. 20-CV-1053 (S.D.N.Y.); *Community Housing Improvement Program v. City of New York*, No. 19-CV-4087 (E.D.N.Y.); and *74 Pinehurst LLC v. State of New York*, No. 19-CV-6447 (E.D.N.Y.).

[6] G-Max Plaintiffs include the following: G-Max Management, Inc.; 1139 Longfellow, LLC; Green Valley Realty, LLC; 4250 Van Cortlandt Park East Associates, LLC; 181 W. Tremont Associates, LLC; 2114 Haviland Associates, LLC; Siljay Holding LLC; 125 Holding LLC; Jane Ordway; Dexter Guerrieri; Brooklyn 637-240 LLC; and 447-9 16th LLC.

dismiss the G-Max Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  (G-Max City Defendants' Motion To Dismiss (Dkt. No. 67).)  G-Max State

Defendants move this Court to dismiss the G-Max Complaint against the G-Max Plaintiffs for

lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  (G-Max State

Defendants' Motion To Dismiss (Dkt. No. 70).)  CVH and New York Tenants & Neighbors

("T&N") filed a parallel Motion To Dismiss the G-Max Complaint against the G-Max

Defendants for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).

(CVH Motion To Dismiss (together the "G-Max Motions") Dkt. No. 72).)[7]  Because of the

overlapping claims and issues of law in the two cases, the Court addresses the motions filed in

both cases in this Opinion and Order.[8]

    For the reasons stated herein, the BRI and G-Max Defendants and Intervenors CVH and

T&N Motions To Dismiss are granted without prejudice.

## I.  Background

### A.  Factual Background

    In 1969, the City of New York (the "City") enacted the first rent-stabilization laws with

the Rent Stabilization Act of 1969 (collectively, "RSL.")  RSL were "a means to control a

perceived penchant toward unreasonably high rent increases on the part of landlords."  *Gramercy*

*Spire Tenants' Ass'n v. Harris*, 446 F. Supp. 814, 825 (S.D.N.Y. 1977).  At the time, the New

York City Council "found that many owners of non-rent-controlled buildings were demanding

exorbitant and unconscionable rent increases" and these increases were "causing severe hardship

---

[7] CVH and T&N filed a Motion To Intervene in the G-Max Action, which the Court
granted.  (Dkt. No. 92.)

[8] The Court does not, however, consolidate the cases.

to tenants of such accommodations and . . . uprooting long-time city residents from their communities." *Id.* (citation and quotation marks omitted).  RSL apply to privately owned buildings, built between February 1, 1947 and March 10, 1969 for buildings with six or more units.  N.Y.C. Admin. Code § 26-504(a).  Cited in the RSL legislative findings, the conditions of rent environment in New York City were described as "exactions of unjust, unreasonable and oppressive rents and rental agreements . . . profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare . . . ." N.Y. UNCONSOL. LAW § 26-501 (McKinney).  Essentially, RSL place limits on the amount of rent that can be charged, limit the percentage and frequency of rent increases, and entitle tenants to certain protections such as lease renewal, eviction prevention under many circumstances, and the ability to file complaints against landlords.  *Id.* §§ 26-501 *et seq.*  RSL created a system of rent regulation that covers nearly one million apartments, which house over two million people, or about one in three residents in the City.  Timothy L. Collins, *An Introduction to the New York City Rent Guidelines Board and the Rent Stabilization System* (rev. ed. Jan. 2020), https://rentguidelinesboard.cityofnewyork.us/wp-content/uploads/2020/01/intro2020.pdf.

In 1974, the ETPA was passed, which extended rent stabilization to any Westchester, Rockland, or Nassau County municipality with a rental vacancy rate of five percent or less that opted in.  N.Y. UNCONSOL. LAW §§ 8621 *et seq.*; *see also Massagli v. Bastys*, 532 N.Y.S.2d 638, 641 (Sup. Ct. 1988) (describing applicability of ETPA to Westchester, Rockland, and Nassau counties prior to its amendment in 2019); HSTPA, Part G, § 3.  The ETPA has been described as "a form of local option legislation, which authorized the City of New York (and other specified localities) to declare the existence of a public emergency requiring the regulation of residential rents."  *Gramercy Spire*, 446 F. Supp. at 819.  The ETPA covers roughly 25,000 rent-stabilized

apartments in the 21 municipalities in Westchester County.  (BRI Compl. ¶ 1, at 98.)  Once the existence of a public emergency is declared, the ETPA places limits on the rents that property owners can charge tenants.  The ETPA also created a Rent Guidelines Board ("RGB") to regulate how much the rents of ETPA units could be increased for one- and two-year periods. Under the ETPA, landlords are generally obligated to offer one- or two-year renewal leases to each tenant prior to expiration of the current lease.  Further, landlords are required to make rent adjustments in their rent-regulated apartments in accordance with standards set forth in the ETPA, in addition to complying with local building and housing laws.  N.Y. UNCONSOL. LAW § 8624 (McKinney 2019).  RSL and regulations have since been renewed and modified several times.

In June 2019, the New York State Senate again amended the State's RSL and enacted the HSTPA.  As amended, the HSTPA expands previous incarnations of the New York rent stabilization statutes in various ways – it places additional limits on rent increases, deregulation of units, and eviction of tenants in breach of lease agreements, among other changes.  *See generally* HSTPA.  Most significantly, the HSTPA limits a landlord to use one housing unit only if there is a showing of "immediate and compelling necessity" for his or her own personal use and occupancy as his or her primary residence or for the use by an immediate family member. HSTPA, Part I.  The HSTPA repealed the luxury decontrol provisions, which allowed landlords to decontrol units once the rent or the tenant's income reached a certain threshold.  *Id.* at Part D, § 5; *see also* N.Y. UNCONSOL. LAW §§ 26-504.1, 26-504.2, 26-504.3 (repealed 2019).  In addition, the HSTPA eliminated the vacancy and longevity rental increases.  *Id.* at Part B, §§ 1, 2; *see also* N.Y. UNCONSOL. LAW § 26-511(c)(5-a) (repealed 2019); *id.* § 8630(a-1) (repealed 2019).  The HSTPA changed it so that preferential rent operates as the legal rent for the life of

the tenancy – i.e., the rent cannot be raised upon lease renewal.  *Id.* at Part E.  Further, the HSTPA reduced the value of capital improvements called "individual apartment improvements" ("IAI") and "major capital improvements" ("MCI") that landlords could cover through rent increases.  *Id.* at Part K, §§ 1, 2, 4, 11.  IAI spending is now capped at $15,000 over a 15-year period, and no more than three IAIs can be charged to tenants during that time.  *Id.* § 1.  The HSTPA provided that the maximum collectible rent increases will now be no more than the average of the five most recent RGB annual rent increases for one-year renewal leases.  *Id.* at Part H, § 1.  The HSTPA increased the percentage of tenant consent needed to convert a building to cooperative or condominium use from at least 15% of tenants for approval to a threshold of 51%.  *Id.* at Part N.  The HSTPA also prohibited conversion plans under which tenants who decline to buy their units are evicted.  *Id.*  The HSTPA extended the period during which state housing courts may stay the eviction of breaching tenants from six months to one year.  *Id.* at Part M, § 21.

The HSTPA removed the geographic limitation of the ETPA so that now all municipalities in the State, including Westchester County, can opt-in to rent stabilization.  *Id.* at Part G, § 3.  Specifically, under the HSTPA, any locality in the State can participate in rent stabilization if "a declaration of emergency" regarding available apartments is made in the subject locality pursuant to the ETPA.  *Id.* § 5.  In 2019, when New York reauthorized and amended RSL through the HSTPA, it declared that a "severe disruption of the rental housing market ha[d] occurred" that "threaten[ed] to be exacerbated" because previous incarnations of the law allowed for the removal of vacant units from rent stabilization in certain circumstances.  HSTPA, Part D, § 1.  As such, the HSTPA was adopted to limit "profiteering" and curtail "the loss of vital and irreplaceable affordable housing for working persons and families."  *Id.*

8

The BRI Plaintiffs present four legal claims through ten causes of actions.  (*See* BRI Compl. at 91–92.)  Through these causes of action, BRI Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 and the U.S. Constitution.  (*Id.*)  First, BRI Plaintiffs allege that the HSTPA deprives property owners of substantive due process in violation of the Fourteenth Amendment.  (*Id.* at 92–94.)  Next, BRI Plaintiffs' second and third claims allege that the HSTPA effects a physical and a regulatory taking of property in violation of the Fifth Amendment, and the Fourteenth Amendment as applied to the states.  (*Id.* at 95–96.)  Finally, though not identified explicitly as a claim in the BRI Complaint, BRI Plaintiffs allege that the HSTPA violates the Contract Clause, Article I, § 10 of the U.S. Constitution, because the HSTPA locks in existing preferential rents for the duration of the current tenancy and impairs the existing lease contract agreements.  (*Id.* at 96.)  As such, the Court will treat the Contract Clause as its own claim.  (*Id.*)  BRI Plaintiffs request that this Court declare the HSTPA as facially unconstitutional and seek an injunction against its enforcement.  (*Id.* at 97–98.)[9]

G-Max Plaintiffs allege that the HSTPA "violate[s] the Takings, Due Process, and Equal Protection Clauses of the U.S. and New York State Constitutions, and the Contract Clause of the U.S. Constitution, both facially and as applied."  (G-Max Pls.' Mem. of Law in Opp'n to Mot. ("G-Max Pls.' Mem.") 2 (Dkt. No. 61, Case No. 20-CV-634); G-Max Compl. ¶¶ 213–72.)  The G-Max Plaintiffs also allege that the HSTPA violates the FHA due to its disparate impacts.  (G-Max Compl. ¶¶ 273–80.)[10]

---

[9] The New York State Office of the Attorney General (the "NYAG") represents all Defendants in the BRI Action.  (*See generally* Dkt., Case No. 19-CV-11285.)

[10] In the G-Max Action, the NYAG represents the State of New York, Visnauskas, and Pascal.  (*See generally* Dkt., Case No. 20-CV-634.)  The New York City Law Department represents the City of New York.  (*See generally id.*)  Similarly, the BRI Plaintiffs are "organizations and landlords in Westchester County."

BRI and G-Max Plaintiffs assert that these actions are distinguishable from a series of similar cases because the other plaintiffs seek to strike down RSL as a whole, while G-Max and BRI Plaintiffs challenge only the constitutionality of the HSTPA, and not RSL broadly as they existed prior to the HSTPA.  (*See generally* BRI Compl.; G-Max Compl.)

B.  Procedural Background

BRI Plaintiffs filed the Complaint on December 10, 2019, and G-Max Plaintiffs commenced the G-Max Action on January 23, 2020.  (BRI Compl.; G-Max Compl.)  On May 8, 2020, CVH filed the BRI Motion To Intervene and accompanying Memorandum of Law in Support of the Motion To Intervene.  (Not. of Mot.; CVH Mem. of Law in Supp. of BRI Mot. To Intervene (Dkt. Nos. 39–41, Case. No. 19-CV-11285).)  On the same day, CVH and T&N filed the G-Max Motion To Intervene and accompanying Memorandum of Law in Support of the Motion To Intervene.  (Not. of Mot.; CVH G-Max Mem. in Supp. of G-Max Mot. To Intervene (Dkt. Nos. 58–60, Case No. 20-CV-364).)  On May 22, 2020, BRI and G-Max Plaintiffs filed their Opposition papers to the Motions To Intervene in the BRI and G-Max Actions.  (Dkt. Nos. 42–44, Case No. 19-CV-11285; Dkt. No. 61, Case No. 20-CV-364.)  The Court held Oral Argument on the Motions To Intervene in both Actions and an additional Motion To Add a Party, filed by 300 Apartment Associates, Inc. in the BRI Action on July 8, 2020.  (*See* Dkt. (minute entries for July 8, 2020, Case No. 19-CV-11285, Case No. 20-CV-364).)  The Court reserved its ruling on all of the Motions.  (*Id.*)  On September 23, 2020, the Court issued two Opinions and Orders regarding the pending Motions To Intervene.  The Court granted CVH's Motion to Intervene and denied 300 Apartment Associates' Motion To Intervene in the BRI Action.  (Dkt. Nos. 86–87, Case No. 19-CV-11285.)  However, the Court granted 300 Apartment Associates the ability to file memoranda as amicus curiae in the case going forward.  (Dkt. No.

10

87, Case No. 19-CV-11285.)  The Court also granted CVH and T&N's Motions to Intervene in the G-Max Action.  (Dkt. No. 92, Case No. 20-CV-634.)

Pursuant to the briefing schedule set by the Court, on June 19, 2020, BRI and G-Max Defendants filed Motions To Dismiss, CVH filed its own Motion To Dismiss in the BRI Action, and CVH and T&N filed their own Motion To Dismiss in the G-Max Action on June 19, 2020. (Dkt. Nos. 60, 62, Case No. 19-CV-11285; Dkt. Nos. 67, 70, 72, Case No. 20-CV-634).  On the same day, BRI and CVH filed Memoranda of Law in Support of the Motions to Dismiss.  (BRI State Defs.' Mem. in Support of Mot. To Dismiss ("BRI State Defs.' Mem.") (Dkt. No. 61, Case No. 19-CV-11285); CVH Mem. in Support of Mot. To Dismiss ("BRI CVH Mem.") (Dkt. No. 63, Case No. 19-CV-11285).)  On August 13, 2020, BRI Plaintiffs filed their Opposition.  (Pls.' Mem. of Law in Opp'n to Mot. To Defendants' and CVH's Mots. To Dismiss ("BRI Pls.' Mem.") (Dkt. No. 81, Case No. 19-CV-11285).)  On September 4, 2020, BRI Defendants and CVH filed Replies.  (Reply Mem. of Law in Support of Defs.' Mot. To Dismiss ("BRI State Defs.' Reply"); Reply In Further Support of CVH's Mot. To Dismiss ("BRI CVH Reply") (Dkt Nos. 84–85, Case No. 19-CV-11285).)

Also on June 19, 2020, G-Max Defendants and CVH and T&N filed Memoranda of Law in Support of the Motions to Dismiss.  (G-Max State Defs.' Mem. in Support of Mot. To Dismiss ("G-Max State Defs.' Mem."); G-Max City Defs.' Mem. in Support of Mot. To Dismiss ("G-Max City Defs." Mem.") (Dkt. Nos. 68, 71, Case No. 20-CV-634); CVH and T&N Mem. in Support of Mot. To Dismiss ("G-Max CVH Mem.") (Dkt. No. 73, Case No. 20-CV-634).)  On July 30, 2020, G-Max Plaintiffs filed their Opposition.  (G-Max Plaintiffs' Omnibus Mem. of Law in Opp'n to Defendants' and CVH and T&N's Mots. To Dismiss ("G-Max Pls.' Mem.") (Dkt. No. 86, Case No. 20-CV-634).)  On September 11, 2020, G-Max Defendants and CVH and

T&N filed Replies.  (City Defs.' Reply Mem. of Law In Further Support of Mot. To Dismiss ("G-Max City Defs.' Reply"); State Defs.' Reply Mem. of Law In Further Support of Mot. To Dismiss ("G-Max State Defs.' Reply"); CVH's Reply In Further Support of CVH and T&N's Mots. To Dismiss ("G-Max CVH Reply") (Dkt Nos. 89–91, Case No. 20-CV-634).)

Since filing their Motions and supporting papers for the pending Motions To Dismiss, the Parties have submitted numerous letters alerting the Court to new authority addressing the legal questions in this case.  (*See* Dkt. Nos. 88–100, Case No. 19-CV-11285; Dkt. Nos. 93–101, 104–06, Case No. 20-CV-634.)

## II. Discussion

### A.  Standard of Review

"The standards of review under Rules 12(b)(1) and 12(b)(6) . . . are substantively identical."  *Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (quotation marks omitted) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)), *aff'd*, 591 F. App'x 28 (2d Cir. 2015).  "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quotation marks omitted)).  However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)."  *Id.* (citing *Lerner*, 318 F.3d at 128); *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the

evidence that it exists." (quotation marks omitted)).  This allocation of the burden of proof is the "only substantive difference" between the standards of review under these two rules.  *Fagan v. U.S. Dist. Ct. for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 447, n.7 (S.D.N.Y. 2009).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint."  *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as a "threshold question").  "In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court may consider matters outside the pleadings."  *JTE Enters., Inc. v. Cuomo*, 2 F. Supp. 3d 333, 338 (E.D.N.Y. 2014).

### 2.  Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

B.  Sovereign Immunity

Before evaluating Plaintiffs' constitutional claims, the Court must first address

Defendants' assertions of sovereign immunity as it implicates whether subject-matter jurisdiction

exists.  *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990); *see also* FED. R. CIV.

P. 12(h)(3).  BRI Defendants argue that the Eleventh Amendment mandates dismissal of this

action against the State and DHCR.  (BRI State Defs.' Mem. of Law at 37–38.)  The Eleventh

Amendment provides that "[t]he Judicial power of the United States shall not be construed to

extend to any suit in law or equity, commenced or prosecuted against one of the United States."

U.S. CONST. amend. XI.  Claims against the State or its agencies and instrumentalities are barred

regardless of the relief sought.  *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam)

(barring a suit seeking injunctive relief from a state); *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79,

81 (2d Cir. 2004) (noting that immunity extends to arms of the state).  "The Eleventh

Amendment effectively places suits by private parties against states outside the ambit of Article

III of the Constitution."  *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004) (citing

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)).  The two well-established exceptions

to this are a valid Congressional abrogation of sovereign immunity or waiver by the state.  *See*

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *see also Gollomp v.*

*Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009).

New York has not waived its Eleventh Amendment immunity to suit in federal court, and

Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983.  *See Rodriguez v.*

*New York*, No. 17-CV-4126, 2017 WL 8777374, at *2 (S.D.N.Y. Nov. 28, 2017) (citing *Trotman*

*v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Lane v. N.Y. State Office of*

*Mental Health*, No. 11-CV-1941, 2012 WL 94619, at *2 (S.D.N.Y. Jan. 11, 2012) (holding that

Congress, through § 1983, did not "abrogate[] the state's immunity"); *Bryant v. N.Y. State Dep't of Corr. Servs. Albany*, 146 F. Supp. 2d 422, 425 (S.D.N.Y. 2001) (noting it is "beyond dispute" that New York and its agencies have not consented to being sued in federal court).[11]  As such, a claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction.  *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011) (noting that "the Eleventh Amendment . . . confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"); *Seminole Tribe*, 517 U.S. at 54 ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890))).

Eleventh Amendment immunity extends not only to a State when sued as a defendant in its own name, but also to "state agents and state instrumentalities" when "the state is the real, substantial party in interest."  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (quotation marks omitted)); *Roberts v. New York*, 911 F. Supp. 2d 149, 159–60 (N.D.N.Y. 2012) ("Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction

---

[11] Section 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002). To state a § 1983 claim, Plaintiffs must allege that Defendants "acted under color of state law" and that as a result Plaintiffs "suffered a denial of . . . federal statutory rights, or . . . constitutional rights or privileges."  *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

over plaintiffs' claims asserted against the State of New York and its agencies."). In both the

BRI and G-Max Actions, there are a number of state agencies. In particular, DHCR, Visnauskas,

James, and Pascal are instrumentalities or agents of New York. *See Cmty. Hous. Improvement*

*Program v. City of New York* ("*CHIP*"), 492 F. Supp. 3d 33, 39 n.3 (E.D.N.Y. 2020) ("The

DHCR is the New York State agency charged with overseeing and administering the RSL.").

Courts have repeatedly applied sovereign immunity to dismiss actions against the State and

DHCR. *See, e.g.*, *Schiavone v. N.Y.S. Office of Rent Admin.*, No. 18-CV-130, 2018 WL

5777029, at *3–4 (S.D.N.Y. Nov. 2, 2018); *Morring v. Cuomo*, No. 13-CV-2279, 2013 WL

4004933, at *1 (S.D.N.Y. Aug. 5, 2013); *Manko v. Ruchelsman*, No. 12-CV-4100, 2012 WL

4034038, at *3 (E.D.N.Y. Sept. 10, 2012); *Helgason v. Certain State of  N.Y. Emps. (Unknown*

*and Known)*, No. 10-CV-5116, 2011 WL 4089913, at *7–8 (S.D.N.Y. June 24, 2011), *report and*

*recommendation adopted sub nom. Helgason v. Doe*, 2011 WL 4089943 (S.D.N.Y. Sept. 13,

2011); *Morris v. Katz*, No. 11-CV-3556, 2011 WL 3918965, at *5 (E.D.N.Y. Sept. 4, 2011);

*Sierotowicz v. State of N.Y. Div. of Hous. & Cmty. Renewal*, No. 04-CV-3886, 2005 WL

1397950, at *1–2 (E.D.N.Y. June 14, 2005).

Actions for damages against state officials in their official capacities are essentially

actions against the state and will be barred by the Eleventh Amendment unless (1) Congress has

abrogated immunity; (2) the state has consented to suit; or (3) the *Ex parte Young* doctrine

applies. *See Ex parte Young,* 209 U.S. 123 (1908); *see also Will v. Mich. Dep't. of State Police*,

491 U.S. 58, 71 (1989); *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). The

Eleventh Amendment bars actions against state officials sued in their official capacities where, as

here, the state is a real party in interest. *See Edelman v. Jordan*, 415 U.S. 651, 663, 669 (1974)

(holding that suits against state employees in their official capacities are barred by the Eleventh

Amendment); *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (rejecting federal suit against

state officials under the Eleventh Amendment); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988)

("The [E]leventh [A]mendment also bars suits against state officials and state agencies if the

state is the real party in interest . . . ."); *Muhammad v. Rabinowitz*, 11-CV-2428, 2012 WL

1155098, at *6 (S.D.N.Y. Apr. 6, 2012) (dismissing claims for damages against state employees

in their official capacity as being barred by the Eleventh Amendment); *Crockett v. Pataki*, 97-

CV-3539, 1998 WL 614134, at *5 (S.D.N.Y. Sept. 14, 1998) (dismissing claims against

governor and housing commissioner sued in their official capacities); *Sassower v. Mangano*, 927

F. Supp. 113, 121 (S.D.N.Y. 1996) (dismissing claims for damages against state officials sued in

their official capacities).  Where claims are brought against an official in their official capacity,

the state is considered the real party in interest, and therefore the same sovereign immunity

principles apply as if the claim was brought directly against the state.  *See Spiteri v. Russo*, No.

12-CV-2780, 2013 WL 4806960, at *16 (E.D.N.Y. Sept. 7, 2013), *aff'd sub nom. Spiteri v.*

*Camacho*, 622 F. App'x 9 (2d Cir. 2015); *see also KM Enterprises, Inc. v. McDonald*, 518 F.

App'x 12, 13–14 (2d Cir. 2013) (finding that a suit against a state agent in her official capacity

effectively rendered the suit against the State of New York and was thus covered under

sovereign immunity); *Gollomp*, 568 F.3d at 369 ("Eleventh Amendment sovereign immunity 'is

not a mercurial area of law, but has been definitively settled by the Supreme Court since 1890

with respect to actions against the state itself, and 1945 with respect to actions against state

agencies or state officials named in their official capacity.'" (quotation marks omitted));

*Huminski v. Corsones*, 386 F.3d 116, 133 (2d Cir. 2004) ("[S]tate officials cannot be sued in

their official capacities for retrospective relief under [§] 1983."); *Anghel v. N.Y. Dep't of Health*,

No. 12-CV-3484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) ("A suit for damages

against a state official in his or her official capacity 'is deemed to be a suit against the state, and

the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.'"

(quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993))), *aff'd*, 589 F.

App'x 28 (2d Cir. 2015); *Pietri v. N.Y. Off. of Ct. Admin.*, 936 F. Supp. 2d 120, 128 (E.D.N.Y.

2013) ("The Eleventh Amendment also bars suits against state officials in their official capacities

for money damages.").

      In both Actions, the issues presented before this Court involve the third exception.  Under

the *Ex parte Young* doctrine, a suit may proceed against state officials, notwithstanding the

Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law and (b)

seeks relief properly characterized as prospective."  *See In re Deposit Ins. Agency*, 482 F.3d at

618  (quotation marks and citations omitted); *see also Santiago v. N.Y. State Dep't of Corr. Serv.*,

945 F.2d 25, 32 (2d Cir. 1991) (holding that prospective relief claims cannot be brought directly

against the state, or a state agency, but only against state officials in their official capacities).

While Eleventh Amendment immunity precludes claims against State Defendants, the claims by

BRI and G-Max Plaintiffs against Visnauskas, and by the G-Max Plaintiffs against Pascal and

James – state officials – are permissible under the doctrine of *Ex parte Young*.  Under this

doctrine, the Eleventh Amendment does not bar suits for declaratory and injunctive relief against

state officials acting in their official capacities in alleged violation of federal rights.  *See Quern v.*

*Jordan*, 440 U.S. 332, 337 (1979); *Edelman*, 415 U.S. at 677.  Consequently, the claims against

Visnauskas, James, and Pascal in their official capacities are analyzed below on their merits.  *See*

*Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 67 (E.D.N.Y.

2018) ("[T]he doctrine of *Ex parte Young* permits a suit to proceed in federal court []against a

state official in his or her official capacity, notwithstanding the Eleventh Amendment." (quoting

*Kisembo v. NYS Off. of Child. & Fam. Servs.*, 285 F. Supp. 3d 509, 520 (N.D.N.Y. 2018))).

However, the Eleventh Amendment bars BRI Plaintiffs' substantive Due Process and

Contract Clause claims against the State and DHCR.  The Eleventh Amendment also bars G-

Max Plaintiffs' Due Process, Equal Protection, and Contract Clause claims against New York

State.  In fact, G-Max Plaintiffs do not even discuss the Eleventh Amendment as applied to their

substantive due process and equal protection claims.  Instead, G-Max Plaintiffs spend only a

page of their lengthy brief addressing sovereign immunity but only as it relates to their takings

claims.  (*See* G-Max Pls.' Mem. at 74.)  BRI Plaintiffs similarly barely address the issue of

sovereign immunity, citing cases from BRI Defendants' briefs but offering no analysis.  (*See*

BRI Pls.' Mem. at 66–67.)  Simply put, federal courts lack jurisdiction over § 1983 claims that

are barred by Eleventh Amendment immunity.  *See Dube*, 900 F.2d at 594 (concluding that

"federal causes of action . . . brought under [§] 1983, in the absence of consent, . . . against the

State or one of its agencies or departments are proscribed by the Eleventh Amendment"

(quotation marks and alterations omitted)); *Morales v. New York*, 22 F. Supp. 3d 256, 268

(S.D.N.Y. 2014) (holding that sovereign immunity mandates dismissal under Rule 12(b)(1)); *see*

*also Morabito v. New York*, 803 F. App'x 463, 465 (2d Cir. 2020) (summary order) (affirming

the district court's holding that the Eleventh Amendment barred a § 1983 suit against New York,

a state agency, and a state official in his official capacity), *as amended* (Feb. 27, 2020), *cert.*

*denied*, 141 S. Ct. 244 (2020), *reh'g denied*, 141 S. Ct. 886 (2020).  Indeed, courts routinely

dismiss, on sovereign immunity grounds, due process, equal protection, and Contract Clause

claims against the state, state agencies, and agents sued in their official capacities.  *See, e.g.,*

*Adeleke v. United States*, 355 F.3d 144, 151–53 (2d Cir. 2004) (affirming dismissal of due

process damages claim on the basis of sovereign immunity); *JTE Enters.*, 2 F. Supp. 3d at 340–41 (dismissing due process claim as barred by sovereign immunity); *Taedger v. New York*, No. 12-CV-549, 2013 WL 5652488, at *7 (N.D.N.Y. Oct. 15, 2013) (dismissing equal protection claim on sovereign immunity grounds against New York state, state agency, and agency official); *accord Boda v. United States*, 698 F.2d 1174, 1176 (11th Cir. 1983) (ruling that a claim alleging a violation of constitutional due process rights was barred by the doctrine of sovereign immunity); *Smith v. Fla. Dep't of Corr.*, No. 08-CV-1213, 2009 WL 10670364, at *1 (M.D. Fla. Oct. 16, 2009) (dismissing substantive due process claims as barred by sovereign immunity); *see also Zynger v. Dep't of Homeland Sec.*, 370 F. App'x 253, 255 (2d Cir. 2010) (summary order) (finding that the plaintiff waived a possible challenge to the district court's dismissal of due process claims against the federal government, its agencies, and an agent in his official capacity); *335-7 LLC v. City of New York*, — F. Supp. 3d —, 2021 WL 860153, at *4 n.2 (S.D.N.Y. Mar. 8, 2021) (noting that plaintiffs agreed to dismissal of due process claim and conceded that their damages claim against the state defendant was barred by sovereign immunity); *CHIP*, 492 F. Supp. 3d at 40 (explaining that the parties agreed that sovereign immunity barred plaintiffs due process and Contract Clause claims).

Next, the Court must determine whether sovereign immunity bars claims under the Takings Clause.  G-Max Plaintiffs argue that "the Supreme Court has rejected the notion that sovereign immunity limits the compensation remedy."  (G-Max Pls.' Mem. at 74.)  But neither the Supreme Court nor the Second Circuit has conclusively addressed the issue.  *See CHIP*, 492 F. Supp. 3d at 40 ("Despite the fact that the Eleventh Amendment and Takings Clause date back so long, neither the Supreme Court nor the Second Circuit has decisively resolved the conflict.") In *CHIP*, the court noted that "[t]he overwhelming weight of authority among the circuits" is that

"sovereign immunity trumps the Takings Clause – at least where . . . the state provides a remedy of its own for an alleged violation." 492 F. Supp. 3d at 40.[12]   The court pointed to a recent decision in which the Second Circuit affirmed the district court's ruling that "the Eleventh Amendment . . .bar[s] a takings claim."  *Id.*  However, as noted in *CHIP*, this decision was a non-precedential summary order "that did not analyze the question in detail."  *Id.* (citing *Morabito*, 803 F. App'x at 464–65 (affirming dismissal of Takings Clause claim against New York, a state agency, and state official in his official capacity because the Eleventh Amendment "generally bars suits in federal courts by private individuals against non-consenting states"), *aff'g* No. 17-CV-6853, 2018 WL 3023380 (W.D.N.Y. June 18, 2018)).  Other district courts within the Second Circuit have held that the Eleventh Amendment applies to Takings Clause claims.  *See, e.g., MPHJ Tech. Invs., LLC v. Sorrell*, 108 F. Supp. 3d 231, 242 n.8 (D. Vt. 2015) (ruling that "to the extent [Plaintiff] is seeking damages under the Takings Clause, its claim against the Attorney General in his official capacity is barred by the Eleventh Amendment");

---

[12] *See also Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019) (holding that the takings claim against the state agency must be dismissed based on Eleventh Amendment immunity); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019) (same); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (concluding that "the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims" (italics omitted)); *Jachetta v. United States*, 653 F.3d 898, 909–10 (9th Cir. 2011) (same); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 955 (9th Cir. 2008) (determining that the "Takings Clause, which is . . . self-executing . . . can comfortably co-exist with the Eleventh Amendment immunity of the States from similar actions in federal court"); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 528 (6th Cir. 2004) (holding that "because [the state] enjoys sovereign immunity in the federal courts from [plaintiff's] federal takings claim, the district court was correct to dismiss the . . . complaint for want of jurisdiction"), *overruled on other grounds San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005); *Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 638, 640–41 (11th Cir. 1992) (holding Eleventh Amendment barred plaintiffs' claim "for violation of the Fifth and Fourteenth Amendments for a taking of their property"); *Garrett v. State of Illinois*, 612 F.2d 1038, 1040 (7th Cir. 1980) (ruling that a takings claim filed in federal court against the state barred by Eleventh Amendment).

*Gebman v. New York*, No. 07-CV-1226, 2008 WL 2433693, at \*4 (N.D.N.Y. June 12, 2008)

(holding that Eleventh Amendment barred the plaintiff's § 1983 due process and regulatory

takings claims against the State).  This Court agrees with this line of authority and therefore

rejects BRI and G-Max Plaintiffs' position that their Takings Clause claims survive Eleventh

Amendment state sovereign immunity.  Therefore, for the reasons further articulated in *CHIP*,

claims under the Takings Clause are dismissed on sovereign immunity grounds against the State,

the DHCR by BRI Plaintiffs, Visnauskas as to both BRI and G-Max Plaintiffs, and James and

Pascal as to G-Max Plaintiffs (to the extent BRI and G-Max Plaintiffs seek monetary relief from

these Defendants in their official capacities).  *See CHIP*, 492 F. Supp. 3d at 40–43.

    C.  <u>Standing</u>

        1.  <u>Legal Requirements</u>

    The Court next addresses the issue of standing.  Article III of the Constitution restricts

federal judicial power to the resolution of cases and controversies.  U.S. CONST. art. III, § 2.

"That case-or-controversy requirement is satisfied only where a plaintiff has standing."  *Sprint*

*Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).  The Supreme Court has

explained that constitutional standing requires a plaintiff to establish at minimum three

elements—that the plaintiff suffered an "injury in fact," which means an "invasion of a legally

protected interest," the existence of "a causal connection between the injury and the conduct

complained of," and "a likelihood that the 'injury will be redressed by a favorable decision.'"

*Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–61 (1992)).  A "legally protected interest" is one that is "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560

(quotation marks omitted).  As a threshold matter, standing is a jurisdictional predicate that

cannot be waived.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *accord Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 188 (2d Cir. 2018).

Under current standing jurisprudence, an organization may assert two distinct types of standing: (1) organizational standing, and (2) associational standing.  Under the organizational standing theory, "an association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  In contrast, under the associational standing theory, "an association has standing to bring suit on behalf of its members."  *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  "[The Supreme] Court has recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity."  *Id.* at 342.  The Supreme Court, however, has held that "an organization seeking to recover damages on behalf of its members lacked standing because 'whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.'"  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth*, 422 U.S. at 515–16).  To establish organizational standing, an organizational plaintiff "must meet the same standing test that applies to individuals."  *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (citation, quotation marks, and alterations omitted).  The Supreme Court has held that an organization establishes an injury-in-fact if it can show that it was "perceptibly impaired" by defendants' actions.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Consequently, the Second Circuit has repeatedly held that "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'"  *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993));

24

*N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *N.Y. State Citizens'*
*Coal. for Children v. Velez*, 629 F. App'x. 92, 94 (2d Cir. 2015).  However, the Second Circuit
has restricted organizational standing under § 1983 by interpreting the rights it secures "to be
personal to those purportedly injured."  *Nnebe*, 644 F.3d at 156 (quoting *League of Women*
*Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)).
Accordingly, BRI Plaintiffs bear the burden of showing that (1) a distinct and palpable injury-in-
fact exists to themselves as organizations; (2) the injury-in-fact is fairly traceable to the
challenged action; and (3) a favorable decision would redress its injuries.  *Id.*

　　　2.  BRI Plaintiffs

　　　BRI Defendants challenge the standing of several plaintiffs – Property Management
Associates ("Property Management"), Nilsen Management Co., Inc. ("Nilsen Management"),
Apartment Owners Advisory Council ("AOAC"), Cooperative and Condominium Council
("CCAC"), and Lisa DeRosa ("DeRosa").  (BRI State Defs.' Mem. at 37–40.)  The Court will
first discuss Property Management and Nilsen Management, both of which serve as "managing
agents" for apartment buildings or multi-family homes in Westchester County that contain rent-
regulated units.  (BRI Compl. ¶¶ 8(g), 8(h), 24, 31.)  The Court agrees with BRI Defendants that
the BRI Complaint fails to allege that as managing agents Property Management and Nilsen
Management sufficiently allege injuries as required for standing.  (BRI State Defs.' Mem. at 38–
39; BRI Compl. ¶¶ 8(g),(h).)  Property Management alleges it is unable to recoup building and
apartment renovations because of changes to IAIs and MCIs.  (*Id.* ¶ 31.)  Nilsen Management
complains of rent disparities between actual rent and market rent for the eight building that the
company manages.  (*Id.* ¶ 24.)  But Property Management and Nilsen Management have neither
alleged facts that trace these purported injuries to the BRI Defendants nor established how their

role as managing agents could confer standing upon them.  And neither Property Management

nor Nilsen Management represents that either owns any rent-regulated properties that would

result in any possible cognizable injuries.  Instead, the BRI Complaint refers to "another Owner-

Landlord, with buildings operated by Property Management" and Nilsen Management

"manag[ing] 8 buildings in Yonkers."  (*Id.* ¶¶ 24, 31.)  As the Supreme Court has explained, an

organization, like Property Management and Nilsen Management, may establish an injury-in-fact

if it demonstrates that it was "perceptibly impaired" by BRI Defendants actions.  *Havens Realty*

*Corp.*, 455 U.S. at 379; *cf. W.R. Huff Asset Management Co. v. Deloitte*, 549 F.3d 100, 109 (2d

Cir. 2008) ("There are, indeed, a few well-recognized, prudential exceptions to the 'injury-in-

fact' requirement.  These exceptions permit third-party standing where the plaintiff can

demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's

ability to assert its own interests.").  Property Management and Nilsen Management have not

offered any such plausible demonstrations of perceptible impairment based on their roles as

managing agents for rent regulated properties.  Their vague assertions regarding alleged injuries

without more are insufficient facts upon which the Court could find that standing.  Thus, the

claims by Property Management and Nilsen Management are dismissed for lack of standing.

Next, the Court turns to whether AOAC and CCAC have standing.  "[A]n organization[]

is fully able to bring suit on its own behalf 'for injuries it has sustained,'" *Int'l Action Ctr. v. City*

*of New York*, 522 F. Supp. 2d 679, 693 (S.D.N.Y. 2007) (quoting *Mid-Hudson Catskill Rural*

*Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005)), "so long as those

injuries—or threats of injury—are 'both "real and immediate," [and] not "conjectural or

hypothetical,"'" *id.* (alteration in original) (quoting *Bordell v. Gen. Electric Co.*, 922 F.2d 1057,

1060 (2d Cir. 1991)).  The Supreme Court has held that a "concrete and demonstrable injury to

26

[an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" and may be sufficient to confer standing. *Havens Realty Corp.*, 455 U.S. at 379. Importantly, the Supreme Court has held that an organization establishes an injury-in-fact if it establishes that it "spent money to combat" activity that harms its organization's core activities. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017). In line with this Supreme Court precedent, the Second Circuit has repeatedly held that "where an organization diverts its resources away from its current activities, it has suffered an injury . . . independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (finding standing for a not-for-profit corporation that expended resources investigating and advocating for plaintiffs because such activities diverted resources from its other advocacy and counseling activities); *Nnebe*, 644 F.3d at 157 (finding standing for an organization that used resources to assist its members who faced adverse action by providing counseling, explaining the rules, and assisting members in obtaining attorneys); *Ragin*, 6 F.3d at 905 (finding standing where an organization devoted significant resources to identify and counteract the defendants' actions).

AOAC is described as an entity that "provides its members with a variety of services, including advice relating to regulatory compliance and assistance to members who are facing legal challenges." (*Id.* ¶ 6.) AOAC "advocates on behalf of its members at the local, City, County[,] and State levels and provides regular updates on issues of importance to property owners." (*Id.*) Similarly, CCAC "is a component entity of the BRI" that represents more than 150 cooperatives and condominiums in Westchester County. The BRI Complaint describes the

CCAC as serving the same role as AOAC of advising its members on various matters and advocating on their behalf before the different levels of government.  (*Id.* ¶ 7.)  Plaintiffs AOAC and CCAC allege that they have standing because they "have been forced to devote substantial time and resources to counsel their members about how to administer their properties under the [HSTPA], [and] how to abide by the maze of new requirements governing the owners['] properties . . . ."  (*Id.* ¶ 17.)  Further, Plaintiffs AOAC and CCAC allege that they have participated in the RGB process, advised and advocated for their members related to the HSTPA, expended time, money, and resources in helping members to address the implementation of the HSTPA, and noted that their members are regulated by and have suffered injuries because of the HSTPA.  (*Id.* ¶¶ 6–7, 17–21.)  The injuries alleged by AOAC and CCAC are not "conjectural or hypothetical," and instead the Court finds that these injuries of expending time, money, and resources to help their clients address the passage of the HSTPA are both "real and immediate."  *Bordell*, 922 F.2d at 1060.  As such, AOAC and CCAC have alleged sufficient facts of an injury-in-fact with "a causal connection between the injury and the conduct complained of" – the enactment of the HSTPA.  *Fulton*, 591 F.3d at 41.  Finally, AOAC and CCAC satisfy the last requirement of standing – redressability.  AOAC and CCAC's injuries would be redressed if the Court were to invalidate the HSTPA.  Consequently, the Court finds that AOAC and CCAC satisfy the requirements of standing.

Lastly, the Court evaluates whether DeRosa has standing to sue.  The general rule in New York is that individual partners cannot sue on a partnership claim in their individual capacity.  *See Leonard P'ship v. Town of Chenango*, 779 F. Supp. 223, 233 (N.D.N.Y. 1991) (noting "under New York law, an individual partner may not assert the claim of the partnership"); *Shea v. Hambro America Inc.*, 606 N.Y.S.2d 198, 199 (App. Div. 1994) ("[I]t is settled that a

partnership cause of action belongs only to the partnership itself or to the partners jointly, and . . .
an individual member of the partnership may only sue and recover on a partnership obligation on
the partnership's behalf."); *Stevens v. St. Joseph's Hosp.*, 381 N.Y.S.2d 927, 928 (App. Div.
1976) (same).[13]  The BRI Complaint alleges that DeRosa is a "principal" of Stepping Stones,
L.P., a limited partnership that owns an apartment building in White Plains.  (BRI Compl.
¶ 8(a).)  As to her injuries, the BRI Complaint only asserts, without explanation or specific
factual allegations, that DeRosa "has standing to sue in her own right as principal of Stepping
Stones."  (*Id.* ¶ 22.; BRI Pls.' Mem. at 67–68.)  DeRosa has neither filed a derivative suit nor
alleged that she has suffered a distinct injury that can be remedied by this Court.  (BRI Compl.
¶¶ 8(a), 22.)  To assert a claim derivatively on behalf of Stepping Stones, DeRosa would need to
name Stepping Stones as a defendant in this matter, which she has not done.  *See Lenz v.
Associated Inns & Rests. Co. of Am.*, 833 F. Supp. 362, 378 (S.D.N.Y. 1993) ("[I]n a derivative
action brought by a limited partner, the limited partnership is an indispensable party.").  Further,
DeRosa would be required to plead that she unsuccessfully demanded that Stepping Stones file
suit in its own name, or that such a demand would be futile.  *See Plymouth Cnty. Ret. Ass'n v.
Schroeder*, 576 F. Supp. 2d 360, 368–69 (E.D.N.Y. 2008) ("[T]he plaintiff must state with
particularity 'any effort . . . to obtain the desired action from the directors or comparable
authority and, if necessary, from the shareholders or members; and the reasons for not obtaining
the action or not making the effort.'" (citing Fed R. Civ. P. 23.1(b)(3))).  Nor is standing saved
by the vague claim that the "value of Stepping Stones Associates' property has been substantially

---

[13] Moreover, the Second Circuit has held that corporate shareholders "generally lack standing to assert claims in their own name based on injury to the [entity] and must instead bring such claims derivatively."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122 (2d Cir. 2013).

diminished by the HSTPA," as this does not sufficiently allege any injury to DeRosa separate from the partnership to which she belongs.  (BRI Compl. ¶ 22.)  *See Russell Pub. Grp., Ltd. v. Brown Printing Co.*, No. 13-CV-5193, 2014 WL 1329144, at *4 (S.D.N.Y. Apr. 3, 2014) (holding that plaintiff cannot bring claims in her individual capacity because all alleged injuries are to the corporation or were indirectly caused by harm to the corporation and plaintiff suffered no "distinct" injury).  "[I]t is the burden of the party who [is seeking standing to sue to] . . . clearly . . . allege facts demonstrating that [s]he is a proper party to invoke judicial resolution of the dispute."  *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citation and quotation marks omitted).  Because DeRosa has failed to "clearly allege facts" demonstrating that she, not Stepping Stones, is the proper party to sue and further does not allege that she personally sustained any injuries by BRI Defendants, her claims in the BRI Action are dismissed due to lack of standing.

### 3.  G-Max

In the G-Max action, the City challenges G-Max Plaintiffs' standing to bring any claims against it.  The City argues that G-Max Plaintiffs lack standing to sue because the City does not enforce the HSTPA and therefore has not caused G-Max Plaintiffs' any alleged injuries – a necessary predicate of standing.  (G-Max City Defs.' Mem. at 9–12.)  As the City explains, it has two roles in the enforcement of RSL.  First, the ETPA "authorizes local legislative bodies to declare the existence of a housing emergency whenever the vacancy rate falls below five percent, after which housing becomes subject to the ETPA."  (*Id.* at 10 (citing ETPA § 3).)  Under the Local Emergency Housing Rent Control Act ("LEHRCA"), the City must make a new determination of emergency at least every three years following a survey of the supply of housing accommodations.  N.Y. UNCONSOL. LAW § 8603 (McKinney 2020).  Second, the City's

RGB annually establishes guidelines for rent adjustments.  N.Y.C. Admin. Code § 26-510(a).

Aside from these two actions, the enforcement of RSL is left to the State.  *Rent Stabilization*

*Ass'n v. Higgins*, 630 N.E.2d 626, 628 (N.Y. 1993) ("The legislature in 1983 designated DHCR

'the sole administrative agency to administer the regulation of residential rents' under the rent

control and rent stabilization statutes . . . ." (quoting Omnibus Housing Act, L. 1983, ch. 403,

§ 3)).  To achieve standing, G-Max Plaintiffs would need to challenge the City Council's

declaration of a housing emergency or the RGB's rent adjustment.  Instead, G-Max Plaintiffs

allege that the HSTPA, a *state* statute, is unconstitutional and also violates the FHA.  (G-Max

Compl. ¶¶ 273–80.)  But the City does not enforce the HSTPA and thus could not possibly cause

any injuries alleged by G-Max Plaintiffs.  G-Max Plaintiffs need to establish a "causal

connection between the injury and the conduct complained of [and] the injury has to be fairly

traceable to the challenged action of the defendant," which G-Max Plaintiffs have not established

here.  *Lujan*, 504 U.S. at 560 (quotation marks and alterations omitted).  For example, G-Max

Plaintiffs challenge the HSTPA recoupment rate and period for MCIs and IAIs.  (G-Max Compl.

¶¶ 11–12.)  But this injury is potentially attributable to the State, not the City.  To obtain a rent

adjustment based on MCI or IAI, a landlord must apply to the DHCR, a *state* agency, which

determines whether to grant the adjustment.  *See* N.Y.C. Admin. Code § 26-511.1 (the DHCR

shall promulgate rules and regulations to establish a schedule of reasonable costs of MCIs and a

notice and documentation procedure for IAIs).  As noted above, the City plays no role in

determining the recoupment rate of MCIs or IAIs.

G-Max Plaintiffs also challenge the repeal of the high-income regulatory provisions of

the HSTPA.  (G-Max Compl. ¶¶ 72–73, 198, 243.)  But this repeal in the HSTPA is a result of a

change in *state* law.  *See* HSTPA, Part D, § 5.  G-Max Plaintiffs describe the HSTPA as

"irrational and arbitrary," *id.* ¶ 252, and that the law unfairly "singles out" G-Max Plaintiffs, *id.*
¶¶ 257, 262.  G-Max Plaintiffs further argue that the City concedes it has "roles in enforcing" the
underlying rent stabilization laws that the HSTPA amends.  (G-Max Pls.' Mem. at 75.)
Specifically, G-Max Plaintiffs note the fact that the City's role is to periodically renew the
emergency declaration and to set rent-increase levels through the RGB.  (*Id.*; *see also* G-Max
Compl. ¶¶ 74(c), 229.)  But fatal to G-Max Plaintiffs' claims is that the City has not caused any
of their alleged injuries.  G-Max Plaintiffs do not challenge the RGB's rent adjustments, nor the
City Council's declaration of a housing emergency.  Instead, G-Max Plaintiffs challenge the
HSTPA itself.  (G-Max Compl. ¶¶ 213–80.)  Because G-Max Plaintiffs allegations against the
City are in essence challenges to a state law and the resulting state actions, thus they have failed
to allege any injuries that are fairly traceable to the City's conduct.  *Lujan*, 504 U.S. at 560–61
("[T]here must be a causal connection between the injury and the conduct complaint of—the
injury has to be fairly traceable to the challenged action of the defendant . . . ." (quotation marks
and alterations omitted)).  Accordingly, all claims against the City are dismissed in their entirety
for lack of standing.

       G-Max Plaintiffs bring an FHA claim against all G-Max Defendants except the State.
(G-Max Compl. ¶¶ 5, 21, 273–80.)  This claim is wanting as G-Max Plaintiffs do not have
standing to sue for violations of the FHA.  The purpose of the FHA is to "eliminate all traces of
discrimination within the housing field."  *Cabrera v. Jakabovitz*, 24 F.3d 372, 390 (2d Cir. 1994)
(quotation marks omitted).  To effect this purpose, the FHA makes it unlawful to "[t]o
discriminate against any person in the terms, conditions, or privileges of sale or rental of a
dwelling, or in the provision of services or facilities in connection therewith, because of race,
color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  The FHA extends

"only to plaintiffs whose interests fall within the zone of interests protected by the law invoked."
*Bank of Am.*, 137 S. Ct. at 1302 (quotation marks omitted).  Thus, under the FHA, only an
"aggrieved person" may bring a claim under the FHA.  An "aggrieved person" is someone who
"claims to have been injured by a discriminatory housing practice" or who believes that they
"will be injured by a discriminatory housing practice that is about to occur."
42 U.S.C. § 3602(i).  To carry its burden of establishing standing, an FHA plaintiff "must allege
specific, concrete facts demonstrating that the challenged practices harm [the plaintiff], and that
[the plaintiff] personally would benefit in a tangible way from the court's intervention."
*Palmieri v. Town of Babylon*, No. 01-CV-1399, 2006 WL 1155162, at *12 (E.D.N.Y. Jan. 6,
2006) (citing *Warth*, 422 U.S. at 508), *aff'd*, 277 F. App'x 72 (2d Cir. 2008).

  G-Max Plaintiffs have not alleged sufficient facts to plausibly establish that they are
"aggrieved person[s]" under the FHA.  G-Max Plaintiffs are comprised of limited liability
companies, a corporation, and two individuals who want to take over a rental unit from the only
rent stabilized tenant in their building.  (G-Max Compl. ¶¶ 22–33.)  G-Max Plaintiffs allege that
the HSTPA disproportionately benefits white renters.  (*Id.* ¶¶ 208–12.).  First, this conclusory
allegation is far from the type of "specific, concrete" allegation that plausibly states a cognizable
harm or that G-Max Plaintiffs would benefit in a tangible way from a favorable result in this
case.  *See Palmeri,* 2006 WL 1155162, at *2.  For example, there are no specific allegations that
these entities have been "deprived benefits from interracial associations when discriminatory
rental practices kept minorities out of their apartment complex" protected by the FHA.  *Bank of
Am.*, 137 S. Ct. at 1303.  Second, individual Plaintiffs Ordway and Guerrieri do not have
standing because they no longer wish to rent one of their rent stabilized unit to *anyone* –

regardless of their race, color, religion, sex, familial status, or national origin, which as such does not implicate the FHA protections.  (G-Max Compl. ¶¶ 168–76.)

But even more problematic to G-Max Plaintiffs' FHA claim is that they fail to allege the necessary causal link between the HSTPA and the alleged pattern of racially segregated housing in New York.  Under the FHA, there is a "robust causality requirement," which "protects defendants from being held liable for racial disparities they did not create."  *Winfield v. City of New York,* No. 15-CV-5236, 2018 WL 1631336, at *2 (S.D.N.Y. Mar. 29, 2018) (quoting *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015)).  G-Max Plaintiffs have offered no such causal link between the HSTPA and the purported racial segregation caused by G-Max Defendants.  (G-Max Compl. ¶¶ 5, 208–12, 273–80.)  Further, G-Max Plaintiffs complain of economic harm and argue that this is sufficient to confer standing.  But G-Max Plaintiffs do not actually allege that the economic harm *to them* is a result of the purported violations of the FHA.  (*Id.* ¶¶ 130–31, 135, 140, 143–44, 154; G-Max Pls.' Mem. 71.)  Instead, the G-Max Complaint alleges that the HSTPA has a disparate, adverse impact on racial and ethnic minority renters, thereby perpetuating residential segregation in New York which violates the FHA.  (*Id.* ¶¶ 5, 208–12, 273–80.)  G-Max Plaintiffs can only establish standing from economic harm that is the result of any FHA violation for which G-Max Plaintiffs would otherwise have standing.  Because G-Max Plaintiffs have not met the "injury in fact" prong which is one of the "irreducible constitutional minimum[s] of standing," the FHA claim against all G-Max Defendants is dismissed.  *Lujan*, 504 U.S. at 560.

### D.  Physical Takings Under the Fourteenth and Fifth Amendments

#### 1.  Applicable Law

BRI and G-Max Plaintiffs bring facial and as-applied Takings Clause claims.  The

Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation."  U.S. CONST. amend. V.  The Takings Clause applies to the states through the Fourteenth Amendment.  *See Kelo v. City of New London*, 545 U.S. 469, 472 n.1 (2005).  To state a takings claim under § 1983, BRI and G-Max Plaintiffs must show "(1) a property interest (2) that has been taken under color of state law (3) without just compensation."  *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 452 (S.D.N.Y. 1998) (citing *HBP Assoc. v. Marsh*, 893 F. Supp. 271, 277 (S.D.N.Y. 1995)).  A plaintiff's property interest must stem from some "legitimate claim of entitlement" and not just an "abstract need or desire" or "unilateral expectation."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The law recognizes two types of takings: physical takings and regulatory takings.  *See Buffalo Teachers Fed'n v. Tobe,* 464 F.3d 362, 374 (2d. Cir. 2006).

A physical taking only occurs when the government "requires the landowner to submit to the physical occupation of his land."  *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (emphasis omitted); *accord Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 94 (2d Cir. 1992); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162 (S.D.N.Y. 2020); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524, 527 (S.D.N.Y. 1998).  The Second Circuit has explained that a physical taking happens when "government has committed or authorized a permanent *physical* occupation of property."  *Southview Assocs.*, 980 F.2d at 92–93 (emphasis added).  The "*absolute* exclusivity of the occupation, and *absolute* deprivation of the owner's right to use and exclude others from the property . . . [are] hallmarks of a physical taking."  *Id.* at 93 (emphasis in original) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982)).  Recently, in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) the Supreme Court reiterated that there are "heightened concerns associated with '[t]he

permanence and absolute exclusivity of a physical occupation' in contrast to 'temporary limitations on the right to exclude,' and . . . '[n]ot every physical invasion is a taking.'" 141 S. Ct. at 2074–75 (alterations in original) (quoting *Loretto*, 458 U.S. at 435 n.12). The Supreme Court has explained that there are different circumstances under which a physical taking may occur, such as "condemnations" of property, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002), seizure of property through eminent domain, *Kelo*, 545 U.S. at 489, or physical occupation of property, *Loretto*, 458 U.S. at 427. Physical appropriations are the "clearest sort of taking." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). Such *per se* takings are assessed by the rule: "[t]he government must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071 (quoting *Tahoe Sierra*, 535 U.S. at 322).

"A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). This is the "most difficult challenge to mount successfully," because the challengers "must establish that no set of circumstances exists under which the [HSTPA] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The "uphill battle" of a facial claim is "made especially steep" when those seeking relief "have not claimed . . . that [government action] makes it commercially impracticable" for the plaintiffs to continue business use of their property. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96 (1987).

2.  Analysis

a.  Physical Taking – Facial Challenge

G-Max Plaintiffs bring a facial physical takings claim.[14]  Specifically G-Max Plaintiffs

argue that the condominium and cooperative conversion amendments grant tenants "a collective

veto right over such conversions, thereby denying owners the right to dispose of their property

and exit the rental business via a conversion."  (G-Max Pls.' Mem. at 44; G-Max Compl. ¶ 218.)

G-Max Plaintiffs also claim that this elevates possession rights of the tenant over those of a

lawful property owner through "drastic restrictions on owners' ability to reclaim units for

personal use and occupancy."  (G-Max Compl. ¶¶ 82, 102–09, 218–19.)  G-Max Plaintiffs take

issue with the elimination of a "sunset provision" under which previous versions of the RSL

would have expired without legislative action.  (*Id.* ¶ 218.)  G-Max Plaintiffs further contend that

by "compelling owners to remain in the rental business absent tenant consent, the co-op/condo

conversation go far beyond 'regulat[ing] an existing landlord-tenant relationship.'"  (G-Max Pls.'

Mem. at 45.)  G-Max Plaintiffs explain that "[b]y blocking the eventual non-renewal of existing

---

[14] BRI Plaintiffs explain that "the essence of the [BRI] Complaint is a facial challenge" to the HSTPA.  (BRI Pls.' Mem. at 68.)  But BRI Plaintiffs by their own admission state that they "do not allege a physical encroachment."  (*Id.* at 15.)  BRI Plaintiffs misstate the law regarding physical takings, describing these challenges as applicable "when the degree of the regulation is such that it removes an opportunity for a reasonable return on investment."  *Id.*  This describes the analysis for *regulatory* takings.  For example, BRI Plaintiffs cite *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), but that case is generally regarded as the first case to address the concept of regulatory takings – in which the Supreme Court held that government *regulation* will not be considered a taking unless the regulation "goes too far."  *Id.* at 415.  BRI Plaintiffs confuse the two types of takings in other portions of their Memorandum of Law.  (*See* BRI Pls.' Mem. at 13–15, 22 (BRI Defendants cite *regulatory* takings cases such as *Tahoe-Sierra, Eastern Enterprises. v. Apfel*, 524 U.S. 498 (1998), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978).)  As such, these arguments will be addressed in the regulatory takings analysis *infra*.

tenancies . . . while simultaneously allowing current tenants to block conversion altogether . . . , the HSTPA forces owners to remain in the rental business on a going-forward basis." (*Id.*; G-Max Compl. ¶¶ 104–11.) G-Max Plaintiffs claim that this "compel[s] owners to remain in the rental market against their will." (*Id.*) Finally, G-Max Plaintiffs dispute G-Max Defendants' argument that the various exit options available to property owners foreclose a physical takings claim. (*Id.* at 47; G-Max CVH Mem. at 11–12; G-Max State Defs.' Mem. at 18.)

In *Yee*, the Supreme Court considered a Takings Clause challenge to a local rent control ordinance, in which mobile home park owners claimed that the law amounted to a physical taking because it had the effect of depriving them of all use and occupancy of their property. 503 U.S. at 524–25. Specifically, the plaintiffs complained that the ordinance granted tenants the right to permanently occupy and use such property. *Id.* at 525. The Supreme Court disagreed and ruled that the ordinance did not amount to a physical taking of the mobile home park owner's property because the property owners *voluntarily* rented their land. *Id.* at 527–28. "Put bluntly, no government has required any physical invasion of petitioners' property." *Id.* at 528. Instead, "[the] tenants were invited by [the property owners], not forced upon them by the government." *Id.* (citing *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252–53 n.6 (1987)).

Consistent with *Yee*, courts have repeatedly recognized that when owners invite tenants to physically occupy their apartments, laws like the HSTPA (and RSL before it) simply govern the property owners' voluntary use of their property as rental housing. *See 335-7 LLC,* 2021 WL 860153 at *8 ("In accordance with *Yee*, courts in this Circuit have long upheld the RSL against facial physical taking challenges because landlords have voluntarily offered their property for rent and, by the express terms of the RSL, landlords can evict unsatisfactory tenants, reclaim or convert units, or exit the market."); *see also Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of*

*Hous. & Cmty. Renewal* ("*FHLMC*"), 83 F.3d 45, 47–48 (2d Cir. 1996) (noting that "where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking"); *Southview Assocs.*, 980 F.2d at 94–95 (finding no physical taking where the government limited the development of property because property owners had not lost the right to possess, use, and dispose of the property); *Greystone Hotel*, 13 F. Supp. 2d at 527 (holding that the challenged RSL provision regulates the terms on which property owners can rent rooms, the amounts it can charge, and the services it must provide, but does not amount to a physical occupation of the property); *Higgins*, 630 N.E. 2d at 632–33 (concluding that it is not a physical taking to require an owner who has voluntarily acquiesced in the use of its property for rental housing to rent to family members succeeding the tenant); *Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1065 (N.Y. 1989) (holding that "[i]t is the forced occupation . . . , not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings").

Here, the Court finds no physical taking because the HSTPA does not compel physical occupation. The HSTPA merely changes the percentage required to convert buildings into condominiums or cooperatives from 15% of tenants to 51%. *See* HSTPA, Part N, § 1. Prior to the enactment of the HSTPA, RSL allowed tenants who did not purchase to remain in their homes. N.Y. GEN. BUS. LAW § 352-eeee(2)(c)(ii) (McKinney 2021) (proving that "[n]o eviction proceedings will be commenced at any time against non-purchasing tenants for failure to purchase"). However, the HSTPA did not create forced occupancies or authorize "physical invasion" of G-Max Plaintiffs' properties, thus moving their allegations outside the zone of a taking because such amendments do not compel landlords to use their properties for new and

unexpected use.  *Yee*, 503 U.S. at 528.  As G-Max Plaintiffs acknowledge, the State has

previously adjusted the tenant-approval threshold for cooperative and condominium conversions

under General Business Law § 352-eeee.  In the 1970s, the threshold for conversion was 35%,

and prior to the HSTPA it was 15%.  (G-Max Compl. ¶¶ 107, 112.)  In other words, while the

HSTPA may have added certain hurdles to the conversion of rental properties, the HSTPA does

not on its face require G-Max Plaintiffs to rent their properties; that was a choice of their own

making, thus defeating their Takings Claim.  *See CHIP*, 492 F. Supp. 3d at 44 (concluding that

the "[p]laintiffs' argument fails . . . because . . . no physical taking has occurred in the first

place"); *see also 335-7 LLC*, 2021 WL 860153, at *8 ("[C]ourts in this Circuit have long upheld

the RSL against facial physical taking challenges because landlords have voluntarily offered

their property for rent and, by the express terms of the RSL, landlords can evict unsatisfactory

tenants, reclaim or convert units, or exit the market."); *Higgins*, 630 N.E.2d at 633 ("Because the

challenged regulations may require the owner-lessor to accept a new occupant but not a new use

of its rent-regulated property, we conclude that appellants have failed to establish their claim

that, facially, a permanent physical occupation of appellants' property has been effected.").

It is true that in *Yee*, the Supreme Court acknowledged that the day would come in which

a statute, on its face or as applied, would "compel a landowner over objection to rent his property

or to refrain in perpetuity from terminating a tenancy."  *Yee*, 503 U.S. at 528.  Indeed, G-Max

Plaintiffs assert that property conversions are "no longer feasible" under the HSTPA, but offer

no specific allegations to support that they have attempted such conversions.  (G-Max Compl.

¶¶ 149, 163, 181, 186, 191, 196.)  In any event, even if G-Max Plaintiffs were unable to obtain

the required number of purchase agreements for conversion, they may still use the property as a

rental, thus defeating their facial claim.  *See Elmsford*, 469 F. Supp. 3d at 162–64 (noting that the

"Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted"); *335-7 LLC*, 2021 WL 860153, at *8–10 (rejecting a physical takings claim). In addition, whether this amendment renders conversion a "near-impossibility" as G-Max Plaintiffs allege is a question more aptly suited for a regulatory takings analysis as it is essentially asking whether the regulation goes "too far." *1256 Hertel Ave. Assocs. v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014).

Therefore, the Court finds that G-Max Plaintiffs' facial takings claim should be dismissed.

### b.  Physical Taking – As-Applied Challenge

BRI and G-Max Plaintiffs also bring as-applied physical takings claims.[15] To be clear, BRI and G-Max Plaintiffs do not allege condemnation, seizure by eminent domain, or physical encroachment of any property. Instead, BRI Plaintiffs argue that the HSTPA constitutes a physical taking because it "deprives property owners of their basic ownership rights to either choose, include or exclude those that it selects from their property and to possess, use, and dispose of their property or concomitantly, to use, rent and own their property without improper, illegal and unconstitutional government interference and restriction."  (BRI Compl. ¶ 99.)  As BRI Plaintiffs describe it: the HSTPA "dramatically limit[s] the ability of property owners to dispose of their own property . . . [which] effects an unconstitutional physical taking . . . ."  (*Id.*

---

[15] The Court notes that not once in the 98-page BRI Complaint do BRI Plaintiffs mention an "as-applied" taking challenge to the HSTPA.  (*See generally* BRI Compl.)  The Court believes that given the extremely high burden to mount a successful facial challenge for a physical or regulatory taking that BRI Plaintiffs styled claims as "as-applied" given the less stringent standard.  However, the BRI Complaint is devoid of analysis as to its application to the various landlords involved in the BRI Action.  Instead, BRI Plaintiffs repeatedly assert that the HSTPA is unconstitutional in all circumstances – which is a facial, not as-applied, challenge.  (BRI Compl. at 95–97.)  As such, the Court construes BRI Plaintiffs takings challenge as a facial one and dismisses it for the same reasons as it dismisses the G-Max Plaintiffs' claim.

¶ 124.)  BRI Plaintiff do not object to the physical presence of tenants, instead they object to the financial terms of the tenants' occupation.  (*See id.* ¶ 105 (alleging the HSTPA effects a physical taking because it "has eliminated almost every avenue that allowed a transition from regulation to free market").  G-Max Plaintiffs, with the exception of Plaintiffs Ordway and Guerrieri, lodge a similar complaint – that the HSTPA deprives owners of "their fundamental rights to possess, use, admit or exclude others, and dispose of their property, thereby effecting an unconstitutional physical taking . . . ."  (G-Max Compl. ¶ 7; G-Max Pls.' Mem. at 44–51.)  G-Max Plaintiffs focus on certain provisions of the HSTPA, specifically the (1) limitations on converting rental units into condominiums or cooperatives, (2) restrictions on recovery of a unit for personal use, and (3) changes to the eviction process.  (G-Max Compl. ¶¶ 82, 103, 122.)

Takings are rooted in the disruption of an owner's "bundle of property rights" which include the rights to "possess, use[,] and dispose of" property.  *Horne v. Dep't of Agric.*, 576 U.S. 350, 361–62 (2015) (quoting *Loretto*, 458 U.S. at 435) (quotation marks omitted).  Previous examples of actionable takings include installation of physical items on buildings, *Loretto*, 458 U.S. at 438, the seizure of control over private property, *Horne*, 576 U.S. at 361–62, and takings through eminent domain, *Kelo*, 545 U.S. at 489.  Like the plaintiffs in *CHIP*, BRI Plaintiffs maintain the first and third strands in *Horne's* bundle of property rights as they continue to possess the properties and can dispose of them through sale.  492 F. Supp. 3d at 43.  BRI Plaintiffs principally argue that BRI Defendants limit their use of property through enactment of the HSTPA – and to some extent interfere with their ability to dispose of the property – which is sufficient to constitute a physical taking.  (BRI Pls.' Mem. at 23–27.)

BRI Plaintiffs' allegations fall short of plausibly alleging an as-applied physical taking. As the Supreme Court has explained to find a physical taking the state must "not simply take a

single 'strand' from the 'bundle' of property rights" but instead "chop[] through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435.  A regulation which involves no physical invasion, such as the HSTPA, cannot form the basis of a *physical* takings claim.  BRI Plaintiffs' claim fails, because under binding case law of *Loretto*, *Horne*, *Yee*, and others, no physical taking ever actually occurred.  As articulated in *CHIP*, "[n]o precedent binding on this Court has ever found any provision of a rent-stabilization statute to violate the Constitution." 492 F. Supp. 3d at 38.[16]  Importantly, the "fact of a taking is fairly obvious in physical takings cases." *Buffalo Teachers*, 464 F.3d at 374; *see also Loretto*, 458 U.S. at 421 (finding a physical taking where New York law provided that a landlord must permit a cable television company to install equipment on the owner's property); *Horne*, 576 U.S. at 361 (holding that the government's formal demand that plaintiffs turn over a percentage of their raisin crop is a "clear physical taking").[17]  This is in contrast to a regulatory taking where the government "merely . . . bans certain private uses" of property.  *Tahoe-Sierra*, 535 U.S. at 322–23.  BRI Plaintiffs do not allege that they have been deprived of title to their property, or that they are unable to sell the

---

[16] Indeed, the Second Circuit has rejected physical takings claims against rent stabilization laws, like the HSTPA.  *See Harmon v. Markus*, 412 F. App'x 420 (2d Cir. 2011) (summary order); *FHLMC*, 83 F.3d at 47–48.  Furthermore, even if the HSTPA goes beyond prior versions of the rent stabilization laws in New York, "it is not for a lower court to reverse this tide." *FHLMC*, 83 F.3d at 47; *see also 335-7 LLC*, 2021 WL 860153, at *10 (holding that plaintiffs had not sufficiently alleged an as-applied physical takings challenge because "these limitations [do not] lock[] [the] [p]laintiffs out of screening their tenants or leaving the rental market.").

[17] BRI Plaintiffs cite *Loretto* and note that the Supreme Court found a taking where there was minimal intrusion by the use of the property for cable equipment.  (BRI Pls.' Mem. at 23.) *Loretto* is distinguishable.  In *Loretto*, the key part of the Supreme Court's analysis was that the cable equipment installed at appellant's building under a New York state law was a *physical intrusion* that resulted in a *permanent physical occupation* – very different from the rent regulations, like the HSTPA, that allegedly impact property owners' rights according to BRI and G-Max Plaintiffs.  *Loretto*, 458 U.S. at 426.

property if they choose.  Instead, BRI Plaintiffs complain of several burdensome aspects of the HSTPA in Westchester County.  (BRI Compl. ¶ 100; *see also* BRI Pls.' Mem. at 15.)  For example, BRI Plaintiffs point to the fact that owners are generally required to tender renewal leases to tenants in rent stabilized apartments.  (*Id.* ¶ 100(b).)  BRI Plaintiffs also highlight that the HSTPA grants succession rights to certain family members who have lived with the tenant of record in a rent stabilized apartment for a certain period of time before the tenant dies or moves out.  (*Id.* ¶ 100(d); BRI Pls.' Mem. at 25–26, 44.)  *See* N.Y. COMP. CODES R. & REGS. ("N.Y.C.R.R.") tit. 9, § 2523.5 (2021).  However, these renewal leases and familial succession rights are not creations of the HSTPA.  As BRI Defendants note, these aspects have been "part of New York's rent stabilization regime for decades" and repeatedly upheld by courts.  (BRI State Defs.' Mem. at 16.)  *See, e.g., Golub v. Frank*, 483 N.E.2d 126 (N.Y. 1985) (explaining that RSL "provide[] that no tenant shall be denied a renewal lease except upon grounds specifically recognized by law"); *Lesser v. Park 65 Realty Corp.*, 527 N.Y.S.2d 787, 789 (App. Div. 1988) (noting that "[t]he family succession provisions . . . were enacted in response to the harsh consequences resulting from displacement from one's home upon the death or departure of a named tenant with whom a family member, not named in the lease, resided").  These longstanding and pre-existing provisions of the rent stabilization laws in New York cannot form the basis of BRI Plaintiffs' as-applied physical takings challenge to the HSTPA when these provisions predated its enactment.

BRI Plaintiffs also allege that the HSTPA forces owners to accept "the intrusion of strangers" or "prevents [them] from excluding strangers from the property" or mandates them to rent units "often to strangers who claim 'succession' rights."  (BRI Compl. ¶¶ 33, 104, 107.)  But this characterization is flawed, as an individual who lives in a rent stabilized apartment must

prove he or she is a family member (or in an intimate relationship with the tenant of record) who has resided in the apartment for a period of two years or one year in the case of elderly or disabled persons.  N.Y.C.R.R. tit. 9, § 2523.5.  Such persons, either family or a person in an intimate relationship with the tenant, are a far cry from the "strangers" BRI Plaintiffs describe as foisted upon them infringing on their property rights.  As noted above, the Supreme Court has held that once a property owner "decides to rent his land to tenants, the government may . . . require the landowner to accept tenants he does not like."  *Yee*, 503 U.S. at 529; *see also Higgins*, 630 N.E.2d at 633 (rejecting physical takings challenge to succession rights in rent-stabilized units because "the challenged regulations may require the owner-lessor to accept a new occupant but not a new use of its rent-regulated property").  As Judge Edgardo Ramos succinctly explained in *335-7 LLC*, even if the successor were indeed a "stranger[]," that feature of the law "is not a physical taking as long as it only forces new tenants, not a new use."  2021 WL 860153, at *9.[18,19]

BRI Plaintiffs further claim that the ETPA grants tenants a "life estate."  (BRI Compl. ¶¶ 43, 100(d).)  G-Max Plaintiffs assert a similar claim – that the HSTPA's amendments to the eviction process essentially authorize a permanent physical occupation of their property.  (G-

---

[18] The Court notes that these challenged succession rules pre-date the HSTPA, and have been previously upheld by courts; therefore, such challenges to these rules cannot form the basis of a physical taking claim here.  *See Harmon v. Markus*, No. 08-CV-5511, 2010 WL 11530596, at *1 (S.D.N.Y. Mar. 1, 2010), *aff'd* 412 F. App'x 420 (2d Cir. 2011).

[19] BRI Plaintiffs also describe the various changes in the HSTPA as "commandeer[ing] a[n] . . . easement."  (BRI Compl. ¶¶ 100–01.)  This assertion is meritless.  An easement is a "nonpossessory right to *enter* and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement."  *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014) (emphasis added) (citing Restatement (Third) of Property: Servitudes § 1.2(1) (1998)).  No allegation in the BRI Complaint plausibly demonstrates that the HSTPA effects a physical taking involving *entry* on to property and thus is not an easement.  (BRI Compl. ¶¶ 100–01.)

Max Compl. ¶¶ 121–26.)  But the Second Circuit has already rejected this argument because owners of rent-stabilized apartment offer their properties for rent and retain statutory rights to recover them.  *Harmon*, 412 F. App'x at 422 (noting that landlords did not dispute retention of statutory rights such as recovery of property for personal use or demolition, or the ability to evict an unsatisfactory tenant, among others); *see also FHLMC*, 83 F.3d at 47–48 (finding no physical taking where the law regulated the terms under which the owner may use the property as previously planned); *Greystone Hotel*, 13 F. Supp. 2d at 527 (finding no physical taking in a forced conversion from renting to transients to leasing to permanent tenants).  For example, owners of rent stabilized apartments can "recover possession of a housing accommodation because of immediate and compelling necessity . . . ."  N.Y. Unconsol. Law § 26-408(b)(1) (McKinney 2021).  The lone change to this part of the rent stabilization law through the HSTPA is that a landlord can only recover possession for use "as his or her primary residence" or use for the same purpose for his or her immediate family.  HSTPA, Part I, §1.  But this modification still does not *eliminate* the owner's property rights – instead, it lawfully limits them.  *See CHIP*, 492 F. Supp. 3d at 44 (dismissing physical taking claim because "while significant to investment value, personal use, unit deregulation, and eviction rights, is not so qualitatively different from what came before as to permit a different outcome."); *335-7 LLC*, 2021 WL 860153, at *9–10 (concluding that the HSTPA did not constitute a physical taking even though it restricted conversion, eviction, and vacancy as the same was true in all of the cases where RSL have been upheld); *Greystone Hotel*, 13 F. Supp. 2d at 527 ("The challenged provisions regulate the terms on which [a property owner] can rent its rooms, the amounts it can charge, and the services it must provide.  That is not a physical occupation . . . ."); *see also FHLMC*, 83 F.3d at 47–48 (holding that where property owners offer property for rental housing, governmental regulation

of the rental relationship does not constitute a physical taking).

Contrary to BRI and G-Max Plaintiffs' assertions, owners retain many important statutory rights, even after passage of the HSTPA.  (BRI Pls.' Mem. 16–17; G-Max Pls.' Mem. 9–10.)  Aside from the ability to recover housing units for an "immediate and compelling necessity," landlords can evict tenants who fail to pay rent, who violate another substantial obligation of the lease agreement, commit a nuisance, or use the apartment for unlawful purposes.  N.Y.C.R.R. tit. 9, § 2524.3.  Landlords can recover property to demolish it, withdraw units for use as an owner-owned and operated business, or may withdraw the units from the rental market if the cost to repair dangerous living conditions "would substantially equal or exceed" the building's value.  *Id.* § 2524.5.  In *Yee,* the Supreme Court held that the ordinance at issue did not constitute a physical taking despite "limit[ing] the bases upon which a park owner may terminate a mobile home owner's tenancy."  *Yee*, 503 U.S. at 524, 528.  As explained in *335-7 LLC*, the Supreme Court in *Yee* reasoned that there was no physical taking because "[t]he mobile park owners had voluntarily made their property available to tenants and nothing in the law's terms required them to continue to do so."  2021 WL 860153, at *8.  The Supreme Court held that the law "merely regulate[d] petitioners' use of their land by regulating the relationship between landlord and tenant," which was consistent with longstanding precedent "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."  503 U.S. at 528–29 (emphasis omitted) (collecting cases).  The New York Court of Appeals has similarly held that RSL do not effect a facial physical taking because the "right to evict an unsatisfactory tenant or convert rent-regulated property to other uses remains unaffected."  *Higgins*, 630 N.E.2d at 632.

Furthermore, under the HSTPA, landlords can convert rent regulated apartments to condominiums or cooperatives with purchase agreements from 51% of tenants.  N.Y. GEN. BUS. LAW § 352-eee.[20]  BRI and G-Max Plaintiffs concede that landlords can use these avenues to stop being landlords and end physical occupation of these properties as rent regulated units. (*See, e.g.*, BRI Compl. ¶¶ 100(b), 100(h) (noting that under the HSTPA property owners can refuse to renew leases in "narrow circumstances," but also alleging that condo conversions have been "virtually eliminated"); ¶ 109 (alleging that the HSTPA "significantly limits the owner's right not to renew" a lease and also "substantially eliminates" the ability to remove a tenant); ¶ 111 (asserting that "non-renewal of a lease is permitted in certain limited circumstances where an owner seeks to occupy a unit or demolish a building"); G-Max Compl. ¶ 126 ("making it harder for property owners to evict tenants"); ¶ 175 ("demanding renewal leases in perpetuity"); ¶ 227 ("effects of rent-regulation []such as perpetual renewal and succession rights").)  As BRI Defendants highlight, BRI Plaintiffs do not plausibly plead an individual owner would need to occupy more than one apartment, or why a corporate owner would need occupy a residential apartment – or more importantly how the lack of their ability to do so amounts to a physical taking.  (BRI State Defs.' Mem. at 18.)  Instead, the HSTPA prohibits an owner from refusing to renew rent-regulated leases in order to occupy more than one unit for him or herself or allowing a family member to do so, absent an immediate and compelling necessity.  N.Y. UNCONSOL. LAW § 26-408(b)(1).  G-Max Plaintiffs challenge the same restrictions regarding a property owner's personal use of property.  But like BRI Plaintiffs, G-Max Plaintiffs acknowledge that at

---

[20] The Court also notes that BRI and G-Max Plaintiffs' conversion challenges are speculative and not ripe as neither involve allegations that they have tried to actually obtain the 51% tenant agreements for conversion.  (BRI Compl. ¶¶ 85(x)–(y), 120; G-Max Compl. ¶¶ 113, 149, 163, 181, 186, 191, 196.)

least some landlords may recover units for their own use through different avenues in the

HSTPA.  (G-Max Compl. ¶¶ 8, 122.)  These concessions are fatal to the physical taking claims

because this type of regulation of the landlord-tenant relationship is permissible.  *See Loretto*,

458 U.S. at 440 (affirming that states hold "broad power to regulate housing conditions in

general and the landlord-tenant relationship in particular without paying compensation for all

economic injuries that such regulation entails").[21]

      G-Max Plaintiffs, like BRI Plaintiffs, argue that the limited manner in which they may

use their property under the HSTPA effectuates a taking.  But the case law is clear: property

owners who offer their properties for rent do not suffer from a taking based on laws that regulate

the rental of that property.  *See Higgins*, 630 N.E.2d at 633 (finding no physical taking where the

property owner decided to rent to tenants); *see also Harmon*, 412 F. App'x at 422 (noting that

"where . . . a property owner offers property for rental housing, the Supreme Court has held that

governmental regulation of the rental relationship does not constitute a physical taking" (quoting

*FHLMC*, 83 F.3d at 47–48)).  Because "the government effects a physical taking only where it

*requires* the landowner to submit to the *physical occupation* of his land" the Court finds that BRI

and G-Max Plaintiffs fail to allege a physical taking by the HSTPA.  *See Yee*, 503 U.S. at 527

(second emphasis added) (finding no physical taking where petitioners voluntarily rented

property and no physical invasion of the property had occurred); *335-7 LLC*, 2021 WL 860153,

at *10 ("Although [the] [p]laintiffs complain that the RSL constitutes a physical taking by

---

[21] BRI Plaintiffs also allege that the HSTPA limits their right and ability to refuse to rent
to prospective tenants.  (BRI Compl. ¶¶ 110, 116).  But these allegations ignore the many
protections afforded to landlords by the HSTPA and prior incarnations of the law to investigate
potential tenants.  For example, property owners may perform credit checks and background
checks precisely so that landlords maintain some control over to whom to offer leases.  N.Y.
REAL PROP. LAW § 238-a (McKinney 2021).

restricting their reversionary interests because conversion, eviction and vacancy are up to the tenant, not the owner, the same was true in all of the cases where the RSL has been upheld."); *CHIP*, 492 F. Supp. 3d at 43 ("The restrictions on [the landlords'] right to use the property as they see fit may be significant, but that is insufficient under the standards set forth by the Supreme Court and Second Circuit to make out a physical taking."); *Elmsford*, 469 F. Supp. 3d at 162–63 ("Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical taking of property.").

G-Max Plaintiffs Ordway and Guerrieri offer a more thorough as-applied analysis as to their physical taking claim.  In particular, Ordway and Guerrieri assert that they cannot recover a third unit in their building for personal use to combine two floors into a single residence.  (G-Max Compl. ¶¶ 168–76.)  Prior to the enactment of the HSTPA, Ordway and Guerrieri initiated holdover proceedings in housing court to remove the current tenant in the unit they wished to occupy.  (*Id.* ¶¶ 172–73.)  These Plaintiffs argue that because of the HSTPA, they have lost their "fundamental right to occupy their own private property."  (*Id.* ¶ 175.)  Even assuming that there is an unwanted tenant in one of their rental units, Ordway and Guerrieri have failed to allege how HSTPA bars recovery of their unit.  As discussed *supra*, under the HSTPA, a property owner may recover a unit because of "immediate and compelling necessity."  HSTPA, Part I, §1.  While the HSTPA limits recovery to one unit for personal use, Ordway and Guerrieri's other units were recovered voluntarily.  (G-Max Compl. ¶ 171.)  The voluntary recovery of the other rental units means that under HSTPA there is no bar to recovering a unit based on "immediate and compelling necessity" – indeed to date, they have not exercised their rights to do so under this provision.  HSTPA, Part I, §1.  Thus, Plaintiffs Ordway and Guerrieri cannot claim that the HSTPA results in their inability to occupy their own private property when their property right of

disposal, i.e. an exit option, is available to them.  In particular, the return of Ordway and

Guerrieri's adult son could serve as the immediate and compelling necessity as to why they need

to recoup the unit for personal use, a remedy available to them under the HSTPA.  (G-Max

Compl. ¶ 174.)  Aside from this option, Ordway and Guerrieri have other disposal options, as

they could evict the tenant, upon request, if they provide a similar accommodation.  N.Y. Admin.

Code § 26-511(c)(9).  In *Harmon*, the Second Circuit affirmed the dismissal of a physical takings

challenge to RSL because landlords retained the right to recover possession of a unit for

immediate and compelling necessity, as is the case here.  412 F. App'x at 422.[22,23]  The right to

recover a unit under the "immediate and compelling necessity" provision remains substantially

unchanged by the HSTPA.  *See* HSTPA, Part I, § 1 ("The landlord seeks in good faith to recover

possession of a housing accommodation because of immediate and compelling necessity for his

or her own personal use and occupancy as his or her primary residence or for the use and

occupancy of his or her immediate family as their primary residence . . . .").

     A recent decision from the First Department is instructive here.  *See Harris v. Israel*, 142

N.Y.S.3d 497 (App. Div. 2021).  In *Harris*, the court was tasked with determining whether the

HSTPA applied to a holdover proceeding which had been pending for one year before the

HSTPA's enactment.  *Id.* at 498.  Specifically, the court considered the same amended provision

challenged by Ordway and Guerrieri, which governs an owner's right to refuse to renew a rent-

---

[22] While summary orders do not have precedential effect, the Court is not at liberty to disregard or contradict "a Second Circuit ruling squarely on point merely because it was rendered in a summary order" and rather should view such reasoning as "valuable appellate guidance."  *United States v. Tejada*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010).

[23] It is also notable that while the "immediate and compelling necessity" standard is new for rent stabilized units, it has long been the standard for recovery for rent controlled units.  *See* N.Y.C. Admin. Code 26-408; N.Y.C.R.R. tit. 9, § 2104.5(a)(1) (2021).

stabilized lease on the ground that the owner seeks to recover the unit for her or her own personal use and occupancy as a primary residence.  *Id.*  The Appellate Division concluded that the amended provision was applicable to this proceeding.  *Id.*  However, while *Harris* was pending before the First Department, the Court of Appeals in *Regina Metropolitan Co. v. New York State Division of Housing and Community Renewal*, 154 N.E.3d 972 (N.Y. 2020), held that the HSTPA's rent overcharges could not apply retroactively without violating due process.  *Id*. at 976–77.  Consequently in *Harris*, the court reversed and reinstated the judgment of possession, applying *Regina Metro's* reasoning "that an owner's increased liability and the disruption of relied-upon repose are impairments to his or her substantive rights" to preclude "any retroactive application of HSTPA" given that "petitioner had spent several years reclaiming all other units at the property and was ultimately awarded a judgment of possession before [the] HSTPA's enactment."  *Harris*, 142 N.Y.S.3d at 499.  To put it more directly, *Harris* turned on "settled expectations" following a favorable *judgment*.  *Id.*  However, by their own admission, Ordway and Guerrieri have not obtained any judgment of possession.  (G-Max Compl. ¶ 172 (noting that Ordway and Guerrieri "commenced owner-occupancy holdover proceedings . . . .").)  Having only "commenced" an owner-occupancy holder proceeding by serving one "notice of non-renewal" which is not a judgment of possession, Ordway and Guerrieri have no "settled expectations" regarding their property.  (*Id.*); *see Harris*, 142 N.Y.S.3d at 499.[24]  The court in *Harris* ultimately determined that Part I of the HSTPA "impair[s] rights owners possessed in the past, increasing their liability for past conduct and imposing new duties with respect to

---

[24] The Complaint is silent as to the status of Plaintiffs Ordway and Guerrieri's holdover proceedings in Brooklyn housing court to remove the tenant, which may render this claim moot if ultimately successful.  (G-Max Compl. ¶¶ 172–73.)

transactions already completed." *Id.* (alteration in original). But Ordway and Guerrieri have merely just begun proceedings to repossess their unit.[25]

The Supreme Court has explained that a plaintiff alleging a taking must show that the state regulatory entity has rendered a final decision on the matter and that the plaintiff has sought just compensation by means of an available state procedure. *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled in part by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). Prior to the Supreme Court's decision in *Knick*, the law in the Second Circuit had been that a taking is not without just compensation under § 1983 unless a plaintiff has exhausted all state remedies that may provide just compensation. 139 S. Ct. at 2169 (citing *Williamson Cnty.*, 473 U.S. at 195). However, the Supreme Court in *Knick* overruled the state-exhaustion requirement as an "unjustifiable burden on takings plaintiffs." *Id.* at 2167. This means that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Id.* at 2170. However, the Supreme Court reversed *Williamson County* only to the extent of finding that a property owner need not seek compensation from the State before raising a takings claim, but left undisturbed the "question [of] the validity of th[e] finality requirement." *Id.* at 2169; *see also Sagaponack Realty, LLC v. Village of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) (explaining that "*Knick* leaves undisturbed *Williamson's* requirement that a state regulatory agency must render a final decision on a matter before a taking claim can proceed").

---

[25] G-Max Plaintiffs further argue that *Regina Metro* and *Harris* should extend to the HSTPA's Part K regarding MCIs. (G-Max Pls.' Suppl. Letter, March 16, 2021; Dkt. No. 98.) But *Regina Metro* reaffirmed that "a statute that affects only 'the propriety of prospective relief' . . . has no potentially problematic retroactive effect even when the liability arises from past conduct." 154 N.E.3d at 988 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994)). The MCI changes in the HSTPA make it so that "increases shall be collectible prospectively" and thus result in not impermissibly retroactive legislation. N.Y.C. Admin. Code § 26-511.1(8).

Applying this principle here, Ordway and Guerrieri have not plausibly pled that the HSTPA inflicts an "*absolute* deprivation" of the right to their property, because they can recover the unit under the HSTPA. *Southview Assocs.*, 980 F.2d at 95 (finding no physical taking because "no absolute, exclusive physical occupation exist[ed]"); HSTPA, Part I, §1. Here, there has not been a final decision taking Ordway and Guerrieri's property. Instead, Ordway and Guerrieri's allegations merely establish personal use restrictions that govern the terms of an existing landlord-tenant relationship, which does not make plausible their takings claim. *See Dawson v. Higgins*, 610 N.Y.S.2d 200, 209 (App. Div. 1994) (upholding constitutionality of personal-use restrictions for rent-controlled apartments); *see also Higgins*, 630 N.E.2d at 632 ("That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent control and rent stabilization—does not, without more, render it a permanent physical occupation of property."). Thus, the as-applied physical takings challenge as to Plaintiffs Ordway and Guerrieri fails.

### E.  Regulatory Takings Under the Fourteenth and Fifth Amendments

#### 1.  Applicable Law

A regulatory taking occurs when the government acts in a regulatory capacity and such state regulation "goes too far" and "effects a taking." *Buffalo Teachers*, 464 F.3d at 374 (citation omitted). Courts view regulatory takings as either categorical or non-categorical. *See Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014). A categorical taking occurs in "the extraordinary circumstance when no productive or economically beneficial use of land is permitted." *Id.* (emphasis omitted) (quoting *Tahoe-Sierra*, 535 U.S. at 330); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (holding that government regulation of private property may be "so onerous that its effect is tantamount to a direct appropriation or ouster—and

that such 'regulatory takings' may be compensable under the Fifth Amendment"); *Lucas*, 505

U.S. at 1019 (holding that the categorial rule applies when a regulation completely deprives an

owner of "all economically beneficial use" of his or her property" (emphasis omitted)).

Categorical takings occur only in a "narrow" set of circumstances. *Lingle*, 544 U.S. at 538. The

regulatory takings framework applies in a myriad of circumstances, including use restrictions

such as zoning ordinances, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926),

orders barring the mining of gold, *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168

(1958), and regulations that prohibit certain conduct on private property, *Andrus v. Allard*, 444

U.S. 51, 65–66 (1979).

Anything short of a complete elimination of value or a total loss is a non-categorical

taking, which is analyzed under the framework articulated in *Penn Central*. 438 U.S. at 124.

The *Penn Central* analysis of a non-categorical taking "requires an intensive ad hoc inquiry into

the circumstances of each particular case." *Buffalo Teachers*, 464 F.3d at 375. In applying *Penn*

*Central*, courts must "weigh three factors to determine whether the interference with property

rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the

extent to which the regulation has interfered with distinct investment-backed expectations; and

(3) the character of the governmental action." *Id.* (quotation marks omitted). The inquiry turns

on whether "justice and fairness require that economic injuries caused by public action be

compensated by the government, rather than remain disproportionately concentrated on a few

persons." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) (quotation marks omitted).

Notably, the Supreme Court cautioned that "[g]overnment action that physically appropriates

property is no less a physical taking because it arises from a regulation." *Cedar Point*, 141 S. Ct.

at 2072. The key inquiry is "whether the government has physically taken property for itself or

someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* (citing *Tahoe-Sierra*, 535 U.S. at 321–323).

2.  Analysis

a.  Regulatory Taking – Facial Challenge

As noted, a *per se* regulatory taking exists when the government completely deprives an owner of all economically beneficial uses of one's property. *See Lingle*, 544 U.S. at 538.  Such a categorical taking involves "the extraordinary circumstance when *no* productive or economically beneficial use of [property] is permitted." *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017 (emphasis in original)).  BRI and G-Max Plaintiffs do not allege facts to support that they have been deprived of *all* economical viable use of their property by the "mere enactment of the regulation[]" – here, the HSTPA. *Tahoe-Sierra*, 535 U.S. at 318.  Instead, BRI and G-Max Plaintiffs only plead that the HSTPA decreases the value of their properties.  (BRI Compl. ¶¶ 22–23, 33, 54, 69, 79, 81–82, 126(a), 128, 135(a)) (claims that the HSTPA results in decreased, diminution, or reduction in BRI Plaintiffs' property values); (G-Max Compl. ¶¶ 4–5, 9, 11, 91, 119, 127, 148, 154, 161, 176, 180, 185, 190, 195, 198–99, 202, 205, 227) (claims that the HSTPA drastically devalues or impairs the values of G-Max Plaintiffs' properties).)

As the court in *CHIP* noted, "[r]ent regulations have now been the subject of almost a hundred years of case law, going back to Justice Holmes.  That case law supports a broad conception of government power to regulate rents, including in ways that may diminish — even significantly — the value of landlords' property."  492 F. Supp. 3d at 38.  Importantly, "every regulatory-taking challenge to the RSL has been rejected by the Second Circuit." *Id.* at 44 (citing *W. 95 Hous. Corp.v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary order) (upholding that New York's rent stabilization laws are not subject to

56

facial challenge as a regulatory taking)); *see Rent Stabilization Ass'n of the City of N.Y. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) ("[T]he hardship provisions [of RSL], standing alone, obviously cannot effect a taking because they do not limit a landlord's rent in the first instance." (emphasis in original)); *see also Greystone Hotel*, 13 F. Supp. 2d at 528–29 (declining to find regulatory taking claim where plaintiffs conceded that the unregulated portion of the building retained value); *FHLMC*, 83 F.3d at 48 (finding no regulatory taking where property owners could still rent their apartments and collect the regulated rents).  Judge Ramos succinctly applied this vast case law to the HSTPA:

> [e]ven following the [HSTPA], the RSL does not strip landlords of all economic enjoyment of their rent-stabilized properties because they still collect rent from their tenants and, to the extent their rental income does not exceed their operating costs, they may seek hardship exemptions. They may also convert or sell their buildings.

*335-7 LLC*, 2021 WL 860153, at *11.  The Court will follow the weight of authority that rejects facial regulatory takings claims such as those alleged in these cases.  *See id.*; *see also Harmon v. Markus*, 2010 WL 11530596, at *3 (S.D.N.Y. Mar. 1, 2021) (noting that it is "well-settled law that a facial taking challenge to rent stabilization laws will not lie as of right").  Further, the Supreme Court has noted that it is "particularly important in takings cases to adhere to [its] admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.'"  *Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 294–95 (1981)).  The need for individualized analysis of such claims is why facial attacks face an uphill battle because "whether a taking has occurred depends . . . on a variety of financial and other information unique to each landlord."  *Dinkins*, 5 F.3d at 597.

Because the Court concludes that the HSTPA is not a *per se* regulatory taking, BRI and G-Max Plaintiffs claims will be analyzed as a non-categorical taking under the framework articulated in *Penn Central*. *See Tahoe-Sierra*, 535 U.S. at 330 (explaining that a plaintiff must show no productive or economically beneficial use of his or her property to sustain a categorical regulatory takings claim); *cf. Greystone Hotel*, 13 F. Supp. 2d at 528 (concluding at summary judgment that failure to offer facts showing that plaintiff was denied economically viable use of its property forfeited a regulatory takings claim).[26] In applying the *Penn Central* factors, it is the Court's responsibility to "determin[e] when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than disproportionality concentrated on a few persons." *Penn Cent.*, 438 U.S. at 124.[27]

### b.  Regulatory Taking – As-Applied Challenge

As discussed previously, a regulatory taking occurs when governmental regulation of private property "goes too far" and is "tantamount to a direct appropriation or ouster." *Lingle*,

---

[26] The Supreme Court's recent decision in *Cedar Point* is illustrative of what constitutes a *per se* regulatory taking and why BRI and G-Max Plaintiffs have failed to allege any. In *Cedar Point*, the Supreme Court held that a California regulation granting labor organizers a "right to take access" to private farms for three hours per day, 120 days per year, constituted a *per se* physical taking. 141 S. Ct. at 2069, 2080. The Supreme Court reasoned that because "the regulation grant[ed] a formal entitlement to physically invade the growers' land" and that did not arise from any "traditional background principle of property law" and was "not germane to any benefit provided to agricultural employers or any risk posed to the public," it "amount[ed] to simple appropriation of private property." *Id.* at 2080. Here, no such appropriation exists. Unlike the circumstances in *Cedar Point*, the HSTPA does not "grant[] a right to invade property closed to the public." *Id.* at 2077. Instead, BRI and G-Max Plaintiffs' "tenants were invited by [them], not forced upon them by the government." *Yee*, 503 U.S. at 528. This is in stark contrast to *Cedar Point* where the regulation at issue resulted in a *physical invasion* of property, which is entirely absent in both Actions here.

[27] G-Max Plaintiffs argue that they have stated a facial regulatory takings claim. (*See* G-Max Pls.' Mem. at 33–36.) But the weight of the authority dictates otherwise as described above. Thus, the Court dismisses G-Max Plaintiffs facial regulatory takings claim.

544 U.S. at 537.  In evaluating a regulatory takings claim, it is important to note that government

regulation "involves the adjustment of rights for the public good, and that [g]overnment hardly

could go on if to some extent values incident to property could not be diminished without paying

for every such change in the general law."  *Id.* at 538 (citation and quotation marks omitted).

Indeed, the Supreme Court has consistently recognized that "[s]tates have broad power to

regulate housing conditions in general and the landlord-tenant relationship in particular without

paying compensation for all economic injuries that such regulation entails."  *Loretto*, 458 U.S. at

440; *see also Fla. Power*, 480 U.S. at 252 (noting that "statutes regulating the economic relations

of landlords and tenants are not *per se* takings").  "When a landowner decides to rent his land to

tenants, the government may place ceilings on the rents the landowner can charge . . . ."  *Yee*,

503 U.S. at 529 (citing *Pennell*, 485 U.S. at 12 n.6).  Such forms of regulation are analyzed by

engaging in the "essentially ad hoc, factual inquiries" necessary to determine whether a

regulatory taking has occurred.  *Kaiser Aetna*, 444 U.S. at 175.  There are limits, however, to the

power of the government to regulate property.  In the words of Justice Holmes, "while property

may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

*Pa. Coal Co.*, 260 U.S. at 415.  Mere profit loss, however, does not establish that a regulation has

gone too far.  *See Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984) ("[R]egarding

economic impact, it is clear that prohibition of the most profitable or beneficial use of a property

will not necessitate a finding that a taking has occurred."); *see also Penn Cent.*, 438 U.S. at 130

(noting that "the submission that [the plaintiffs] may establish a 'taking' simply by showing that

they have been denied the ability to exploit a property interest that they heretofore had believed

was available for development is quite simply untenable").

The Court must first evaluate the economic impact of the regulations on BRI and G-Max

Plaintiffs.  *Penn Cent.*, 438 U.S. at 124.[28]  Put differently, the Court needs to determine whether

the HSTPA "amounts to a physical invasion or instead merely affects property interests through

some public program adjusting benefits and burdens of economic life to promote the common

good."  *Jado Assocs., LLC v. Suffolk Cnty. Sewer Dist. No. 4-Smithtown Galleria*, No. 12-CV-

3011, 2014 WL 2944086, at *6 (E.D.N.Y. June 30, 2014) (quoting *Lingle*, 544 U.S. at 539).[29]

---

[28] As previously noted, BRI Plaintiffs assert that the BRI Complaint is at bottom a facial
challenge, but that the BRI Complaint should be construed as raising an as-applied challenge
because the two are "the same" given the "HSTPA's restrictive effect upon each of the [BRI]
Plaintiffs and their members."  (BRI Pls.' Mem. at 68.)  To that end, BRI Plaintiffs offer
sweeping assertions that "[t]he broad draconian measures of the HSTPA amount to a [t]aking
without the necessary demonstration of an as-applied challenge as the cumulative effects
satisfying the law in that regard."  (*Id.* at 9.)  BRI Plaintiffs offer no legal support that an as-
applied regulatory takings challenge can be determined by evaluating the "cumulative effects" of
the HSTPA.  (*Id.*)  Nevertheless, the Court will analyze BRI Plaintiffs' under-developed
arguments as to their alleged as-applied challenge.

[29] BRI Plaintiffs claim that there are "several tests" to evaluate a regulatory taking and
argue that the appropriate test for a regulatory taking is the "diminution of value" that "focuses
on the impact of the regulation on the landowner."  (BRI Pls.' Mem. at 28.)  BRI Plaintiffs
contend that "if the landowner's use is restricted such that the value of his property is drastically
diminished, a taking exists no matter how great the benefit to the public."  (*Id.* at 28–29; BRI
Compl. ¶¶ 85(a)–(aa).)  BRI Plaintiffs state that some courts "adhere to a lesser standard, finding
takings where the existing use is substantially minimized."  (*Id.*)  The Court disagrees with this
characterization of the case law.  For example, BRI Plaintiffs cite to *Penn Central* for the notion
that there is no set formula to trigger compensation for economic injury caused by public action.
While that may be true, it does not support the assertion that courts find takings where existing
use of property is substantially minimized by government regulation as they put forward.
  In *Penn Central*, the Supreme Court held that owners could not establish a taking by
showing that they had been denied the right to use superadjacent airspace; in fact, the Supreme
Court reached a conclusion that was the opposite of what BRI Plaintiffs urge – that minimized
use of property did *not* constitute a taking.  *Penn Cent.*, 438 U.S. at 130, 138 ("[T]he submission
that appellants may establish a 'taking' simply by showing that they have been denied the ability
to exploit a property interest that they heretofore had believed was available for development is
quite simply untenable.").  BRI Plaintiffs also cite to cases regarding physical takings, total
regulatory takings, and land-use exactions, (*see* BRI Compl. ¶ 101), which have no bearing on
the as-applied regulatory taking claim here since each involves a distinct legal theory, *Lingle*,
544 U.S. at 546–48 (citing *Nollan*, 483 U.S. 825; *Dolan*, 512 U.S. 374).  Instead, those cases

The changes by the HSTPA do not impose a physical occupation, but instead adjust the economic relationship between owners and tenants.  *See FHLMC*, 83 F.3d at 48 (finding that the law "regulates the terms under which the owner may use the property" but does not "deprive [plaintiffs] of economically viable use of the property"); *Dinkins*, 805 F. Supp. at 163 ("A 'reasonable return' is not protected by law in this [C]ircuit."); *Harmon*, 412 Fed. App'x at 422 (affirming the dismissal of a taking claim because the "law does not subject the property to a use which its owner neither planned nor desired.  Rather, it regulates the terms under which the owner may use the property . . . ." (quoting *FHLMC*, 83 F.3d at 48)); *Greystone Hotel*, 13 F. Supp. 2d at 528 (holding that there was no taking where the plaintiff failed to show deprivation of "economically viable use of its property" and further held that plaintiff is "not guaranteed a 'reasonable return' on its investment"); *Higgins*, 630 N.E.2d at 633–34 (holding that because the regulations "do not affect the owner's right to receive the regulated rents" the plaintiffs "have not met their burden of showing the requisite deprivation of economically beneficial use of their property").  BRI and G-Max Plaintiffs do not allege that the HSTPA deprives them of all of their properties' economic value; instead, both assert that the rents they are able to charge are insufficient.  (BRI Compl. ¶¶ 22–23, 33, 46, 76, 79, 102, 107; G-Max Compl. ¶¶ 12, 59, 71, 85–

---

deal with instances in which the government demanded an easement or other cession of property rights as a condition of granting a development permit or allowing certain land use.  *Id.*  The HSTPA does not impose on BRI Plaintiffs any such land-use exaction and thus the Court finds reliance on such cases unavailing.

Further, BRI Plaintiffs cite *Sherman v. Town of Chester*, 752 F.3d 566 (2d Cir. 2014) to support the contention that a regulatory taking occurs when government "effectively prevent[s] [plaintiff] from making any economic use of his property."  (BRI Pls.' Mem. at 31.)  But the BRI Complaint does not allege that BRI Plaintiffs have been deprived of all economic use of their property.  Indeed, BRI Plaintiffs' allegations do not challenge any particular application of the HSTPA to any of the BRI Plaintiffs and instead make generalized assertions about the HSTPA's constitutionality, which is a facial, not as-applied challenge.  (*See generally* BRI Compl.)

93, 128–67.)[30]  For example, BRI Plaintiffs allege that the HSTPA "reduced the market value of

regulated properties in some cases by over 50%."  (BRI Compl. ¶ 128.)  In a similar vein, G-Max

Plaintiffs argue that "[a]ll [G-Max] Plaintiffs have been harmed . . . [by] the HSTPA's

provisions, which independently and cumulatively deprive [them] of their private property

without compensation."  (G-Max Compl. ¶ 127.)  The G-Max Complaint purports to detail

specific examples of the HSTPA's "direct harmful impacts on each individual [G-Max]

Plaintiff."  (*See id.* ¶¶ 128–96; G-Max Pls.' Mem. at 11–18.)  But the Second Circuit has held

that the owner of rent regulated property "is not guaranteed [a] 'reasonable return' on

investment."  *FHLMC*, 83 F. 3d at 48.  Indeed, courts in the Second Circuit have concluded that

a property owner has "no constitutional right to what it could have received in an unregulated

market."  *Greystone Hotel*, 13 F. Supp. 2d at 528 (citing *FHLMC*, 83 F. 3d at 48).  Stated

otherwise, a "mere diminution in the value of property, however serious, is insufficient to

demonstrate a taking."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust

for S. Cal.*, 508 U.S. 602, 645 (1993); *Andrus*, 444 U.S. at 66 ("When [the Supreme Court]

review[s] [a] regulation, a reduction in the value of property is not necessarily equated with a

taking."); *FHLMC*, 83 F.3d at 48 (denying regulatory taking claim because "[a]lthough

[plaintiff] will not profit as much as it would under a market-based system, it may still rent

apartments and collect the regulated rents"); *Dinkins*, 805 F. Supp. at 163 (explaining that "the

Second Circuit does not consider the denial of a 'reasonable return' as necessarily preventing an

---

[30] BRI Plaintiffs complain that the rent increases authorized each year for rent-stabilized units in Westchester County are insufficient.  (*See* BRI Compl. ¶¶ 78, 80.)  However, rent increases are not determined by any of the BRI Defendants and instead are determined by the Westchester RGB, which is not a party in the BRI Action.  (*Id.* ¶¶ 34, 78, 80.)  BRI Plaintiffs have thus not plausibly alleged that the HSTPA is unconstitutional on the grounds that property owners are unsatisfied with the rent increased approved by the RGB in Westchester County, and this falls short of establishing a regulatory taking.  (*Id.* ¶ 80.)

owner's economically viable use of his land" that constitutes a per se regulatory taking); *see also Kabrovski v. City of Rochester*, 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015) (noting that a taking "does not occur merely because a property owner is prevented from making the most financially beneficial use of a property"); *Donovan Realty, LLC v. Davis*, No. 07-CV-905, 2009 WL 1473479, at *5 n.3 (N.D.N.Y. May 27, 2009) (describing that the "mere diminution in value or inability to exploit property to the fullest economic extent" is insufficient to support takings claim); *Sterngass v. Town of Woodbury*, 433 F. Supp. 2d 351, 356 (S.D.N.Y. 2006) (holding that there is no taking where a zoning change prevented a property owner from "develop[ing] the land to its highest and best use"), *aff'd*, 251 F. App'x 21 (2d Cir. 2007) (summary order).  Other courts have declined to find regulatory takings where the property values were reduced well beyond what the HSTPA allegedly does here.  *See, e.g., Village of Euclid*, 272 U.S. at 384 (approximately 75%); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5%); *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 696 (4th Cir. 2018) (83%); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (81%); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (92%); *William C. Haas & Co., Inc. v. City & County of San Francisco*, 605 F.2d 1117, 1120 (9th Cir. 1979) (roughly 95%).

Second, the Court is to evaluate whether the HSTPA interferes with investment-backed expectations to the point of constituting a taking.  BRI and G-Max Plaintiffs claim that the HSTPA interferes with the investment-backed expectations by changing the reimbursement rate and recoupment period for MCIs and IAIs.  (BRI Compl. ¶¶ 12, 56, 126(b); G-Max Compl. ¶¶ 2, 11–12, 85, 86–88.)  BRI Plaintiffs broadly suggest that in looking at the "varied factors impacted by the HSTPA, the *Lingle* criteria for a regulatory taking fits, i.e., there is a substantial, and in fact, monumental impact and interference with investment backed expectations" and in attacking

the "permanency" of the ETPA, which they argue "essentially forever preclud[es] the right to exclude from one's property," that the HSTPA effects a regulatory taking.  (BRI Pls.' Mem. at 33.)[31]  G-Max Plaintiffs claim that the effect of the HSTPA's "drastic infringements on fundamental property rights is to strip rent-regulated properties of economic value and eliminate any chance that owners had of realizing a reasonable return or profit on their investments."  (G-Max Compl. ¶ 91.)  But both the BRI and G-Max Complaints fail to allege that these changes made their properties entirely unprofitable by decreasing the percentage of IAI costs that owners can compel tenants to pay, or by increasing the minimum amortization period for MCIs.  The "mere diminution in the value of property," regardless of how serious, "is insufficient to demonstrate a taking."  *Concrete Pipe & Prods.*, 508 U.S. at 645.  BRI and G-Max Plaintiffs' allegations that their properties have materially lost value or are less profitable do not render the HSTPA a regulatory taking.  *See Andrus*, 444 U.S. at 66 ("[L]oss of future profits— unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim.").  Judge Ramos recently considered and rejected this very argument in *335-7 LLC* and explained that given the range of expectations among property owners, landlords cannot possibly allege that RSL frustrate the reasonable investment-backed expectations of every landlord it affects.  *CHIP*, 492 F. Supp. 3d at 47.  Further, the HSTPA only takes effect whenever the local legislative body of a city, town, or village determines the existence of a public emergency pursuant to the ETPA – demonstrating that the law is indeed not permanent. HSTPA, Part A.  Thus, the Court is not persuaded by BRI Plaintiffs' arguments on this point. Prediction of profitability is essentially a matter of reasoned speculation that courts are not

---

[31] It is worth noting again that BRI Plaintiffs have made clear throughout this case that HSTPA, not the ETPA, is the sole law being challenge in the instant BRI Action.  Thus, the Court does not consider BRI Plaintiffs arguments against the ETPA.  (BRI Compl. ¶ 1.)

especially competent to perform.  Furthermore, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.  *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139–40 (2d Cir. 1984) (explaining that a takings claim based on loss profits is undermined further by the legion of cases that have upheld regulations which severely diminished the value of commercial property); *CHIP*, 492 F. Supp. 3d at 51 ("[B]y the time these [p]laintiffs invested, the RSL had been amended multiple times, and a reasonable investor would have understood it could change again.  Under the Second Circuit's case law, it would not have been reasonable, at that point, to expect that the regulated rate would track a given figure, or that the criteria for decontrol and rate increases would remain static."); *335-7 LLC*, 2021 WL 860153, at *12 ("[The] [p]laintiffs also cannot argue that the [HSTPA] interfered with their reasonable investment-backed expectations. Rent regulation has existed in some form in the City for over seventy years, and rent stabilization in particular has existed for over fifty years.  Plaintiffs knowingly entered a highly regulated industry.").  The Constitution does not demand that property owners be able to pass on to their tenants every penny of every expense and certainly not that they will be able to do so within a certain time frame.  As explained during the legislative debate for the HSTPA, the changes to MCIs and IAIs were intended to "help the tenants . . . stay" in their units, as "some of the individual apartment improvements [were being] made not to improve the apartments as such, but simply to raise the rent."  Assembly Bill A08281, Chamber Tr. at 35, 73 (New York 2019), https://www2.assembly.state.ny.us/write/upload/transcripts/2019/6-14-19.html.  Further, the challenges to the HSTPA that adjust the recoupment rate for MCIs and IAIs follow two recent changes to these very processes.  In both 2011 and 2015, the New York State Legislature ("the State Legislature") lengthened the recoupment rate and amortization period for IAIs and MCIs.

The 2011 amendment changed the formula for IAIs so that a landlord could increase rent by 1/60 the cost of improvement in buildings with more than 35 units, changed from 1/40.  2011 N.Y. SESS. LAWS ch. 97 (McKinney).  In 2015, the amendment lengthened the amortization period for MCIs from 84 months to 96 months for buildings with 35 or fewer units, and to 108 months for buildings with more than 35 units.  2015 N.Y. SESS. LAWS ch. 20 (McKinney).  While BRI and G-Max Plaintiffs may be unhappy that full recovery of all reasonable MCIs and IAIs costs are now on a longer schedule, the Second Circuit has held that loss of a reasonable return does not amount to a regulatory taking.  *Park Ave. Tower*, 746 F. 2d at 138 ("[T]he inability of [landlords] to receive a reasonable return on their investment by itself does not, as a matter of law, amount to an unconstitutional taking . . . .")

Finally, under *Penn Central* the Court looks to the "character of the governmental action."  *Penn Cent.*, 438 U.S. at 124.  Like the rent-control law upheld by the Supreme Court in *Bowles v. Willingham*, 321 U.S. 503 (1944), the HSTPA does not "*require* any person to . . . offer any accommodations for rent."  *Id.* at 517 (emphasis added).  Instead, the HSTPA imposes "negative restriction[s]" on permitted uses, which are "uncharacteristic of a regulatory taking." *Buffalo Teachers*, 464 F.3d at 375; *see also Elmsford*, 469 F. Supp. 3d at 168 (finding eviction moratorium did not have the character of a taking).  As discussed above, the HSTPA does not result in the physical occupation of property, but instead simply adjusts the economic relationship between owners and tenants.  *FHLMC*, 83 F.3d at 48 (affirming the denial of a regulatory taking claim because plaintiff failed to demonstrate deprivation of economically viable use of the property); *Dinkins*, 805 F. Supp. at 163 (noting that the Second Circuit does not consider the denial of a reasonable return, for rent regulation, as necessarily preventing an owner's economical viable use of his land); *Greystone Hotel*, 13 F. Supp. 2d at 528–29 (finding

66

no regulatory taking where plaintiff failed to offer facts showing that it was denied economically viable use of its property even if such use was not the plaintiff's preferred one); *Higgins*, 630 N.E. 2d at 633–34 (rejecting regulatory taking claim where the regulations did not affect the owner's right to receive the regulated rents).  The HSTPA builds upon a long-standing regime of rent-stabilization that has repeatedly been upheld by courts in previous regulatory takings challenges.  *335-7 LLC*, 2021 WL 860153, at *12 (rejecting a regulatory taking by reasoning that the Second Circuit has rejected the notion that loss profits, much less loss of a reasonable return, alone could constitute a taking); *CHIP*, 492 F. Supp. 3d at 51 (finding that because plaintiffs made their investments in rent-stabilized property against a backdrop of New York law that suggested RSL could change, plaintiffs could thus not allege that the HSTPA violated their reasonable investment-backed expectations).

"Legislation designed to promote the general welfare commonly burdens some more than others."  *Penn Cent.*, 438 U.S. at 133.  To the extent BRI and G-Max Plaintiffs attack the efficacy and the wisdom of the HSTPA, (BRI Compl. ¶¶ 5, 75, 87, 94, 244; G-Max Compl. ¶¶ 65–101, 114, 246), the case law is clear that the relevant inquiry for the courts is whether a law "arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones" or reflects "land-use control as part of some comprehensive plan," *Penn Cent.*, 438 U.S. at 132.  The HSTPA applies to about one million rental units in New York City and 25,000 rental units in the 21 municipalities in Westchester County.  (BRI Compl. ¶ 1, at 98; G-Max Comp. ¶ 60.)  The alleged burdens of the HSTPA are thus shared among many more property owners than the law upheld in *Penn Central*.  As G-Max Defendants point out, landlords receive corresponding benefits because the HSTPA facilitates housing for those who otherwise could not afford it, specifically in some instances to New Yorkers who provide vital

but undercompensated services, and some who would experience homelessness without it.  (G-Max CVH Mem. at 24.)  This in turn creates a more diverse community, and owners of unregulated properties (or regulated ones with market values below regulated rents) can charge more because of the increased demand for real estate these community benefits allow.  (*Id.*)  The Supreme Court has noted that a "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  *See Loretto*, 458 U.S. at 426.  The HSTPA is the State Legislature's response to an ongoing housing emergency in New York and, as such, is a "public program adjusting the benefits and burdens of economic life to promote the common good."  *1256 Hertel Ave.*, 761 F.3d at 264 (citation omitted).

Putting the merits aside however, BRI and G-Max Plaintiffs claims are not ripe for judicial review.  "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority."  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) ("Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (citation and quotation marks

68

omitted)); *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 455 (S.D.N.Y. 2012) ("Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies of sufficient immediacy and reality and not hypothetical or abstract disputes." (citation and quotation marks omitted)), *vacated in part on other grounds*, 755 F.3d 87 (2d Cir. 2014).

As discussed above, "*Knick* leaves undisturbed" the requirement in *Williamson* that "a state regulatory agency must render a final decision on a matter before a taking claim can proceed." *Sagaponack Realty*, 778 F. App'x at 64. BRI and G-Max as-applied regulatory taking claims are not ripe because the property owners have not tried to take advantage of available hardship exemptions. N.Y.C. Admin. Code §§ 26-511(c)(6), (6-a), 26-405(g); N.Y. UNCONSOL. LAW §§ 8626(d)(4), (5), 8584(4). Indeed, a taking claim "depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering . . . waivers allowed by law." *Palazzolo*, 533 U.S. at 620–21; *see also Thomas v. Town of Mamakating*, 792 F. App'x 24, 27 (2d Cir. 2019) (summary order) (explaining that judicial review is "condition[ed] . . . on a property owner submitting at least one meaningful application for a variance" (quoting *Murphy*, 402 F.3d at 348)). For example, several G-Max Plaintiffs complain of mounting taxes, water bills, electric bills, insurance premiums, and the cost of regular maintenance and repairs. (G-Max Compl. ¶¶ 129, 134, 147, 160, 165.) BRI and G-Max Plaintiffs may apply to the DHCR for a hardship exemption if their rental incomes do not exceed their expenses by at least a statutorily defined percentage. N.Y.C. Admin. Code § 26-511(c)(6). However, G-Max Plaintiffs do not allege that they sought and have been denied hardship exemptions to address any shortfalls in their ability to pay their debts, thus fatally undermining this claim. *See Hodel*, 452 U.S. at 296–97 (denying relief where plaintiffs could have sought variance or waiver from the challenged provisions for use of their

property); *Greystone Hotel*, 13 F. Supp. 2d at 528–29 (denying regulatory takings challenge as premature because the plaintiff had not applied for a hardship exemption); *Harmon*, 2010 WL 11530596, *3 (finding regulatory taking not ripe where the plaintiffs failed to apply for a hardship exception).  BRI and G-Max Plaintiffs also complain of not being able to convert building to condominiums or cooperative buildings.  But these allegations also suffer from the same ripeness defect, as none of the BRI and G-Max Plaintiffs has tried to obtain the requisite tenant agreements for conversions to condominiums or cooperative buildings.  (BRI Compl. ¶¶ 100(h), 124, at 95; G-Max Compl. ¶¶ 149, 163, 181, 186, 191, 196.)

Accordingly, because BRI and G-Max Plaintiffs have not shown that the HSTPA inflicts "any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking" these claims are dismissed.  *Keystone*, 480 U.S. at 493.

F.  Substantive Due Process Under the Fourteenth Amendment

1.  Applicable Law

BRI and G-Max Plaintiffs assert substantive due process claims.  To assert a substantive due process claim, plaintiff must show that (1) "a constitutionally cognizable property interest is at stake;" and (2) [D]efendants' "alleged acts against [the property] were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006) (citations and quotation marks omitted).

To uphold the legislative choice in the face of a substantive due process challenge, a court need only find some "reasonably conceivable state of facts that could provide a rational basis" for the legislative action.  *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  To pass constitutional muster, the legislation under review merely must "find some footing" in the realities of the subject addressed by the

law.  *Heller*, 509 U.S. at 321.  Thus, the Second Circuit has recognized that "it may be seen that today it is very difficult to overcome the strong presumption of rationality that attaches to a statute."  *Beatie*, 123 F. 3d at 712.  To succeed on such a claim, BRI and G-Max Plaintiffs must "convince the [C]ourt that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."  *Vance v. Bradley*, 440 U.S. 93, 111 (1979).  However, the Court "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish," because "the problem could have been better addressed some other way," or because "the statute's classifications lack razor-sharp precision."  *Beatie*, 123 F. 3d at 712.  Thus, if public "officials responsible for the enforcement guidelines reasonably might have conceived that the policies would serve legitimate interests, those guidelines must be sustained."  *All Aire Conditioning, Inc. v. City of New York*, 979 F. Supp. 1010, 1018 (S.D.N.Y. 1997).

The Due Process Clause "protects individual liberty against certain government actions." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quotation mark omitted).  The Due Process Clause offers heightened protection against government interference with certain fundamental rights and liberty interests.  *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).  These fundamental rights are "specific freedoms protected by the Bill of Rights" and those liberties which have been designated by the Supreme Court in a long line of cases.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing cases in which the Supreme Court recognized various fundamental rights such as the right to marry or to have an abortion).  However, economic regulations, such a rent-stabilization, are not subject to the same heightened scrutiny as fundamental rights.  *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines or

infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); *see also Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461 (2d Cir. 1996) ("Where the claimed right is not fundamental, the government regulation need only be reasonably related to a legitimate state objective.").

### 2.  Analysis

BRI and G-Max Plaintiffs assert that the HSTPA violates rent regulated property owners' substantive due process rights in violation of both the U.S. and New York Constitutions.  (BRI Compl. ¶¶ 40–70, 84–97, at 92–94; G-Max Compl. ¶¶ 239–54.)[32,33]  Specifically, BRI Plaintiffs argue that the HSTPA violates due process because it is not "rationally related to achieve any of the ends that have been used to justify the extreme measures taken under this law" and that it "fails to[] achieve the ends that it is claimed to serve."  (BRI Compl. ¶¶ 42–44, 50.)  To support their claim, BRI Plaintiffs cite studies by economists that the HSTPA does not achieve the purposes for which it allegedly was passed.  (*Id.* ¶¶ 59, 146.)  G-Max Plaintiffs make similar allegations, such as that the HSTPA "does not substantially advance legitimate state interests" and "does not accomplish its stated objective."  (G-Max Compl. ¶ 242.)  G-Max Plaintiffs also argue that the HSTPA "contravenes its purported intent—supposedly, to preserve affordable

---

[32] Because "[d]ue process . . . rights under the New York state and United States constitutions are coextensive with one another," these claims are analyzed together.  *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 408 n.3 (S.D.N.Y. 2004).

[33] G-Max Plaintiffs point to a New York Court of Appeals case that struck down the provisions of Part F of the HSTPA that would have applied new overcharge calculations retroactively, extended the limitations period for past overcharge claims, and retroactively imposed treble damages.  *Regina Metro.*, 154 N.E.3d at 1001–03 .  Because this issue has already be adjudicated, G-Max Plaintiffs' challenge to these provisions is denied as moot.

housing in New York" but "in fact, [it] do[es] the opposite." (*Id.* ¶ 5.)  While the specifics of

their allegations somewhat differ, BRI and G-Max Plaintiffs both allege broadly that the HSTPA

is "arbitrary and irrational" on its face.  (BRI Compl. ¶¶ 2–3, 41, 69, 91, 95, 97, at 93–94; G-Max

Compl. ¶¶ 1, 5, 20, 69, 101–02, 243, 252, 278.)[34]

First, as a threshold matter, BRI and G-Max Plaintiffs cannot invoke the substantive due

process doctrine to circumvent the requirements of takings claim.  In *Stop the Beach*

*Renourishment, Inc. v. Florida. Department of Environmental Protection*, 560 U.S. 702 (2010)

---

[34] Both BRI and G-Max Plaintiffs challenge various aspects of the HSTPA as violating due process.  BRI Plaintiffs challenge the changes in MCIs and IAIs recoupment, the high rent and high-income regulation, the vacancy and longevity "bonus," the 5% vacancy threshold, limitations on preferential rents, and eligibility for rent regulation.  (BRI Pls.' Mem. at 53–57; BRI Compl. ¶¶ 5, 8–9, 41, 48–49, 59, 81, 91–93, 120.)  G-Max Plaintiffs challenge the following aspects of the HSTPA under the due process clause:

> (1) its repeal of the income cap for rent-regulated apartments with rents above a certain threshold . . . (2) its repeal of provisions that allowed units to be removed from rent stabilization or control once the rent crossed a statutory high-rent threshold and the unit became vacant; (3) its repeal of provisions permitting larger rent increases for a new tenant after a vacancy; (4) its modification of the preferential rent provisions such that owners who voluntarily agreed to a further-reduced rent in the past (even before the HSTPA took effect) cannot even charge the government-approved legal regulated rent upon renewal; (5) its lowering of the rent increase cap for MCIs from 6% to just 2% in rent-stabilized apartments in New York City, from 15% to 2% in rent-controlled apartments in New York City, and from 15% to 2% in other counties when landlords make MCIs (and its elimination of such increases after 30 years); (6) its retroactive application of these MCI rent increase caps to rent increases attributable to MCIs that were approved within the seven years **prior** to the amendment taking effect; (7) its outright elimination of MCIs for buildings with 35% or fewer rent-regulated units; (8) its cap of $15,000 over 15 years on recoverable IAI spending—spread across a maximum of just three IAIs . . . (9) its restrictions on evicting tenants who do not pay their rent, potentially extending their tenancies for up to a year; (10) its curtailment of owners' rights to reclaim possession of their units for personal use and occupancy . . . (11) its retroactive expansion of the limitations, record-retention, and lookback periods for rent overcharge claims; and (12) its imposition of substantial new restrictions on co-op/condo conversions . . . .

(G-Max Compl. ¶ 243 (emphasis in original).)

(plurality opinion), the Supreme Court explained that plaintiffs cannot use substantive due process "to do the work of the Takings Clause" in circumstances in which "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior."  *Id.* at 721; *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))); *Gounden v. City of New York*, No. 10-CV-3438, 2011 WL 13176048, at *4 (E.D.N.Y. Apr. 22, 2011) (finding that the Fifth Amendment, an explicit textual source, guides the analysis for plaintiff's taking claim rather than substantive due process).  Undaunted by contrary authority, BRI Plaintiffs contend that "a reading of the case law reveals" that they may bring a substantive due process claim that "arise[s] out of the same facts as their takings claim."  (BRI Pls.' Mem. at 47.)  In support of this assertion, BRI Plaintiffs rely on Justice Kennedy's concurrence in *Lingle* and his concurrence in *Stop the Beach*, pointing to the notion that "a regulation might be so arbitrary or irrational as to violate due process."  (*Id.* (citing *Lingle*, 544 U.S. at 548–49 (Kennedy, J., concurring); *Stop the Beach*, 560 U.S. at 737 (Kennedy, J., concurring)).)  But a concurrence is not binding precedent. *See Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (observing that statement in a concurrence does not "constitute[ ] binding precedent").  Given the lack of authority for the claim, the Court rejects it and dismisses the due process claims.  *Stop the Beach*, 560 U.S. at 721.

However, even when considered on the merits, the Court concludes that the due process claims fail under rational basis review.[35]  BRI Plaintiffs argue that their due process rights are violated due to "the lack of surveys and findings of an emergency for decades."  (BRI Pls.' Mem. at 49.)  BRI Plaintiffs point to "the amount of housing construction in Westchester in the last decades," asserting that this is "more than adequate housing."  (*Id.*)  BRI Plaintiffs further contend that the HSTPA "impinges on substantive property rights, not merely economic regulation, but basic restriction on a person's ability to use his or her own property without arbitrary and unconscionable government restriction."  (*Id.* at 51.)  BRI Plaintiffs lodge conclusory allegations to challenge the lack of underlying data to support the State Legislature's concern about housing emergencies while offering no analysis as to why the HSTPA does not pass rational basis review to warrant discovery.  (*Id.* at 51–52.)

---

[35] BRI Plaintiffs dispute the standard of review for their due process claim.  BRI Plaintiffs first argue that strict scrutiny should apply to their due process claim but only a page later in their brief state that such a claim "requires that [the] economic legislation be supported by a legitimate legislative purpose furthered by a *rational* means."  (BRI Pls.' Mem. at 50–51 (emphasis added and citation omitted); BRI Compl. ¶ 5, at 92 (stating that the HSTPA "warrants strict scrutiny" and should be struck down because it is not "narrowly tailored" to serve a compelling government interest).)  For the purposes of resolving the instant Motions, the Court construes this to mean that BRI Plaintiffs contend that the HSTPA should be analyzed under a strict scrutiny standard.  And in the event the Court disagrees with that standard, BRI Plaintiffs argue that the HSTPA does not even pass muster under rational basis review.  However, the HSTPA does not involve suspect classifications, nor does it impinge on any fundamental rights. *See Pennell*, 485 U.S. at 13–14 (holding that the Supreme Court "will not overturn a statute that does not burden a suspect class or a fundamental interest unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational" (alteration omitted)).  Further, BRI Plaintiffs offer no authority or basis to establish that there is a fundamental right to rent apartments without government regulation.  (*See generally* BRI Pls.' Mem.)  Given the lack of support offered by BRI Plaintiffs and the case law holding otherwise, the Court concludes that HSTPA is subject to a rational basis standard.  *See Sidberry v. Koch*, 539 F. Supp. 413, 419 (S.D.N.Y. 1982) ("[H]ousing is not a fundamental right, and classifications affecting housing are subject only to the 'rational relationship' test.").  G-Max Plaintiffs do not advocate for "heightened" or "strict" scrutiny of their due process claim.  (G-Max Pls.' Mem. at 53 n.45.)

G-Max offers similar arguments about the purported goals of the HSTPA and questions

the law's efficacy at addressing such issues surrounding affordable housing.  (G-Max Pls.' Mem.

at 52–63.)  Specifically, G-Max Plaintiffs highlight that instead the HSTPA

> authorizes tenants to remain entrenched in rent-regulated units no matter how high
> the rent or how high their incomes[,] ([G-Max] Compl. ¶ 245); how the repeal of
> the sunset provisions severs any purported link between the HSTPA and the
> "emergency" it is purportedly designed to address[,] (*id.* ¶ 246); how it amends the
> co-op/condo conversion rules for *unregulated* properties, even though the
> conversion of such buildings has no conceivable nexus to affordable housing[,] (*id.*
> ¶ 114); and how certain provisions are given impermissibly retroactive effect[,] (*id.*
> ¶¶ 82, 85, 88–89).  Indeed, the [G-Max] Complaint explains that, through its far-
> reaching web of now-permanent restrictions on ownership rights, the HSTPA will
> *necessarily* exacerbate the emergency it is supposedly intended to address. *See id.*
> ¶¶ 64, 73, 75–76, 245.

(*Id.* at 53.)  But the Second Circuit has held that "[l]egislative acts that do not interfere with

fundamental rights or single out suspect classifications carry with them a strong presumption of

constitutionality and must be upheld if rationally related to a legitimate state interest." *Beatie*,

123 F.3d at 711 (quotation marks omitted).  A regulation "may be based on rational speculation

unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315; *see also Lingle*,

544 U.S. at 544–45 (noting that the "reasons for deference to legislative judgments about the

need for, and likely effectiveness of, regulatory actions are by now well established," and that

such deference is preferable to "choos[ing] between the views of two opposing economists");

*Beatie*, 123 F.3d at 713 (holding that "a lack of direct empirical support for the [legislature's]

assumption" could not "rebut the presumption that the statute has a rational basis").  2019 N.Y.

SESS. LAWS ch. 36, N.Y. Comm (McKinney)

The State Legislature had a rational basis to pass the HSTPA to achieve its goals related

to the State's housing crisis.  Specifically, the State Legislature found that "tenants struggle[d] to

secure safe, affordable housing, and landlords ha[d] little incentive to keep tenants in place long

term by offering consistently low rent increases." N.Y. Comm. Report, S. 6458 ("Committee Report"), 242nd Sess. (2019). In direct response to such a concern, the State Legislature limited landlords' ability to deregulate units so that tenants would not be displaced and curtailed landlords' ability to increase rents. The HSTPA also addressed the issues of housing instability and tenant hardship, both of which are recognized as a legitimate state goal. *See Pennell*, 485 U.S. at 14 n.8 ("The consideration of tenant hardship also serves the additional purpose . . . of reducing the costs of dislocation that might otherwise result if landlords were to charge rents to tenants that they could not afford."); *CHIP*, 492 F. Supp. 3d at 52 (upholding RSL where the housing shortage was only one of multiple justifications offered for the regulation, and concluding that a statute must be upheld so long as any one justification is valid). The State's interest in stabilizing rent, limiting a landlord's ability to charge more than the regulated rent, preventing deregulation of rent-stabilized apartments, and restricting the ability of landlords to remove tenants in certain circumstances are rationally related to the goal of maintaining stable rents and keeping tenants in their homes. *Pennell*, 485 U.S. at 13 (noting that the Supreme Court "ha[s] long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare" and this includes "protecting tenants from burdensome rent increases"); *see also Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) ("[T]he State has a legitimate interest in local neighborhood preservation, continuity, and stability."). Rent stabilization laws, like the HSTPA, serve the aim of keeping tenants in their homes. *See Higgins*, 630 N.E.2d at 634 (finding a "close causal nexus" between the RSL and preventing homelessness); *CHIP*, 492 F. Supp. 3d at 52 (rejecting Due Process challenge to the HSTPA given the multiple

justifications for the law, such as alleviating New York City's housing shortage).[36]  As the Supreme Court long ago articulated in *Pennell*, the goal of "preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing . . . is a legitimate exercise of . . . police powers."  485 U.S. at 12 (quotation marks omitted).

Importantly, one of the broadest aims of the HSTPA is to make housing more affordable. HSTPA, Part D, §1 ("The situation has permitted speculative and profiteering practices and has brought about the loss of vital and irreplaceable affordable housing for working persons and families.  The legislature therefore declares that in order to prevent uncertainty, potential hardship[,] and dislocation of tenants living in housing accommodations subject to government regulations as to rentals and continued occupancy as well as those not subject to such regulation, the provisions of this act are necessary to protect the public health, safety[,] and general welfare.").  Even dating back to 1969 when the first RSL were passed, the City Council at the time found that landlords were "demanding exorbitant and unconscionable rent increases," which caused "severe hardship to tenants."  N.Y.C. Admin. Code § 26-501.  Limiting landlords' ability to charge more than the regulated rent, placing caps on the amount chargeable for credit checks and late fees, preventing deregulation of units, and changing the percentage needed to covert buildings into condominiums and cooperatives are related to the overall goal of preventing excessive and unreasonable rent increases rampant throughout New York State and serve the aim of making housing more affordable.  The New York State Senate sought to lock in preferential rents to close the loophole that permitted owners to increase rents by a greater percentage than

---

[36] Plaintiffs in *335-7 LLC* also raised a due process claim but agreed to dismissal and conceded that their damages claim against the State was barred by sovereign immunity.  As such, the district court dismissed both claims.  2021 WL 860153, at *4 n.2.

that approved by the local RGBs, and to prevent sharp rent increases that could force tenants to be displaced from their apartments.  *See* Committee Report.  ("[The HSTPA was] enacted in response to an ongoing housing shortage crisis, as evidenced by an extremely low vacancy rate. Under tight rental markets, tenants struggle to secure safe, affordable housing, and landlords have little incentive to keep tenants in place long term by offering consistently low rent increases.").[37]  The New York State Senate explained in its justification of the HSTPA that the City and the municipalities in Nassau, Westchester, and Rockland struggle to protect their regulated housing stock, which is critical in "maintain[ing] affordable housing for millions of low and middle income tenants."  *Id.*  The New York State Senate went on to describe that the rent regulations in the HSTPA make it so that "residents can afford to live there without the threat of eviction, the fear of rapid and unaffordable rent increases, or rent burden."  *Id.*  These aims are "rationally related to a legitimate government interest."  *Beatie*, 123 F.3d at 711; *see also Pennell*, 485 U.S. at 13 (applying rational basis review to a rent regulation and highlighting that the Supreme Court has "long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare").

While BRI and G-Max Plaintiffs wish to cast doubt on the wisdom of the HSTPA, "it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as superlegislature to weigh the wisdom of legislation."  *Exxon Corp. v. Governor of Md.*, 437 U.S.

---

[37] It is noteworthy that versions of Part E of the HSTPA, which prohibits an owner from adjusting the amount of preferential rent upon the renewal of a lease, have been introduced almost every year at other Legislative Sessions before the New York State Senate dating back to 2009.  *See* Senate Bill S2845, 2019-2020 Legislative Session (showing previous versions of Part E introduced in Legislative Sessions in 2009-2010, 2011-2012, 2013-2014, 2015-2016, and 2017-2018), https://www.nysenate.gov/legislation/bills/2019/s2845/amendment/original.  Thus, BRI and G-Max Plaintiffs cannot plausibly claim to be surprised that the HSTPA interfered with their reasonable expectations regarding regulation of rent stabilized units.

117, 124 (1978) (quotation marks omitted).  Given the clear connection between the State

Legislature's purpose and the enactment of the HSTPA, Plaintiffs' allegations regarding the

efficacy of the law do not diminish that it aims to serve the permissible goal, even if imperfectly,

to address housing issues in the State.  (*See* BRI Compl. ¶¶ 44–70; G-Max Compl. ¶¶ 75–78.)

The Supreme Court has "emphatically refuse[d] to go back to the time when courts used the Due

Process Clause to strike down state laws, regulatory of business and industrial conditions,

because they may be unwise, improvident, or out of harmony with a particular school of

thought."  *Ferguson v. Skrupa*, 372 U.S. 726, 731–32 (1963) (quotation marks omitted).  It is

long settled that "States have power to legislate against what are found to be injurious practices

in their internal commercial and business affairs . . . ."  *Id.* at 730.  BRI and G-Max Plaintiffs'

substantive due process claims therefore fail to state a claim and are consequently dismissed.

### G.  Equal Protection

#### 1.  Applicable Law

G-Max Plaintiffs also bring equal protection claims.  The Equal Protection Clause of the

Fourteenth Amendment provides that "[n]o State shall make or enforce any law which . . .

den[ies] to any person within its jurisdiction the equal protection of the laws."  U.S. CONST.

amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated be treated

alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Sound*

*Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core,

equal protection prohibits the government from treating similarly situated persons differently.").

To state an equal protection claim, G-Max Plaintiffs must "plausibly allege that [they have] been

intentionally treated differently from others similarly situated and no rational basis exists for that

different treatment."  *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir.

2018) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  The Constitution guarantees the "right to be free from invidious discrimination in statutory classifications and other governmental activity."  *Harris v. McRae*, 448 U.S. 297, 322 (1980).  Where a challenged policy neither disadvantages a suspect class nor interferes with a fundamental right, the claim will survive constitutional scrutiny if the policy is rationally related to a legitimate state purpose or interest.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

### 2.  Analysis

G-Max Plaintiffs allege an equal protection violation.  (G-Max Compl. ¶¶ 255–64.)[38] Specifically, G-Max Plaintiffs claim that the HSTPA "singles out building owners whose properties happen to include rent-regulated units . . . for oppressive treatment that . . .  bears no rational relationship to the goal of providing affordable housing."  (*Id.* ¶¶ 257, 262.)  G-Max Plaintiffs do not contend that the HSTPA disadvantages a suspect class or interferes with a fundamental right; instead they argue that the law is not rationally related to a legitimate state interest.  (G-Max Pls.' Mem. at 63–64.)  Rational basis review is the proper standard to analyze equal protection challenges to rent stabilization laws.  *See Black v. State of New York*, 13 F. Supp. 2d 538, 542 (S.D.N.Y. 1998) ("The rational relationship standard is the appropriate standard for testing the validity under the Equal Protection Clause of laws regulating housing rental rates."); *see also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (applying rational relationship standard to statute that mandated timely determination of eviction proceedings).[39]  Under this

---

[38] G-Max Plaintiffs bring an equal protection violation under both the federal and State constitutions, which are analyzed under the same standard.  *See Hernandez v. Robles*, 855 N.E.2d 1, 9 (N.Y. 2006) ("[W]e have held that our Equal Protection Clause 'is no broader in coverage than the Federal provision.'").

[39] G-Max Plaintiffs do not dispute that rational basis review applies to their equal protection claim.  (G-Max Compl. ¶¶ 257, 262.)

standard, a challenged statute is given a strong presumption of validity and then tested to

determine if the classification it creates is rationally related to a legitimate state interest.  *City of

Cleburne*, 473 U.S. at 440; *Beach Commc'ns*, 508 U.S. at 314–15.  "[E]qual protection is not a

license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Beach

Commc'ns*, 508 U.S. at 313.  Indeed, following this principle, courts have upheld prior iterations

of RSL in New York against equal protection challenges.  *See Black*, 13 F. Supp. 2d at 542

(dismissing equal protection challenge to RSL's succession provisions because "prevention of

the loss of housing by apartment inhabitants" is "a legitimate goal of the state and city

legislatures"); *see also Pennell*, 485 U.S. at 14 (rejecting equal protection claim to a provision of

a San Jose rent control law because the ordinance was designed to serve the legitimate purpose

of protecting tenants and could hardly be viewed as irrational).

There is no doubt that the HSTPA passes the rational basis test.  As noted above, the

goals of the HSTPA are rationally related to a legitimate state interest in the stability of the New

York housing market and other aims as explained in the analysis of G-Max Plaintiffs'

substantive due process claim.  Accordingly, G-Max Plaintiffs equal protection claims also fail

as a matter of law.

H.  Contract Clause Under Article I, § 10

1.  Applicable Law

Article I, § 10 provides that "[n]o State shall . . . pass any . . . Law impairing the

Obligation of Contracts."  U.S. CONST., art. I, § 10, cl. 1.  To state a claim for violation of the

Contract Clause, a complaint must allege sufficient facts to demonstrate that state law has

"operated as a substantial impairment of a contractual relationship."  *Gen. Motors Corp. v.

Romein*, 503 U.S. 181, 186 (1992) (citations omitted). "This inquiry has three components:

whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.* Even if a state law constitutes a substantial impairment, however, it will survive a Contract Clause challenge if it serves "a significant and legitimate public purpose" and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983) (alterations in original) (quoting *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977)).

To determine whether a Contract Clause violation exists, the threshold question is "'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Id.* at 411. As the severity of impairment increases, so too does the level of scrutiny to which the legislation is subjected. *Id.* As a measure of contractual expectations, one factor to be considered in determining the extent of the impairment is "whether the industry the complaining party has entered has been regulated in the past." *Kraebel v. N.Y.C. Dept. of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) (citation omitted). The next question is whether the state has "a significant and legitimate public purpose behind the regulation." *Energy Rsrvs.*, 459 U.S. at 411. Lastly, the Court must consider "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 412 (brackets in original) (citations and quotations omitted).

### 2. Analysis

BRI and G-Max Plaintiffs challenge the HSTPA's change to preferential rents as a violation of the Contract Clause. U.S. CONST., art. I, § 10, cl. 1. (*See* BRI Compl. ¶¶ 121–23; G-

Max Compl. ¶¶ 265–72.)  BRI Plaintiffs also argue that the HSTPA "diminishes the ability of a

landlord to maintain the housing, perform capital repairs, do individual apartment improvements,

and eliminates the availability of housing for those in the most need due to the purported 'goal.'"

(BRI Pls.' Mem. at 60.)  Similarly, G-Max Plaintiffs allege that the HSTPA has impaired

existing contractual relationships based on other provisions aside from preferential rents, which

include limits on MCIs and IAIs that were already under contract, limiting the amount

recoverable in a summary proceeding, "destroying the benefit of the bargain for owners who

contracted with the City to offer affordable housing units under the Article XI program," and a

change to the percentage required for cooperative and condominium conversions.  (G-Max

Compl. ¶ 268.)[40]  G-Max Plaintiffs make facial and as-applied challenges under the Contract

Clause.  (*Id.* ¶ 267.)  BRI Plaintiffs argue that the HSTPA violates the Contract Clause as it

"impairs the existing lease (contract) agreements."  (BRI Compl. at 96.)  G-Max Plaintiffs lodge

a similar complaint, alleging that the HSTPA causes the "substantial impairment of existing

contracts," rendering the law "invalid."  (G-Max Compl. ¶ 5.)  Specifically, G-Max Plaintiffs

allege that the HSTPA "has undermined the bargains embodied in these contracts, interfered with

the contracting parties' reasonable expectations, and prevented landlord owners, including [G-

---

[40] The G-Max Complaint alleges the HSTPA "destroy[s] the benefit of the bargain for owners who contracted with the City to offer affordable housing units under the Article XI program."  (G-Max Compl. ¶ 268(d).)  But none of the G-Max Plaintiffs claims that it opted into rent stabilization under Article XI.  G-Max Plaintiffs also argue that the HSTPA renders cooperative and condominium conversions impossible for owners who had already entered into contracts to finance such conversions under the prior regime.  (G-Max Compl. ¶ 268(e).)  But G-Max Plaintiffs have not alleged that they entered into such conversion contracts that have been impacted by the HSTPA.  Thus, G-Max Plaintiffs lack standing to assert these claims and such claims are consequently dismissed.  *See* U.S. CONST., art. III, § 2.

Max] Plaintiffs, from safeguarding their rights."  (*Id.* ¶ 269.)[41]  BRI and G-Max Plaintiffs also

challenge the provision which provides that the rent under a renewal lease "shall be no more than

the rent charged to and paid by the tenant prior to that renewal, as adjusted by the most recent

applicable [Rent Guidelines Board-approved] increases and any other increases authorized by

law."  *See* HSTPA, Part E § 1.  The change is essentially that this provision applies to all rent

regulated rents, including preferential rents.

BRI and G-Max Plaintiffs have not plausibly stated a Contract Clause violation because

their claims are based on future, rather than existing, contracts.  (BRI Pls.' Mem. at 62–64; G-

Max Pls.' Mem. at 65–66.)  The law has been well settled for almost 200 years that the Contract

Clause does not "limit the ability of the government to regulate the terms of *future* contracts."

*Traher v. Republic First Bancorp, Inc.*, 432 F. Supp. 3d 533, 539 (E.D. Pa. 2020) (emphasis in

original) (citing *Ogden v. Saunders*, 25 U.S. 213 (1827)).  Recently, in *CHIP*, the court evaluated

similar claims by plaintiffs that the HSTPA revised the duration of their expiring leases as

"unavailing."  492 F. Supp. 3d at 53.  The court explained that as applied to future renewals "[a]

contract . . . cannot be impaired by a law in effect at the time the contract was made."  *Id.*

(alterations in original) (quoting *Harmon*, 412 F. App'x at 423).  The court explained that future

---

[41] G-Max Plaintiffs describe the HSTPA as causing a substantial impairment of existing contracts.  (G-Max Compl. ¶ 5.)  G-Max Plaintiffs also state that "[t]he only real winners here will be wealthy white tenants who, according to U.S. Census Bureau data, already disproportionality benefit from rent regulation, and who are now poised to receive a massive windfall at the expense of minority renters who will be frozen out of historically majority-white neighborhoods."  (*Id.*)  But as G-Max State Defendants point out, according to the most recent 2014 New York City Housing and Vacancy Survey, renter occupied housing units by rent regulation status show that 64.4% of rent-stabilized tenants are racial minorities, and only 35.6% are white.  *See Series IA: Renter Occupied Housing Units by Rent Regulation*, U.S. CENSUS BUREAU Table 4 (2014), https://www.census.gov/data/tables/time-series/demo/nychvs/series-1a.html.  Thus, repeal of the HSTPA would harm the existing minority tenants who live in rent regulated housing.  (G-Max State Defs.' Mem. at 49 n.13.)

leases will be subject to the HSTPA from the onset.  *Id.* (citing *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) ("Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein.")); *see also Bricklayers Union Loc. 21 v. Edgar*, 922 F. Supp. 100, 105 (N.D. Ill. 1996) (holding that "claims regarding future contracts do not state a claim since the Contract Clause does not apply to laws with prospective effect.").  The court in *CHIP* ultimately rejected the plaintiffs' Contract Clause claim regarding their expiring, preferential leases on these grounds.  492 F. Supp. 3d at 53.  BRI and G-Max Plaintiffs do not allege that Part E of the HSTPA has been applied retroactively to any lease renewals between Plaintiffs and their tenants.  Still, even if BRI and G-Max Plaintiffs had made such allegations, precedent bars such challenges to the HSTPA under the Contract Clause to enjoin the law's enforcement against future contracts.  *See Elmsford*, 469 F. Supp. 3d at 170 ("[T]he Contracts Clause also permits states to modify and abrogate existing contract terms long since agreed to and performed by the parties."); *see also Fraternal Ord. of Police v. District of Columbia*, 502 F. Supp. 45, 59–60 (D.D.C. 2020) ("As to any future contracts, it is well established that that Contract Clause only concerns itself with laws that retroactively impair current contract rights."), *appeal docketed*, No. 21-7059 (2d Cir. June 7, 2021); *Powers v. New Orleans City*, No. 13-CV-5993, 2014 WL 1366023, at *4 (E.D. La. Apr. 7, 2014) ("[T]he Contract Clause applies only to substantial impairment of existing contracts and not prospective interference with a generalized right to enter into future contracts."), *aff'd sub nom. Powers v. United States*, 783 F.3d 570 (5th Cir. 2015); *Robertson v. Kulongoski*, 359 F. Supp. 2d 1094, 1100 (D. Or. 2004) ("The Contract Clause does not prohibit legislation that operates prospectively."), *aff'd*, 466 F.3d 1114 (9th Cir. 2006).  The HSTPA allows owners to increase preferential rents annually by the same

percentages as any other regulated rents, as well as to account for MCIs, IAIs, and otherwise as authorized by law. *See* HSTPA, Part E, § 1. BRI Plaintiffs assert that the HSTPA "forever extend[s]" the preferential rent in current leases. (BRI Pls.' Mem. at 63.)[42] However, this is not accurate. Tenants must sign new leases to continue their occupancy, and landlords can increase rents in those new leases by the amount set by the RGB or decline to renew the leases in certain circumstances such as to recover for personal use based on an immediate and compelling necessity, among other exit options. HSTPA, Part E; N.Y.C. Admin. Code § 26-511(c)(9)(b); N.Y.C.R.R. tit. 9 §§ 2524.5(a)(2), 520.11(e), 2522.4(b) and (c). For G-Max Plaintiffs in particular, while they have identified a contractual relationship, they have not alleged that it was impaired by the HSTPA. Plaintiff G-Max cites a preferential rent for a two-year lease that commenced February 1, 2018, and expired on February 1, 2020 and Plaintiff Longfellow entered into a two-year lease also with preferential rent that started May 1, 2018 and ended July 1, 2020. (*See* G-Max Compl. ¶¶ 131, 135.) However, both these leases took effect *prior* to the enactment of the HSTPA (on June 14, 2019); thus, the law did not impair these contracts at all. These G-Max Plaintiffs would have collected the same rent for the duration of these contracts had the HSTPA not been enacted.

Moreover, prior versions of RSL barred uncontrolled increases of preferential rents until 2003, so this change was not outside of the realm of reasonable expectations of the property owners. With the passage of the HSTPA, the terms of the amendments have been incorporated into all rent-stabilized lease renewals since its enactment on June 14, 2019, and thus BRI and G-Max Plaintiffs fail to state a Contract Clause claim with respect to such leases. *See Traher*, 432

---

[42] G-Max Plaintiffs do not dispute that the Contract Clause applies only to impairments of existing contracts at the time the HSTPA was enacted. (*See* G-Max Pls.' Mem. at 65 n.58.)

F. Supp. 3d at 539 ("[T]he Supreme Court limited the reach of the Contracts Clause by holding that it did not limit the ability of the government to regulate the terms of *future* contracts." (citing *Ogden*, 25 U.S. 213)).  BRI and G-Max Plaintiffs allege that these preferential rents will be charged in perpetuity or are locked into place going forward.  (BRI Compl. ¶ 45; G-Max Compl. ¶¶ 131, 135, 138.)  But such assertions are incorrect as rents may be revoked when the current tenant vacates a rent-regulated apartment.  *See* HSTPA, Part E, § 1.

Further, any as-applied Contract Clause claims against BRI and G-Max Defendants fails because the HSTPA does not substantially impair new leases due to the fact that no reasonable expectations have been disrupted.  It is "well established that [New York] City's rent control laws do not unconstitutionally impair contract rights."  *Brontel, Ltd. v. City of New York*, 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983) (citing *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921)); *Tonwal Realties, Inc. v. Beame*, 406 F. Supp. 363, 365 (S.D.N.Y. 1976) (same); *Israel v. City Rent & Rehab. Admin. of N.Y.*, 285 F. Supp. 908, 910 (S.D.N.Y. 1968) (holding that the constitutionality of rent control statute is well settled and does not violate the impairment of contract rights); *see also Troy Ltd. v. Renna*, 727 F.2d 287, 298–99 (3d Cir. 1984) (holding that the rental housing law did not violate the Contract Clause because courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure and noting that it was doubtful that any impairment of a contractual relationship had occurred); *Kargman v. Sullivan*, 582 F.2d 131, 134–35 (1st Cir. 1978) (finding no Control Clause violation for Boston's rent control law).

A law only violates the Contract Clause when it "operate[s] as a substantial impairment of a contractual relationship" and is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018)

(citation and quotation marks omitted).  In the justification for the stand-alone bill regarding

preferential rents that is incorporated into the HSTPA, the State Senate explained that the 2003

amendment permitting rent increases to the regulated maximum

> put hundreds of thousands of tenants at risk of sudden and unexpected substantial
> rent increases. All too many . . . have been unable to pay the higher rents and been
> forced to leave their homes. Countless tenants have also been discouraged from
> raising concerns about conditions in their apartments and/or buildings because of
> fears this could lead to the termination of their preferential rents.

Committee Report; *see also* Assembly Bill A08281, Chamber Tr. at 74, 76 (stating that, because

"the landlords have the right today to go back to the legal rent . . . no tenant is going to want to

ever make any demands of the landlord" and that landlords were "jacking up the rents to displace

longtime residents").  In reviewing a Contract Clause claim challenging an economic or social

regulation, like the HSTPA, "courts properly defer to legislative judgment as to the necessity and

reasonableness of a particular measure."  *Energy Rsrvs.*, 459 U.S. at 413 (citation omitted).

Courts should not "second-guess the [legislature's] determinations that these are the most

appropriate ways of dealing with the problem."  *Keystone*, 480 U.S. at 506 (rejecting Contract

Clause claim); *cf. W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 01-CV-1345, 2001

WL 664628, at *10 (S.D.N.Y. June 12, 2001) (explaining in the context of an equal protection

claim that the court need not-and should-not decide whether the legislature's decision to pass

RSL was correct), *aff'd*, 31 F. App'x 19 (2d Cir. 2002).  Under prior RSL, owners were able to

increase preferential rents by a greater percentage than the amount approved by the Rent

Stabilization Board, as long as it did not exceed the maximum legal rent.  *See* HSTPA, Part E,

§ 1 (modifying N.Y.C. Admin. Code § 26-511(c)(14)).  By limiting such increases to the

approved percentage, the HSTPA merely restores the law as it existed prior to 2003.  *See*

*Rosenshein v. Heyman*, 854 N.Y.S.2d 835, 835–36 (App. Div. 2007) (noting that RSL were

amended in 2003 to allow owners to revoke preferential rents upon renewal).  The State Senate

in its enactment of the HSTPA sought to remedy the issue of preferential rents, and this Court

must defer to the legislative judgment regarding the necessity and reasonableness of taking this

measure.  *See U.S. Tr. Co.*, 431 U.S. at 22–23 ("As is customary in reviewing economic and

social regulation, however, courts properly defer to legislative judgment as to the necessity and

reasonableness of a particular measure.").  It is not for this Court to "weigh the wisdom of

legislation nor to decide whether the policy which it expresses offends the public welfare."  *Day-*

*Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952); *see also Pa. Coal*, 260 U.S. at 413

("The greatest weight is given to the judgement of the legislature[.]").[43]

      The Court finds that BRI and G-Max Plaintiffs have not pled sufficient facts to

demonstrate that the impairment by the HSTPA is substantial.  BRI and G-Max Plaintiffs are

"involved in a heavily-regulated industry—rental of residential property in New York City—and

cannot claim surprise that [their contractual] relationships with certain tenants are affected by

governmental action."  *Kraebel*, 959 F.2d at 403; *see also Energy Rsrvs.*, 459 U.S. at 413–14

(holding that the regulation did not substantially impair a contract because "supervision of the

industry was extensive and intrusive"); *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 54

(D. Conn. 2013) ("Where, as here, the industry has been heavily regulated, and regulation of

contracts is therefore foreseeable, a party's ability to prevail on its Contracts Clause challenge is

greatly diminished.").  The HSTPA has not substantially impaired any contracts because no

---

[43] BRI Plaintiffs assert that "the [S]tate, through its legislation, does become the 'silent' party [to a contract] herein."  (BRI Pls.' Mem. at 61.)  While perhaps rhetorically pleasing, the assertion lacks factual and legal support.

reasonable expectations regarding rent-stabilized housing have been disrupted.[44]  When BRI and

G-Max Plaintiffs "purchased into an enterprise already regulated in the particular [manner] to

which [they] now object[], [they] purchased subject to further legislation upon the same topic."

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940).  Accordingly, BRI

and G-Max Plaintiffs' Contract Clause claims are dismissed.

### III. Conclusion

For the foregoing reasons, BRI Defendants, G-Max Defendants, CVH, and T&N Motions

To Dismiss are granted in their entirety.  The Clerk of Court is respectfully directed to terminate

the pending Motions, (Dkt. Nos. 60, 62, Case No. 19-CV-11285; Dkt. Nos. 67, 70, 72, Case No.

20-CV-364.)  Because this is the first adjudication of BRI and G-Max Plaintiffs claims on the

merits, the dismissal is without prejudice and with leave to amend the BRI and G-Max

Complaints within 30 days of the date of this Order.

SO ORDERED.

Dated: September 14, 2021
     White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[44] BRI Plaintiffs argue that they are "not complaining about the rent regulations, *per se*, but about the fact that the HSTPA just "goes too far."  (BRI Pls.' Mem. at 60.)  But this terminology is used in a takings, not Contract Clause, analysis.  Further, BRI Plaintiffs offer no legal support for this argument, and, as such, the Court does not address it.